**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**UTICA MUTUAL INSURANCE**
**COMPANY,**

                      **Plaintiff,**

              **v.**

**CLEARWATER INSURANCE**
**COMPANY,**

                    **Defendant.**

**6:13-cv-1178**
**(GLS/TWD)**

_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **FOR THE PLAINTIFF:** | |
| Cooper, Erving Law Firm | PHILIP G. STECK, ESQ. |
| 39 North Pearl Street | |
| 4th Floor | |
| Albany, NY 12207 | |
| | |
| Sidley, Austin Law Firm | WILLIAM M. SNEED, ESQ. |
| One South Dearborn Street | DANIEL R. THIES, ESQ. |
| Chicago, IL 60603 | THOMAS D. CUNNINGHAM, ESQ. |
| | |
| **FOR THE DEFENDANT:** | |
| Chadbourne, Parke Law Firm | DAVID M. RAIM, ESQ. |
| 1200 New Hampshire Avenue, NW | |
| Washington, DC 20036 | |
| | |
| 1301 Avenue of the Americas | JOHN F. FINNEGAN, ESQ. |
| New York, NY 10019 | |

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff Utica Mutual Insurance Company commenced this diversity action against defendant Clearwater Insurance Company, alleging breach of contract claims and seeking declaratory relief and damages. (*See generally* Compl., Dkt. No. 1.) Clearwater counterclaims for breach of contract and seeks damages to recoup the payments already provided to Utica. (Dkt. No. 17 ¶¶ 66-70.) Pending are Utica's motion for summary judgment and Clearwater's cross-motion for partial summary judgment. (Dkt. Nos. 64, 65.) For the reasons that follow, Utica's motion is granted and Clearwater's cross-motion is denied.

## II. Background

### A. Facts[1]

Goulds Pumps, Inc. manufactures, distributes, and sells pump products. (Dkt. No. 80, Attach. 58 at 3.) Utica, the insurer, issued primary and umbrella general insurance policies to Goulds, the policyholder, for the relevant years of 1978 to 1981. (Pl.'s Statement of Material Facts (SMF)

---

[1] Unless otherwise noted, the facts are not in dispute.

¶¶ 1-2, Dkt. No. 64, Attach. 3, Dkt. No. 92, Attach. 1.)  Clearwater, the reinsurer, agreed to issue reinsurance certificates for all four of Utica's umbrella policies.[2]  (*Id.* ¶ 3.)  Specifically, Clearwater directly reinsured the umbrella policies issued for the calendar years of 1978 and 1979 (hereinafter "Clearwater Certificates").[3]  (*Id.*)  Clearwater also reinsured a portion of Utica's umbrella policies issued for the calendar years of 1979, 1980, and 1981 (hereinafter "TPFC Memoranda") as a member of a pool of reinsurers managed by Towers, Perrin, Forester & Crosby, Inc. (TPFC). (*Id.*; Def.'s SMF ¶ 3, Dkt. No. 84, Attach. 2.)

Both the Clearwater Certificates and the TPFC Memoranda included liability clauses.  (Pl.'s SMF ¶¶ 18-19, 48-49.)  The Clearwater Certificates provided that Clearwater's liability "shall follow [Utica's] liability in accordance with the terms and conditions of the policy reinsured hereunder."  (*Id.* ¶ 18; *see* Dkt. No. 64, Attach. 8 at 3 ¶ 1, Attach. 9 at 3 ¶ 1.)  Under its claims clause, the Clearwater Certificates stated that "[u]pon receipt by [Clearwater] o[f] satisfactory evidence of payment of a

---

[2]  The court provides a brief background on reinsurance in its November 20, 2014 Memorandum-Decision and Order.  (Dkt. No. 54 at 2-3.)

[3]  Clearwater was previously known as Skandia America Reinsurance Corporation. (*See generally* Dkt. No. 64, Attachs. 8-9.)

loss for which reinsurance is provided [Clearwater] shall promptly reimburse [Utica] for its share of the loss and loss expense." (Pl.'s SMF ¶ 48.) Loss expense is defined as "all expenses incurred in the investigation, adjustment, settlement or litigation of claims, awards or judgments." (*Id.*) The TPFC Memoranda "Loss Clause" stated that "[a]ll claims settlements when authorized by [TPFC] shall be binding on [Clearwater] which shall be bound to pay [its] proportion of such settlements" and Clearwater must also pay its "proportion of expenses . . . incurred by [Utica] in the investigation and settlement of claims or suits." (*Id.* ¶¶ 19, 49; *see* Dkt. No. 64, Attach. 10 at 3.)

Beginning in 1997, over 140,000 claims had been filed against Goulds alleging asbestos-related bodily injuries attributed to Goulds' pump products. (Dkt. No. 80, Attach. 58 at 3, Attach. 75 at 6.) In accordance with its primary policy, Utica defended and indemnified Goulds on these claims. (Dkt. No. 80, Attach. 33 at 3.) Two lawsuits subsequently arose regarding Utica's coverage obligations. (Pl.'s SMF ¶¶ 4-5.) In the first, commenced in California state court, Goulds impleaded Utica as a defendant in February 2003 alleging that Utica did not fulfill its coverage obligations under its primary policies. (*Id.* ¶ 4.) In the second, Utica

commenced an action in October 2003 in New York state court against Goulds seeking a declaration of its duties under the same primary policies. (*Id.* ¶ 5.)

In both cases, the parties disputed whether New York or California law applied, how Goulds' asbestos claims should be allocated among the insurance policies, and whether Utica's primary policies had aggregate policy limits.  (*Id.* ¶ 6.)  If New York law applied, the asbestos claims would be handled pro rata, meaning that insurance liability on the asbestos claims would be distributed among all the years of coverage triggered by the claims.  (*Id.* ¶ 6 n.1.)  Utica advocated for the application of New York law.  (*Id.* ¶ 7.)  If California law applied, the claims would be handled under an all sums allocation, allowing the policyholder to choose a trigger year, and the policies for that year would be liable for all the losses.  (*Id.* ¶ 6 n.1.) Goulds advocated for the application of California law, which would have permitted it to attribute its losses to a policy year alleged not to have an aggregate limit.  (Dkt. No. 80, Attach. 75 at 2.)  Under a reservation of rights, Utica indemnified Goulds for more than its pro rata share, however, Utica maintained that Goulds should reimburse it for these excess payments.  (Pl.'s SMF ¶¶ 7-10; Dkt. No. 80, Attach. 33 at 3-4.)

Regarding the aggregate limit issue, Goulds asserted that the primary policies did not contain any limit.  (Def.'s SMF ¶¶ 84-86.)  Thus, Utica would be responsible for a potentially unlimited number of claims capped only by a per occurrence limit.  (Pl.'s SMF ¶ 35.)  Utica, on the other hand, maintained that each of its primary policies from 1978 to 1982 had a $500,000 aggregate limit for bodily injury from products liability.  (*Id.* ¶¶ 22-25.)  Utica cited documentary and testimonial evidence to support its position.  (*Id.* ¶¶ 25-32.)  Utica, however, feared that the California court would agree with Goulds, and it could be liable for an unlimited amount, possibly rendering the company bankrupt.  (*Id.* ¶ 36; Def.'s SMF ¶ 83.)  Based on this uncertain liability, Utica determined that settlement was the best course of action.  (Pl.'s SMF ¶ 37.)

Utica and Goulds began settlement negotiations in 2004 and arrived at a final settlement in February 2007.  (*Id.* ¶¶ 11-12; *see generally* Dkt. No. 64, Attach. 42.)  Under the terms of the settlement, the parties agreed



(Pl.'s SMF ¶ 13.)



(*Id.* ¶ 14(c).)

(*Id.* ¶ 14(a).)

(*Id.* ¶ 81.)

(*Id.* ¶ 14(a); Def.'s SMF ¶ 71.)

(Pl.'s SMF ¶ 14(a).) Finally, the parties stipulated that

(Pl.'s SMF ¶ 14(b); Def.'s SMF ¶ 77.) According to Utica,

(Pl.'s SMF ¶ 14(b).) Although Clearwater reinsured Utica's umbrella policies,

(*Id.* ¶¶ 42, 44.)

Richard Creedon, Utica's General Counsel at the time of settlement,

and Kristen Martin, Utica's associate claims attorney at the time of settlement, testified that Utica did not consider or attempt to maximize its reinsurance recovery during the settlement negotiations.  (Pl.'s SMF ¶¶ 38-39; Def.'s SMF ¶¶ 60, 62.)  According to Creedon, ██████████████

██████████████████████████████████████████████

██████████████████████████████████████  (Pl.'s SMF ¶ 39.)

During and after its settlement negotiations with Utica, Goulds continued its California coverage litigation against an additional insurer. (Pl.'s SMF ¶ 16.)  In January 2014, as part of its decision regarding the other insurer's coverage obligation, the California state court held that Utica's primary policies each contained a $500,000 aggregate limit.  (*Id.*; Dkt. No. 64, Attach. 14 at 5-11.)

Pursuant to the settlement agreement, ██████████████████

████████████████████████  (Pl.'s SMF ¶ 40; Def.'s SMF ¶ 40.)  Starting in 2012, Utica began to bill Clearwater for indemnity and defense costs from its umbrella policies issued to Goulds.  (Compl. ¶ 23; Dkt. No. 17 ¶ 23.)  These billings were not modified by ████████

████████████ but followed the original terms of the Clearwater

8

Certificates and the TPFC Memoranda.  (Pl.'s SMF ¶¶ 42, 44.)  Clearwater paid Utica $993,159 in November 2012, but has made no other payments. (Dkt. No. 17 ¶ 24.)  According to Utica, as of April 2015, Clearwater owes it $5.63 million, representing the amount in unpaid billings.  (Pl.'s SMF ¶ 17.)

## B.   Procedural History

Utica commenced this diversity action on September 20, 2013.  (*See generally* Compl.)  Utica alleged that Clearwater breached their reinsurance agreements pursuant to the Clearwater Certificates and the TPFC Memoranda and sought a declaratory judgment and damages.  (*Id.*) Clearwater answered and asserted a counterclaim for breach of the reinsurance agreements and sought reimbursement of $993,159, the amount Clearwater paid for Utica's first billing.  (Dkt. No. 17 ¶¶ 66-70.) The case was referred to mandatory mediation, but did not settle.  (Dkt. Nos. 21, 30.)

Thereafter, Clearwater filed a motion for partial summary judgment seeking a declaration that its liability under the Clearwater Certificates was capped at $5 million and $2.5 million.  (Dkt. No. 35.)  This court granted Clearwater's motion and ordered that Clearwater's liability, if any, under the Clearwater Certificates could not exceed those amounts.  (Dkt. No. 54.)

9

Utica then filed the now-pending motion for summary judgment seeking judgment on its claims and Clearwater's counterclaim.  (Dkt. No. 64.) Clearwater also filed a motion for partial summary judgment seeking a declaration that Clearwater is not liable for any of the costs that Utica incurred to defend Goulds' asbestos claims.  (Dkt. No. 65.)  For the reasons that follow, the court grants Utica's motion and denies Clearwater's.

### III.  Standard of Review

The standard of review pursuant to Fed. R. Civ. P. 56 is well established and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

### IV.  Discussion[4]

Utica argues that Clearwater is bound by its settlement with Goulds under the follow-the-fortunes or follow-the-settlement doctrine.  (Dkt. No. 64, Attach. 2 at 8-11.)  Clearwater contends that the doctrine does not

---

[4] In its November 20, 2014 Memorandum-Decision and Order, this court held that New York law governs this dispute.  (Dkt. No. 54 at 6 n.3.)

10

apply because Utica settled unreasonably or in bad faith.[5]  (Dkt. No. 80,

Attach. 1 at 33-39.)  Alternatively, if the doctrine applies, Clearwater argues

that Utica billed it for unrecoverable amounts, including defense costs, for

which it seeks summary judgment.  (*Id.* at 41-43; Dkt. No. 65, Attach. 9 at

10-21.)

Under the follow-the-settlements doctrine, a reinsurer must "accept

the cedent's good faith decisions on all things concerning the underlying

insurance terms and claims against the underlying insured: coverage,

tactics, lawsuits, compromise, resistance or capitulation," as well as

settlements and settlement allocation.  *N. River Ins. Co. v. Ace Am. Reins.

Co.* (*Ace*), 361 F.3d 134, 139-40 (2d Cir. 2004) (internal quotation marks

and citations omitted); *see Travelers Cas. & Sur. Co. v. Gerling Glob.

Reins. Corp. of Am.* (*Travelers*), 419 F.3d 181, 190 (2d Cir. 2005); *N. River

Ins. Co. v. CIGNA Reins. Co.* (*CIGNA*), 52 F.3d 1194, 1205-06 (3d Cir.

---

[5]  At the outset, Clearwater argues that the Clearwater Certificates and the TPFC
Memoranda do not contain follow-the-fortunes clauses.  (Dkt. No. 84 at 28-30.)  This position
is inconsistent with nearly identical reinsurance language found to incorporate follow-the-
fortunes obligations.  *See N. River Ins. Co. v. Ace Am. Reins. Co.*, 361 F.3d 134, 137 (2d Cir.
2004).  Clearwater also argues that it is not obligated to reinsure the settlement because Utica
never sought authorization under the TPFC Memoranda.  (Dkt. No. 84 at 30.)  TPFC, however,
could not authorize Utica's settlement with Goulds because TPFC no longer managed this
pool of reinsurers.  (Pl.'s SMF ¶¶ 20-21.)  Thus, Utica is excused from performing this
condition.  *See generally Kel Kim Corp. v. Cent. Mkts., Inc.*, 70 N.Y.2d 900, 902 (1987).

1995).  The follow-the-settlement doctrine serves to promote the "long

established" goals of "maximum coverage and settlement" and to avoid "a

proliferation of litigation" between the cedent and the reinsurer.  *CIGNA*, 52

F.3d at 1206 (internal quotation marks and citation omitted); *see Ace*, 361

F.3d at 140.  Provided the cedent settles "in good faith, reasonabl[y], and

within the applicable policies," the reinsurer is bound by the settlement and

cannot relitigate the underlying coverage disputes.  *Travelers*, 419 F.3d at

190 (internal quotation marks and citation omitted).

## A.    Good Faith

Clearwater argues that Utica settled in bad faith because Utica

intentionally shifted liability from its primary policies, which did not have

reinsurance coverage, to its umbrella policies, which had such coverage.

(Dkt. No. 80, Attach.1 at 35.)  In doing so, Clearwater contends that Utica

put its own interests as the cedent above Clearwater's interests as the

reinsurer.  (*Id.* at 36.)

Generally, "the duty of good faith requires the reinsured to align its

interests with those of the reinsurer."  *CIGNA*, 52 F.3d at 1216.  These

interests, however, need not be "'perfectly aligned to trigger a follow-the-

settlements clause.'"  *Travelers*, 419 F.3d at 193 (quoting *Am. Emp'rs Ins.*

*Co. v. Swiss Reins. Am. Corp.*, 413 F.3d 129, 136 (1st Cir. 2005)).  The

reinsurer bears the burden to prove the cedent's bad faith and must

present an "'extraordinary showing of a disingenuous or dishonest failure.'"

*Id.* at 191 (quoting *CIGNA*, 52 F.3d at 1216) (alteration omitted).  Bad faith

requires that the cedent acted, at a minimum, with gross negligence or

recklessness.  *See Unigard Sec. Ins. Co., Inc. v. N. River Ins. Co.*, 4 F.3d

1049, 1069 (2d Cir. 1993).

Here, Clearwater has not produced any evidence that Utica's

settlement allocation was made in bad faith.  Much to the contrary, Utica's

former General Counsel and claims attorney testified that Utica did not

calculate the impact of its reinsurance recovery into its settlement

agreement with Goulds.  (Pl.'s SMF ¶¶ 38-39.)  Although Utica's board was

presented with memoranda explaining the reinsurance impact of the

settlement terms, Dkt. No. 80, Attachs. 62, 67, 75, 116, consideration of

that impact alone does not amount to gross negligence or recklessness.

Rather, a cedent has no obligation to strictly align its interests with the

reinsurer.  *See Travelers*, 419 F.3d at 193; *see also U.S. Fid. & Guar. Co.*

*v. Am. Reins. Co.*, 20 N.Y.3d 407, 420 (2013) (noting that the cedent has

no duty to put the reinsurer's interest above its own).  In fact, a cedent "is

surely not required to choose the [settlement] allocation that *minimizes* its reinsurance recovery to avoid a finding of bad faith." *Travelers*, 419 F.3d at 193. Utica's conduct certainly does not rise to the level of a "disingenuous or dishonest failure," and Clearwater's attempt to raise a question of fact does not approach the requisite "extraordinary showing." *Id.* at 191 (internal quotation marks and citation omitted). Accordingly, the court must consider whether the settlement was reasonable.

## B. <u>Reasonableness</u>

Utica asserts that its settlement with Goulds was reasonable in two respects. (Dkt. No. 64, Attach. 2 at 11-18.) First, Utica argues that it reasonably negotiated that ███████████████████████████████ ███ (*Id.* at 11-16.) Second, Utica maintains that its payment to Goulds under the umbrella policies was reasonable because the primary policies had been exhausted. (*Id.* at 17.) In opposition, Clearwater reiterates its argument that Utica unreasonably shifted all liability from the primary policies to the umbrella policies to maximize reinsurance recovery. (Dkt. No. 80, Attach. 1 at 33-35, 37-38.)

Deference to the follow-the-settlement doctrine also requires that the cedent reasonably settle. *See Travelers*, 419 F.3d at 194. The New York

State Court of Appeals has held that "objective reasonableness should ordinarily determine the validity of a [settlement] allocation." *U.S. Fid. & Guar.*, 20 N.Y.3d at 420. The court recognized that "[r]easonableness does not imply disregard of a cedent's own interests" as "[c]edents are not the fiduciaries of reinsurers, and are not required to put the interests of reinsurers ahead of their own." *Id*. Accordingly, a settlement allocation is reasonable if the cedent and the insured could have arrived at the allocation without the possibility of reinsurance recovery. *See id.*

Here, Utica's settlement decision to ███████████████████ ████████████████████████████████ was reasonable because sufficient evidence supported its position. Although some primary policies lacked an explicit aggregate limit, Utica contended that this was a "scrivener's error" which left the policies ambiguous. (Pl.'s SMF ¶ 31; Dkt. No. 80, Attach. 75 at 1.) Utica then cited extrinsic evidence to support that the primary policies had aggregate limits of $500,000.[6] (Pl.'s SMF ¶¶ 25-30.) This evidence included testimony from: (1) Gould's former General Counsel who stated that a Utica broker informed him that the primary

---

[6] Utica relied on New York and California law that would have considered extrinsic evidence to interpret the contract in light of the scrivener's error. (Dkt. No. 80, Attach. 57 at 11-12.)

policies had aggregate limits; (2) the Utica broker responsible for the Goulds account who noted that the 1980 primary policy had an aggregate limit; and (3) two Utica underwriters and an employee responsible for rating the Goulds policies from 1978 to 1982 who explained that it was Utica's practice for all insurance policies to have aggregate limits.  (*Id.* ¶¶ 26-30.) Additionally, Utica cited documentary evidence that supported its position including: (1) handwritten markups on the 1980 and 1981 primary policies noting a $500,000 aggregate limit; (2) letters from Utica's broker to Goulds that the 1979 and 1980 primary policies contained aggregate limits of $500,000; and (3) certificates of insurance that listed a $500,000 aggregate limit for the 1978, 1980, and 1981 primary policies.  (*Id.* ¶ 25.) Accordingly, Utica's settlement decision to ████████████████████ ████████████████████████████ was reasonable in light of the ambiguous contract as well as the documentary and testimonial evidence.

Furthermore, Utica was reasonable to negotiate ███████████████ ██████████████████████████ because it reduced Utica's overall liability. If the New York or California court held that the primary policies did not contain an aggregate limit, Utica would be responsible for an unlimited number of claims capped only by the per occurrence limit.  (*Id.* ¶ 35.)

Utica's in-house counsel, Bernard Turi, testified that ███████████

████████████████████████████████████████████████████████████

███████████████████████████████████ (*Id.* ¶ 36.)

Additionally, Utica's aggregate limit position was later confirmed by

the California court.  (Pl.'s SMF ¶ 16.)  Although reasonableness is judged

from the time a settlement is made, *see Commercial Union Ins. Co. v.*

*Seven Provinces Ins. Co., Ltd.*, 9 F. Supp. 2d 49, 66 (D. Mass. 1998), the

California court's determination bolsters Utica's position that its settlement

decision was legitimate.

Finally, Clearwater misconstrues the settlement and contends that

Utica was unreasonable because it did not allocate any liability to its

primary policies.  (Dkt. No. 80, Attach. 1 at 37.)  This is contradicted by the

evidence as Utica paid Goulds up to the stipulated aggregate limit in each

primary policy.  (Pl.'s SMF ¶ 40; Def.'s SMF ¶ 40.)  After the primary

policies had been exhausted, Utica then paid Goulds under its umbrella

policies.  (Dkt. No. 17 ¶ 23.)  Clearwater has failed to raise any triable

issue of fact that Utica acted unreasonably in its settlement decision to

stipulate that the primary policies contained an aggregate limit.  Thus, the

follow-the-settlement doctrine applies.

**C.    Coverage Within Reinsurance Policy Terms**

Clearwater opposes certain billings by Utica as unrecoverable costs under the Clearwater Certificates and the TPFC Memoranda. (Dkt. No. 80, Attach. 1 at 41-43.) Specifically, Clearwater refutes the billings of orphan share payments,[7] declaratory judgment expenses, and defense costs. (*Id.*) Utica maintains that the reinsurance certificates covered all of these billings, and under the follow-the-settlements doctrine, Clearwater must indemnify it. (Dkt. No. 64, Attach. 2 at 17-22.)

The reinsurer is liable to indemnify the cedent for losses covered by the reinsurance policy. *See Ace*, 361 F.3d at 141. As such, "the reinsurer retains the right to question whether the reinsured's liability stems from an unreinsured loss." *Travelers*, 419 F.3d at 193-94 (internal quotation marks and citation omitted). "A loss is unreinsured if it was not contemplated by the original insurance policy or if it was expressly excluded by terms of the certificate of reinsurance." *Id.* at 194 (internal quotation marks and citation omitted). The reinsurer must indemnify the cedent "where the cedent's good-faith payment is at least arguably within the scope of the insurance

_____

[7] Utica identifies these costs as payments made in excess of its pro rata share. (Dkt. No. 64, Attach. 2 at 18-19.)

coverage that was reinsured."  *Mentor Ins. Co. (U.K.) Ltd. v. Norges Brannkasse*, 996 F.2d 506, 517 (2d Cir. 1993); *Christiania Gen Ins. Corp. v. Great Am. Ins. Co.*, 979 F.2d 268, 280 (2d Cir. 1992) (noting that "a reinsurer is required to indemnify for payments reasonably within the terms of the original policy, even if technically not covered by it").

All of the reinsurance certificates included liability clauses which set the indemnification terms.  Under the Clearwater Certificates, Clearwater was obligated to "promptly reimburse [Utica] for its share of the loss and loss expense."  (Pl.'s SMF ¶ 48.)  "Loss expense" was defined as "all expenses incurred in the investigation, adjustment, settlement or litigation of claims, awards or judgments."  (*Id.*)  The TPFC Memoranda stated that Clearwater was liable for its "proportion of expenses . . . incurred by [Utica] in the investigation and settlement of claims or suits."  (*Id.* ¶ 49.)

1.    *Orphan Share Amounts or Payments in Excess of Pro Rata Share*

Clearwater argues that Utica cannot recover its orphan share payments to Goulds.  (Dkt. No. 80, Attach. 1 at 41-42.)  Clearwater contends that Utica ████████████████████████████████████

████████████████████████████████████████████████████████

19

████████████████████████████████████████ (*Id.*)  Utica asserts that

billings for ████████████████████████████████████

████████████████████████████████████████ and

Clearwater cannot second guess this settlement decision.  (Dkt. No. 64,

Attach. 2 at 18-19.)

Under the clear language of the reinsurance certificates, Clearwater

must indemnify Utica for its settlement expenses.  (Pl.'s SMF ¶¶ 48-49.)

As part of the settlement with Goulds, Utica negotiated that ████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████ (*Id.* ¶ 14(a).)  Because the

billing for ████████████████████████ was undisputedly part of

Utica's settlement agreement and the follow-the-settlements doctrine

applies, Clearwater must indemnify Utica.  *See Ace*, 361 F.3d at 141.

2.    *Declaratory Judgment Expenses*

Clearwater maintains that the billings for declaratory judgment

expenses are unrecoverable because Utica has not demonstrated that they

were incurred to resolve the coverage dispute with Goulds.  (Dkt. No. 80,

Attach. 1 at 42.)  Clearwater asserts there is a factual question regarding

whether Utica billed it for unrecoverable amounts, namely, expenses

relating to Goulds' recovery from its excess insurers.  (*Id.* at 42.)

Clearwater relies on the affidavit of Turi, Utica's in-house counsel, which

████████████████████████████████████████████████████████████████

████████████████████████████ (*Id.*; Dkt. No. 80, Attach. 91.)  Utica

counters and argues that all of the post-settlement declaratory judgment

expenses relate to ongoing coverage disputes about Utica's obligations

under the policies it issued to Goulds.[8]  (Dkt. No. 92 at 17-18.)

Clearwater's reliance on Turi's affidavit is insufficient to create a

material question of fact.  Although Turi acknowledged that ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ (Pl.'s SMF ¶ 74.)  As

such, there is no outstanding billing for those expenses and a reasonable

jury could not find otherwise.  (*Id.*); *see Dister v. Continental Grp., Inc.*, 859

F.2d 1108, 1114 (2d Cir. 1988) (explaining that for a fact to defeat

---

[8]  Specifically, Utica states that the post-settlement declaratory judgment expenses include fees to defend a crossclaim by another Goulds' insurer in the California litigation, costs for arbitration between Utica and Goulds to interpret the terms of the settlement agreement, fees to defend a suit against Utica as Goulds' insurer under the Louisiana Direct Action statute, and fees for Utica's consultation with its coverage counsel.  (Dkt. No. 92, Attach. 2 ¶ 4.)

summary judgment it must "allow a reasonable jury to return a verdict for the nonmoving party").  Clearwater does not dispute the reimbursement and does not specifically contest the billings of any other declaratory judgment expense.  More to the point, two of Clearwater's own claims handlers testified that they understood Utica's declaratory judgment expenses to be "loss expense[s]" under the 1978 and 1979 Certificates.  (Pl.'s SMF ¶¶ 50-51.)  Therefore, Clearwater's challenge to the billings of declaratory judgment expenses must fail.  *See Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 98 (2d Cir. 2003) (noting "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact") (internal quotation marks and citation omitted).

      3.   *Defense Costs*

Clearwater seeks partial summary judgment declaring that it does not need to reimburse Utica for defense costs because, under the umbrella policies, Utica had no obligation to pay these costs incurred by Goulds.  (Dkt. No. 65, Attach. 9 at 10-21.)  Specifically, Clearwater asserts that the umbrella policies only fill coverage gaps, and because the primary policies covered defense costs, there was no obligation under the umbrella policies to pay for these costs.  (*Id.* at 12-13.)  Utica, on the other hand, maintains

that it is at least arguable that the umbrella policies required Utica to pay defense costs, and, therefore, Clearwater must defer to its position. (Dkt. No. 79 at 6-20.)

Utica's umbrella policies issued to Goulds contained a provision regarding defense costs. (Def.'s Supp. SMF ¶ 6, Dkt. No. 65, Attach. 10.) The provision provided, in part, that Utica would defend any suit "not covered by [Utica's primary] policies." (*Id.*; Dkt. No. 65, Attach. 6 at 5.) Utica's position was that its primary policies had been exhausted and, therefore, Goulds no longer had defense cost coverage, which triggered coverage from the umbrella policies. (Dkt. No. 79 at 9-10.) Clearwater, on the other hand, makes much about the fact that Utica's primary policies covered defense costs and, thus, relieved Utica from any defense cost obligation under its umbrella policies. (Dkt. No. 65, Attach. 9 at 12-13.)

Whether the exhaustion of Utica's primary policies satisfies the requirement that the policyholder be "not covered" for umbrella coverage purposes is immaterial. The standard for payment by the reinsurer is only whether the cedent's payment to the policyholder "is at least arguably within the scope of the insurance coverage." *Mentor Ins. Co. (U.K.)*, 996 F.2d at 517. Here, Utica cites caselaw from California, New York, and

other jurisdictions that support its interpretation of its umbrella policy coverage obligations. (Dkt. No. 79 at 11-14.) Additionally, Utica presents testimony from a Clearwater claims handler and underwriter that agree once a policy had been exhausted it no longer covered a claim. (*Id.* at 19-20; Pl.'s Supp. SMF ¶¶ 20-21, Dkt. No. 79, Attach. 1.) Finally, Utica cites testimony from its own underwriters and in-house counsel explaining that Utica had always interpreted its umbrella policies to provide defense coverage. (Dkt. No. 79 at 18-19; Pl.'s Supp. SMF ¶¶ 3-5.)

Clearwater solely relies on the terms of the umbrella policies and fails to present any other evidence that defense costs are "clearly beyond the scope of the original policy." *Christiania Gen. Ins. Corp.*, 979 F.2d at 280. Accordingly, Clearwater is not entitled to summary judgment on this billing. Furthermore, because the follow-the-settlement doctrine applies and Utica's billings are within the scope of coverage, Utica is also entitled to summary judgment on Clearwater's breach of contract counterclaim. At present, the amount of Utica's money judgment is uncertain, and the issue of damages remains outstanding to be later addressed by the court.

## V. <u>Conclusion</u>

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Utica's motion for summary judgment (Dkt. No. 64) is **GRANTED**; and it is further

**ORDERED** that Clearwater's motion for partial summary judgment (Dkt. No. 65) is **DENIED**; and it is further

**ORDERED** that Clearwater's counterclaim (Dkt. No. 17 ¶¶ 66-70) is **DISMISSED**; and it is further

**ORDERED** that the Clerk enter judgment in favor of Utica on its billings to Clearwater under the Clearwater Certificates and TPFC Memoranda; and it is further

**ORDERED** that the parties shall confer and advise the court within fourteen (14) days about outstanding issues regarding damages; and it is further

**ORDERED** that the Clerk issue this Memorandum-Decision and Order under seal and publicly file a redacted version of the same on the docket; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

January 20, 2016
Albany, New York

Gary L. Sharpe
U.S. District Judge