## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

UTICA MUTUAL INSURANCE COMPANY, :

                                      :

                      Plaintiff,      :      No. 6:13-CV-01178 (GLS/TWD)

      v.                         :

                                        :

CLEARWATER INSURANCE COMPANY,  :

                                        :

                    Defendant.      :

-----------------------------------------------------------x

## <u>PLAINTIFF UTICA MUTUAL INSURANCE COMPANY'S TRIAL BRIEF</u>

SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

WEBBER & THIES PC
202 Lincoln Square
Urbana, IL 61803
(217) 365-5327

HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1500

COOPER ERVING & SAVAGE LLP
39 North Pearl Street
Albany, NY 12207
(518) 449-3900

*Attorneys for Plaintiff Utica Mutual Insurance Company*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL SUMMARY ........................................................................................... 3

   A.   The Various Contracts At Issue in This Case ................................... 3

   B.   The Goulds Claims ........................................................................... 5

   C.   The Goulds Coverage Litigation ...................................................... 7

   D.   The Settlement Negotiations and Agreement ................................... 7

   E.   Subsequent Ruling in the Coverage Litigation ................................ 9

   F.   Utica's Reinsurance Bills to Clearwater .......................................... 9

ARGUMENT ......................................................................................................... 10

   I.   The Evidence Plainly Establishes Utica's "Proven Liability"
       to Goulds Under the Umbrella Policies. ......................................... 10

       A.   The Applicable Standard: A Good Faith Settlement ............... 10

       B.   Utica Settled a Covered Risk with Goulds in Good Faith....... 12

           1.   The Evidence Overwhelmingly Establishes Aggregate Limits.................. 12

           2.   The Evidence Will Show that Utica's Position that an Occurrence
              Is "Not Covered By" an Exhausted Policy Was Correct
              and in Good Faith ........................................................ 17

           3.   Utica's Settlement of the "Orphan Shares" Issue
              Was in Good Faith ....................................................... 19

       C.   Clearwater's Other Arguments Fail ...................................... 21

           1.   The Second Circuit's Ruling Precludes Clearwater
              from Disputing that its Clearwater Contracts Pay Expense
              in Addition to Limits .................................................... 21

           2.   The TPFC Memoranda Are Expense-Supplemental and
              Not Capped .................................................................. 21

           3.   Clearwater is Barred From Challenging Payment of Declaratory
              Judgment Costs............................................................. 22

           4.   Clearwater is Obligated to Pay Declaratory Judgment Costs.................. 23

II.   Clearwater Is Not Entitled To Reimbursement for the $993,159 it has Paid. .................. 24

CONCLUSION ........................................................................................................................ 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*In re Actrade Fin. Techs., Ltd.*,
  No. 02-16212(ALG), 2009 WL 2929440 (Bankr. S.D.N.Y. Sept. 3, 2009) ........................ 11

*Allianz Glob. Corp. & Specialty, N.A. v. Sacks*,
  No. 08 CIV. 563 LTS, 2010 WL 3733915 (S.D.N.Y. Sept. 23, 2010) ............................... 16

*Am. Com. Lines LLC v. Water Quality Ins. Syndicate*,
  679 F. App'x 11 (2d Cir. 2017) ............................................................................. 18

*Am. Motorists Ins. Co. v. Trane Co.*,
  544 F. Supp. 669 (W.D. Wis. 1982),
  *aff'd*, 718 F.2d 842 (7th Cir. 1983) ...................................................................... 18

*Bellefonte Reinsurance Co. v. Aetna Cas. & Sur. Co.*,
  903 F.2d 910 (2d Cir. 1990) ................................................................................. 21

*British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*,
  342 F.3d 78 (2d Cir. 2003) ................................................................................... 11

*Cannon Elec. Inc. v. ACE Prop. & Cas. Ins. Co.*,
  No. BC 290354 (Cal. Super. Ct. L.A. Cnty.) .............................................................. 7

*Casey ex rel. Casey v. Ryder Truck Rental, Inc.*,
  No. 00 CV 2856 (CLP), 2005 WL 1150228 (E.D.N.Y. May 16, 2005) ............................. 16

*Chen v. Los Angeles Truck Ctrs., LLC*,
  444 P.3d 727 (Cal. 2019) ..................................................................................... 21

*Com. Union Ins. Co. v. Swiss Reinsurance Am. Corp.*,
  413 F.3d 121 (1st Cir. 2005) ................................................................................. 22

*Conner v. Reeves*,
  103 N.Y. 527 9 N.E. 439 (1886) ............................................................................ 11

*CVS Pharmacy, Inc. v. Press Am., Inc.*,
  377 F. Supp. 3d 359 (S.D.N.Y. 2019) ................................................................. 10, 11

*E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*,
  241 F.3d 154 (2d Cir. 2001) ................................................................................... 7

*Emp'rs Ins. Co. of Wausau v. Am. Re-Insurance Co.*,
  256 F. Supp. 2d 923 (W.D. Wis. 2003) .................................................................... 3

*Gray Mfg. Co. v. Pathe Indus., Inc.*,
  33 A.D.2d 739, 305 N.Y.S.2d 794 (1969),
  *aff'd*, 26 N.Y.2d 1045, 260 N.E.2d 821 (1970) ................................................................ 11

*Guadagno v. Wallack Ader Levithan Assocs.*,
  950 F. Supp. 1258 (S.D.N.Y. 1997) ..................................................................... 22

*H.S. Equities, Inc. v. Hartford Accident & Indem. Co.*,
  661 F.2d 264 (2d Cir. 1981) ............................................................................ 2, 10

*H.S. Equities, Inc. v. Hartford Accident & Indem. Co.*,
  609 F.2d 669 (2d Cir. 1979) ................................................................ 10, 11, 12, 20

*Hartford Accident & Indem. Co. v. Superior Court*,
  23 Cal. App. 4th 1774 (1994) ................................................................................ 18

*Hurtado v. Superior Court*,
  11 Cal.3d 574 (1974) ......................................................................................... 20

*IBM v. Liberty Mut. Ins. Co.*,
  363 F.3d 137 (2d Cir. 2004) ................................................................................ 17

*Investors Ins. Co. of Am. v. Dorinco Reinsurance Co.*,
  736 F. Supp. 1260 (S.D.N.Y.),
  *aff'd*, 917 F.2d 100 (2d Cir. 1990) ...................................................................... 13

*JMP Sec. LLP v. Altair Nanotechnologies Inc.*,
  880 F. Supp. 2d 1029 (N.D. Cal. 2012) .............................................................. 21

*Keller v. United States*,
  58 F.3d 1194 (7th Cir.1995),
  *aff'd* 125 F.3d 844 (2d Cir.1997) ........................................................................ 22

*Morgan Stanley Grp. Inc. v. New England Ins. Co.*,
  225 F.3d 270 (2d Cir. 2000) ................................................................................ 13

*N. River Ins. Co. v. Ace Am. Reinsurance Co.*,
  361 F.3d 134 (2d Cir. 2004) ................................................................................ 11

*Schulman Inv. Co. v. Olin Corp.*,
  514 F. Supp. 572 (S.D.N.Y. 1981) ...................................................................... 18

*Sommer v. Gabor*,
  40 Cal.App.4th 1455 (1995) ................................................................................ 20

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*,
  762 F.3d 165 (2d Cir. 2014) ................................................................................ 23

*State v. Cont'l Ins. Co.*,
   281 P.3d 1000 (Cal. 2012) ....................................................... 7

*Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*,
   73 F.3d 1178 (2d Cir. 1995) .................................................... 18

*Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*,
   779 N.E.2d 167 (N.Y. 2002) .................................................... 17

*U.S. Fire Ins. Co. v. Aspen Bldg. Corp.*,
   367 S.E.2d 478 (Va. 1988) ...................................................... 18

*Unigard Sec. Ins. Co. v. N. River Ins. Co.*,
   4 F.3d 1049 (2d Cir. 1993) ................................................. 2, 10

*Unigene Labs., Inc. v. Apotex, Inc.*,
   No. 06 CV 5571 (RPP), 2010 WL 2730471 (S.D.N.Y. July 7, 2010) ................................ 22

*Uniroyal, Inc. v. Home Ins. Co.*,
   707 F. Supp. 1368 (E.D.N.Y. 1988) ........................................ 16

*United States v. Quintieri*,
   306 F.3d 1217 (2d Cir. 2002) .................................................. 23

*Utica Mut. Ins. Co. v. Clearwater Ins. Co.*,
   906 F.3d 12 (2d Cir. 2018) ............................................ 1, 10, 21, 23

*Utica Mut. Ins. Co. v. Goulds Pumps, Inc.*,
   No. CA 2003-002721 (Sup. Ct. N.Y. Oneida Cnty.) ........................................ 7

*Vigilant Ins. Co. v. Travelers Prop. Cas. Co. of Am.*,
   243 F. Supp. 3d 405 (S.D.N.Y. 2017) ...................................... 16

*In re Viking Pump, Inc.*,
   148 A.3d 633 (Del. 2016) ....................................................... 18

*In the Matter of Viking Pump*,
   27 N.Y.3d 244 (2016) ........................................................... 20

*Vitkus v. Beatrice Co.*,
   127 F.3d 936 (10th Cir. 1997) ................................................. 11

*Wechsler v. Hunt Health Sys., Ltd.*,
   No. 94 CIV. 8294 PKL, 1999 WL 672902 (S.D.N.Y. Aug. 27, 1999) ................................ 22

**Other Authorities**

Clearwater Opening and Response Brief,
    *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*,
    No. 16-2535 (2d Cir. Jan. 25, 2017) ...................................................................... 23

Plaintiff Utica Mutual Insurance Company ("Utica") submits the following trial brief pursuant to Section 1(f) of the Trial Order entered in this case (Dkt. 166).

## PRELIMINARY STATEMENT

This is a reinsurance dispute. Utica purchased reinsurance contracts from Defendant Clearwater Insurance Company ("Clearwater") to cover a portion of its liabilities from umbrella liability policies that Utica issued from 1978 through 1981 to its policyholder, Goulds Pumps, Inc. ("Goulds"). Goulds later became the focus of tens of thousands of asbestos bodily injury claims. Goulds sued Utica and other insurers regarding the extent of coverage for the asbestos claims. Following years of litigation, Utica settled its disputes with Goulds under all Utica policies. Utica paid nearly $400 million in loss and expenses. Utica billed about 3% thereof to Clearwater. Clearwater initially paid about $1 million of the billings but then stopped, claiming it owes nothing. Clearwater's unpaid balance owed Utica is nearly $11 million, plus interest. Utica is entitled to payment.

Following a trip to the Second Circuit, the issues in this case have narrowed considerably. Having found that the subject reinsurance contracts lack a "follow-the-settlements" clause, the Court of Appeals ruled that Clearwater is not bound by Utica's settlement but instead must "indemnify Utica according to Utica's proven liability on the umbrella policies." *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 25 (2d Cir. 2018) ("*Utica v. Clearwater*"). That, the Second Circuit found, requires two determinations. First, this Court must determine whether the underlying Utica primary policies provide limitless coverage for products bodily injury claims or instead provide coverage subject to aggregate limits (which would mean the umbrella policies provide coverage after those aggregate limits had exhausted). *Id.* at 25. Second, this Court must determine whether an occurrence is "not covered by" Utica's 1978-81 primary policies after

those policies have exhausted, thereby triggering the corresponding umbrella policies' obligation to pay defense costs in addition to their stated limits. *Id.* at 20-21.

The standard to apply in determining if Utica has proven its liability to Goulds sufficient to trigger Clearwater's duty to indemnify is drawn from the common law of indemnification, which applies to reinsurance contracts in the absence of an agreement otherwise.[1] While not imposing the sort of unequivocal deference afforded under the follow the settlements doctrine, neither does the law of indemnification write on a blank slate, as if Utica's litigation and settlement with Goulds never happened. New York common law on indemnification instead charts a middle course. Where, as here, the party seeking indemnification has settled the underlying claims, it can establish a rebuttable presumption of its liability by showing that it made a "good-faith settlement of the third-party claim." *H.S. Equities, Inc. v. Hartford Accident & Indem. Co.*, 661 F.2d 264, 268 (2d Cir. 1981).

Utica clears this hurdle with room to spare. An avalanche of evidence supports that Utica's decisions and its settlement with Goulds on both issues were correct and made in good faith, starting with a subsequent decision in the coverage litigation that confirms the good-faith nature of Utica's settlement. Testimony from the Goulds employee who purchased the insurance, the broker who placed the insurance, and the Utica employees who sold the insurance all confirms that the parties intended and understood the 1978-81 primary policies to have aggregate limits for products bodily injury claims. Contemporaneous documents bolster these sworn statements, and include Utica "mark-ups" of the subject policies reflecting a $500,000 aggregate limit, letters from the broker to Goulds stating the Utica primary had aggregate limits, and

---

[1] *Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 4 F.3d 1049, 1054 (2d Cir. 1993) ("Reinsurance involves contracts of indemnity. . . .").

certificates of insurance reflecting the aggregate limits. Expert testimony and common sense further reinforce this conclusion.

Finally, although Utica settled these issues, they were also tried to judgment by other insurers in the coverage litigation against Goulds—who were also affected by whether the Utica policies had aggregates. After a lengthy trial, the court in the California Goulds coverage action ruled that "the record establishes that Goulds and Utica intended the 1977-1982 Utica primary policies to include $500,000 aggregate limits." P-100 at 6. The same court held that 1977-1982 umbrella policies covered defense cost in addition to limits. *Id.* at 26. That decision was affirmed on appeal, with the Appellate Court observing that "[n]o serious argument can be made . . . that there was no aggregate." P-344 at 32-33. Those rulings further confirm that Utica's decisions on and settlement of those issues with Goulds were correct and in good faith.

## FACTUAL SUMMARY

### A.     The Various Contracts At Issue in This Case

<u>Utica's Policies to Goulds</u>. Utica issued primary and umbrella insurance policies to Goulds from the 1960's through the 1980's. A primary policy is the initial insurance for a claim. An umbrella policy applies after the primary policy pays out its limit. When the limit of any insurance policy is paid out, it is said to be exhausted.

Primary and umbrella policies ordinarily obligate the insurer to defend and settle claims against its policyholder. The payments to defend claims, like attorneys' fees, are known as expense payments.[2] The payments to settle claims are known as loss payments. The policies Utica issued to Goulds obligated Utica to pay up to hundreds of millions of dollars.

---

[2] Other amounts the insurer pays also qualify as "loss expense," such as amounts paid to litigate coverage disputes with the policyholder. *See Emp'rs Ins. Co. of Wausau v. Am. Re-Insurance Co.*, 256 F. Supp. 2d 923, 925-26 (W.D. Wis. 2003).

Utica's Primary Policies. Utica issued primary policies to Goulds with collective limits of $12.3 million. Those limits applied to loss payments only. The primary policies covered expense in addition to their limits. Thus, each primary policy required Utica to make expense payments until that policy's limit was exhausted by loss payments. The primary policies for the years relevant here are the 1978, 1979, 1980 and 1981 policies, and each afforded limits of $500,000 (collectively, the "Primary Policies"). P-12 to P-15.

Utica's Umbrella Policies. Utica issued over a dozen umbrella policies to Goulds. Collectively, they provided total limits of $255 million. The 1978-81 umbrella policies reinsured by Clearwater (the "Umbrella Policies") had limits of $25 million that applied to loss only. P-8 to P-11. Like the Primary Policies over which they attached, the Umbrella Policies were obligated to pay covered expense unabated until the policy limits were exhausted by loss payments.

Each Umbrella Policy covered expense under the following provision:

> II.   DEFENSE – DEFENSE COSTS – INVESTIGATION – ASSISTANCE AND COOPERATION
>
> With respect to any occurrence not covered by the policies listed in the schedule of underlying insurance or any other insurance collectible by the insured, but covered by the terms and conditions of this policy (including damages wholly or partly within the amount of the retained limit), [Utica] shall:
>
> (a) defend any suit against the insured . . . . [and]
>
> (d)   reimburse   the   insured   for   all   reasonable   expenses . . . ; the amounts so incurred . . . are payable by [Utica] in addition to the applicable limit of liability of this policy.

P-8 at GPA 00857.

Clearwater's Reinsurance Contracts with Utica. Reinsurance is insurance for insurance companies. Under its former name Skandia America Reinsurance Corporation, Clearwater participated on five reinsurance contracts covering four Umbrella Policies. Clearwater issued two

4

reinsurance contracts (covering the 1978 and 1979 Umbrella Policies, respectively) under contracts bearing Clearwater's name (the "Clearwater Contracts"). P-1 to P-2. Clearwater participated in three other reinsurance contracts as a member of a pool of reinsurers managed by Towers, Perrin, Forster & Crosby, Inc. ("TPFC"). Those other contracts covered the 1979, 1980, and 1981 Umbrella Policies, respectively, and were memorialized by memoranda of reinsurance (the "TPFC Memoranda"). P-4 to P-6. The charts below describe the reinsurance:

**Clearwater Contracts**

| Utica Policy and Year | Utica Policy Limits | Clearwater Reins. Contract and Year | Clearwater Reinsurance Coverage |
|---|---|---|---|
| LU 4799 1978 | $25 million, with defense in addition | N-21163 1978 | $5 million excess of $20 million |
| LU 4799 1979 | $25 million, with defense in addition | N-22001 1979 | $2.5 million part of $15 million excess of $10 million |

**Clearwater Reinsurance as a Member of the TPFC Pool**

| Utica Policy and Year | Utica Policy Limits | TPFC Reins. Contract and Year | TPFC Pool Reinsurance Coverage |
|---|---|---|---|
| LU 4799 1979 | $25 million, with defense in addition | V-01522 1979 | $500,000 part of $15 million excess of $10 million (Clearwater = 8.5%) |
| LU 4799 1980 | $25 million, with defense in addition | HC-80-0098 1980 | $1 million part of $15 million excess of $10 million (Clearwater = 8.5%) |
| LU 4799 1981 | $25 million, with defense in addition | HC-81-0098 1981 | $1 million part of $15 million excess of $10 million (Clearwater = 8.5%) |

Collectively, we refer to the Clearwater Contracts and the TPFC Memoranda as the "Reinsurance Contracts."

**B.     The Goulds Claims**

Goulds was a New York-based manufacturer of pumps used in naval vessels and in a variety of industrial applications. Some of its pumps contained asbestos. Goulds became the

subject of thousands of asbestos bodily injury claims (the "Goulds Claims"). Initially, Utica paid defense and loss under its primary insurance policies in respect of the Goulds Claims. As each exhausted, Utica continued to defend and settle the Goulds Claims under the corresponding umbrella policy.

Sometimes, once a Utica primary policy exhausted, the umbrella policy above it was issued by another insurance carrier or there was no umbrella policy at all. In those cases, Utica began to charge Goulds for amounts allocated to those years without a Utica umbrella policy. Utica argued that under applicable New York law, Goulds was responsible for any amounts allocated to years in which the primary policy was exhausted and Utica did not issue a corresponding umbrella policy. These amounts were called the "orphan share." Goulds rejected Utica's argument about orphan shares based on different case law from California, which Goulds said controlled. Because of the risk that Goulds' position would prevail, Utica paid amounts in excess of what it believed to be its proper share under a reservation of rights.

On February 28, 2003, Utica wrote to Goulds outlining how it had been allocating payments for the Goulds claims and advising that it would continue to allocate payments in that manner. Among other things, Utica told Goulds that:

- It was allocating loss payments (also known as indemnity payments) and expense payments evenly across all years of triggered coverage;

- Goulds was responsible for amounts allocated to years in which Utica's Primary Policies had exhausted and in which Utica did not issue UmbrellaPolicies (1959-1963, 1976, and 1983-1985); and

- The Umbrella Policies covered expense in addition to limits.

P-98 at H-0013326-27.

6

### C.    The Goulds Coverage Litigation

On February 26, 2003, Goulds added Utica as a defendant to an existing litigation in California seeking coverage for the Goulds Claims. *See Cannon Elec. Inc. v. ACE Prop. & Cas. Ins. Co.*, No. BC 290354 (Cal. Super. Ct. L.A. Cnty.). Thereafter, Utica sued Goulds in New York, seeking a declaration of its duties under the policies it issued to Goulds. *Utica Mut. Ins. Co. v. Goulds Pumps, Inc.*, No. CA 2003-002721 (Sup. Ct. N.Y. Oneida Cnty.).

The litigation involved many issues, including:

- Choice of law (New York or California);

- Whether the pro rata method or all sums method applied to determining which policies applied to the claims;[3]

- Whether Utica was entitled to continue to control the defense of the Goulds claims—which is important for an insurance company to manage its exposure;

- Whether, due to incomplete documentation, Utica could prove that certain of its Primary Policies were subject to aggregate limits; and

- The parties' responsibility for the so-called orphan share.

After filing dueling motions about forum and the merits, Utica and Goulds undertook settlement negotiations. The judges in the two cases agreed to serve as mediators. The negotiations were lengthy and included multiple sessions before the two judges.

### D.    The Settlement Negotiations and Agreement

In light of the strength of the evidence that its Primary Policies had aggregate limits, Utica's strategy in the settlement negotiations was to "persuade Goulds with the documents we

---

[3] The "pro rata method" means that a policy only covers loss during its policy period, which results in a loss that triggers multiple years of coverage being spread across those years. *See E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 172–73 (2d Cir. 2001) (describing the pro rata method). In contrast, under the "all sums method," a policy can cover loss occurring outside of the policy period, which results in an insured being able to collect the loss triggering multiple years of coverage from any selected year of that coverage. *See State v. Cont'l Ins. Co.*, 281 P.3d 1000, 1008 (Cal. 2012) (describing the all sums method).

are amassing and collating that our approach is one they should accept." P-175 at E-0588143.

After Utica had "persuaded [Goulds] of the aggregate, the limited coverage year block, we will

then enter a coverage agreement." *Id.*

In February 2007, the parties executed a written settlement agreement.[4] The two

judges, who were intimately involved in the hard-fought settlement negotiations, entered an

order finding that "during the mediation, the Parties' respective positions were ably,

vigorously, and comprehensively negotiated, including over all the issues," and that the

settlement agreement was "entered at arm's length and in good faith by the Parties" to resolve

the issues in dispute. P-302.

The agreement included a term that the Primary Policies had aggregate limits, which

were exhausted by Utica's prior payments. In addition, the Settlement Agreement included the

following terms:

1.  Asbestos claim loss and defense payments made after January 1, 2006, would
    be spread across Goulds' coverage block based on a pro rata by time on the
    risk allocation.

2.  The 1978-1980 Umbrella Policies would apply to asbestos claims on the basis
    that defense fees and costs would erode the limits. Pre-settlement, both Utica
    and Goulds took the position that these policies paid defense in addition to
    their limits. The parties accounted for the change from a potentially unlimited
    defense obligation to defense within limits by increasing the limit of each of
    these policies from $25 million to $48,333,332. The increase of approximately
    $23 million in limits reflects a defense to indemnity ratio of less than 1:1 (that
    is, it obligated Utica to pay less than one dollar of expense for every dollar of
    loss).

3.  The total Utica umbrella limits available as of January 1, 2006, would be $325
    million. Any payments that Utica had allocated to the Umbrella Policies prior
    to that date would not be counted against this limit for payments from January
    1, 2006 forward.

---

[4] The settlement was memorialized in four documents: a "Defense and Indemnity Agreement"
(P-111) an "Escrow Agreement," an "Irrevocable Letter of Credit," and a "Repayment
Agreement."

In April 2016, Utica and Goulds entered into a separate agreement to "buy out" Utica's remaining obligations under the Settlement Agreement.

### E.   Subsequent Ruling in the Coverage Litigation

After Goulds settled with Utica, the coverage litigation in California continued, as there were disputes between Goulds and other insurers. Travelers, an excess carrier attaching over Utica's umbrella coverage to Goulds, pursued the same argument that Clearwater pursues here: that the Utica Primary Policies from 1978 to 1982 lacked aggregate limits, such that the Goulds asbestos liability never escaped those Primary Policies, never reached the Utica Umbrella Policies, and so never reached the Travelers excess policies. After thirteen days of trial, the California Superior Court held that the Utica Primary Policies had aggregate limits. P-100 at 6. ("The Court agrees with Goulds that the record establishes that Goulds and Utica intended the 1977-1982 Utica primary policies to include $500,000 aggregate limits."). The California court also held that the 1977-1982 Umbrella Policies, which included the "not-covered-by" provision cited above, covered expense in addition to limits rather than within limits. A three-judge appellate panel affirmed the trial court decision, finding that "[n]o serious argument can be made . . . that there was no aggregate. . . ." P-344 at 32.

### F.   Utica's Reinsurance Bills to Clearwater

Utica has paid indemnity and defense costs to Goulds under the Umbrella Policies and has billed Clearwater for its share of the payments. Dkt. 17 ¶ 23. Clearwater paid approximately $993,159 of those bills without objection in 2012, and then stopped paying, somehow determining in 2013 that it did not owe anything. *Id.* ¶ 24. To date, Clearwater's outstanding balance under the Reinsurance Contracts is $10,901,255.03, not including interest.

## ARGUMENT

I.  **THE EVIDENCE PLAINLY ESTABLISHES UTICA'S "PROVEN LIABILITY" TO GOULDS UNDER THE UMBRELLA POLICIES.**

### A.  The Applicable Standard: A Good Faith Settlement

The Second Circuit held in this case that the Reinsurance Contracts do not impose a "follow-the-settlements" obligation, and so "as a matter of law . . . Clearwater is not obligated . . . to follow Utica's settlement with Goulds." *Utica v. Clearwater*, 906 F.3d at 25. Instead, Clearwater must "indemnify Utica according to Utica's proven liability on the umbrella policies." *Id.* The requirement that Clearwater indemnify Utica according to its "proven liability" is a reference to the common law of indemnification, which applies to reinsurance contracts in the absence of an agreement otherwise. *Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 4 F.3d 1049, 1054 (2d Cir. 1993) ("Reinsurance involves contracts of indemnity. . . .").

The parties agree, and this Court has found, that New York law applies to the Reinsurance Contracts. *See* Dkt. 54 at 6 n.3. New York law on indemnification provides that a party to be indemnified can prove its liability either by a settlement or by a judgment. *See, e.g., H.S. Equities, Inc. v. Hartford Accident & Indem. Co.*, 609 F.2d 669, 674-75 (2d Cir. 1979) (*H.S. Equities I*); *CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 381-82 (S.D.N.Y. 2019). When relying on a settlement reached after providing appropriate notice to the indemnifying party,[5] the indemnified party's burden is to show that it reached a "good-faith settlement of the third-party claim." *H.S. Equities, Inc. v. Hartford Accident & Indem. Co.*, 661 F.2d 264, 268 (2d Cir. 1981) (*H.S. Equities II*). Proof of a good-faith settlement constitutes

---

[5] A different rule may apply if the party to be indemnified failed to give the indemnifying party notice of the claim and the opportunity to exercise a contractual right to associate in the defense. *H.S. Equities I*, 609 F.2d at 674-75. Clearwater makes no such claim here.

"presumptive evidence" of the liability of the party to be indemnified, and the burden shifts to the other party to rebut that presumption.

This approach to proving liability for purposes of common law indemnification is well established in New York law.[6] It is also grounded in sound public policy—the need to avoid wasting judicial resources and discouraging settlement by requiring a party seeking indemnification to establish its own liability by relitigating the entire underlying case. *See Vitkus v. Beatrice Co.*, 127 F.3d 936, 944 (10th Cir. 1997) ("It would be wholly impracticable to charge the district court with trying the Siverado litigation after a successful settlement . . . ."). If the burden to obtain indemnification were so high, parties would litigate every case to judgment, rather than settling only to relitigate the entire case in the indemnification action.

To be sure, this standard is less favorable to Utica than follow the settlements. Under the follow the settlements doctrine, had Utica established a good-faith, reasonable basis for its settlement with Goulds, then it would be insulated from *any* challenge, and Clearwater would be conclusively bound to follow that settlement.[7] By contrast, under the less deferential standard

---

[6] *See Conner v. Reeves*, 103 N.Y. 527, 531, 9 N.E. 439, 441 (1886) ("[T]he judgment . . . although entered upon consent of the parties to the action, presumptively, at least, established the liability of the defendants."); *Gray Mfg. Co. v. Pathe Indus., Inc.*, 33 A.D.2d 739, 305 N.Y.S.2d 794, 796 (1969), *aff'd*, 26 N.Y.2d 1045, 260 N.E.2d 821 (1970) (indemnifying party is obligated to pay "reasonable sums paid . . . in good faith in settlement of the actions" unless it can "come forward with proof of evidentiary facts showing the existence of a genuine and substantial issue as to good faith or reasonableness."); *In re Actrade Fin. Techs., Ltd.*, No. 02-16212(ALG), 2009 WL 2929440, at *2 (Bankr. S.D.N.Y. Sept. 3, 2009) ("The general rule under New York law is that a surety is able to take on the burden of attempting to overcome the presumption by establishing that a settlement was not founded on an actual legal liability."); *see also CVS Pharmacy, Inc.*, 377 F. Supp. 3d at 382 (discussing and applying *H.S. Equities I*, *Conner*, and *Actrade*).
[7] *N. River Ins. Co. v. Ace Am. Reinsurance Co.*, 361 F.3d 134, 140 (2d Cir. 2004); *see also British Int'l Ins. Co. v. Seguros La Republica, S.A.*, 342 F.3d 78, 85 (2d Cir. 2003) (follow-the-fortunes "binds a reinsurer to accept the cedent's good faith decisions on *all things* concerning the underlying insurance terms and claims against the underlying insured: coverage, tactics, lawsuits, compromise, resistance or capitulation") (emphasis added).

applicable to indemnification agreements generally, evidence of a good faith settlement establishes a *presumption* of liability, but one that is rebuttable and can be overcome by a showing of "bad faith, fraud, or factual or legal error" sufficient to show Utica's payments were "not founded upon any legal liability to [Goulds]." *H.S. Equities I*, 609 F.2d at 675 & n.8 (quotation marks omitted). If the presumption is not rebutted by competent evidence, however, it is "unnecessary for the court to determine whether the allegations" in the underlying action are actually true. *Id.*

As set forth below, Utica plainly satisfies its burden because it was correct and settled in good faith on the basis that (a) the Primary Policies were subject to aggregate limits and (b) the Umbrella Policies covered defense costs after exhaustion of the underlying Primary Policies.

### B.    Utica Settled a Covered Risk with Goulds in Good Faith

Clearwater's adjusters for this claim admit that Goulds' asbestos claims are covered by Utica's policies. *See* Chavez Dep. 103:9–14 ("Q: Are you aware of any Clearwater objection that asbestos claims are somehow not covered under the policies issues by Utica to Goulds Pumps? A: I'm not aware of any objection such as that."); *see also* McCaffrey Dep. 86:20–24 ("Q: Do you believe that asbestos claims were not covered by the policies issued by Utica? … A: No."). The questions then are (1) whether the Goulds asbestos claims make their way to the Umbrella Policies because of, for instance, the exhaustion of aggregate limits in the underlying Primary Policies, and (2) with respect to expense, the proper interpretation of the "not covered by" clause of the Umbrella Policies.

#### 1.    The Evidence Overwhelmingly Establishes Aggregate Limits

The evidence adduced at trial will overwhelmingly show that the 1978-1981 Primary Policies were subject to aggregate limits for products bodily injury claims. Tellingly, Clearwater

will introduce no evidence that Goulds sought to purchase unlimited products liability coverage or that Utica agreed to sell such extraordinary coverage. Instead, Clearwater will focus on a blank spot in certain primary policy endorsements where additional information about the aggregate limit should have been filled in. But not even all of the 1978-81 policies contain such blanks. For example, the 1978 Primary Policy shows a single $500,000 figure between an occurrence limit and an aggregate limit:



P-12 at H-0013132. The $500,000 applies to both limits so this shows a $500,000 aggregate, which the testimony will support; it does not signify an unlimited aggregate limit.

Forms from later years include a pre-printed line to be filled in: "$_____,000 aggregate." This blank does not show an unlimited aggregate either, since as written it identifies a $0 aggregate limit. Indeed, the instructions for the form state that if Utica had intended there to be no aggregate limit, it was to delete the "$_____,000 aggregate" line of the form. Utica did not do so and there is no proof that was an error. As this Court has already held, the blank establishes that the policy form was ambiguous, and that it is appropriate to consider extrinsic evidence to construe that ambiguity. Dkt. 106 at 16 (calling primary policies "ambiguous contract[s]"); *see also Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000) (New York law allows extrinsic evidence to resolve an ambiguity in an insurance contract).[8]

---

[8] Even if the policies were not ambiguous, New York law allows consideration of extrinsic evidence to reform a scrivener's error. *Investors Ins. Co. of Am. v. Dorinco Reinsurance Co.*, 736 F. Supp. 1260, 1264 (S.D.N.Y.), *aff'd*, 917 F.2d 100 (2d Cir. 1990) ("Neither the statute of frauds nor the parol evidence rule bars parol or extrinsic evidence of the claimed agreement with regard to a reformation claim.").

The evidence at trial will show that Utica's settlement on the basis that its Primary Policies were subject to aggregate limits for products bodily injury claims was not only in good faith and well-supported, it was correct.

This evidence includes:

- As shown above, in the 1978 Primary Policy, $500,000 was placed in between the lines for occurrence and aggregate, including that it applies to both.

- The policies were typically "marked up" with handwritten changes before the policy renewal each year. The markup of the 1979-80 policy for the 1980-81 policy includes "$500,000" written in the space for aggregate limits. P-23 at H-0026225. Similarly, the markup of the 1980-81 policy for the 1981-82 policy includes "$500,000" written in the space for aggregate limits. P-24 at H-0026157.[9]

- A letter from the broker to Goulds enclosing the insurance proposal for the 1979 policy stated that the policy had a $500,000 aggregate limit. P-49 at E-0344686.

- A letter from the broker to Goulds enclosing the insurance proposal for the 1980 policy stated that the policy had a $500,000 aggregate limit. P-119 at E-0580318.

- A certificate of insurance for the 1978-79 primary policy listed the $500,000 aggregate limit. P-120.

- Certificates of insurance for the 1980-81 primary policy list a $500,000 aggregate limit. P-121 at UMC00178-UMC00190.

- Certificates of insurance for the 1981-82 primary policy list a $500,000 aggregate limit. P-122.

- A copy of the 1982 primary policy which reflects a $500,000 aggregate limit. P-96 at H-0027104.

Utica will also introduce evidence that the Goulds employee who purchased the insurance, the broker who placed the insurance, and the Utica employees who sold the insurance all uniformly understood that the 1978-81 Primary Policies were subject to aggregate limits:

- E. Barry Bradshaw, Goulds' former General Counsel, testified that at the time he purchased the policies, the broker explained to him that the policies were subject to aggregate limits. Mr. Bradshaw also testified that he never attempted to purchase

---

[9] Marcia Schilling, who recognized her handwriting on both of these marked up policies, will testify that she added the "500,000" to indicate that there was an aggregate on the policies.

insurance without aggregates and that he never heard of Utica or any other insurer that was willing to offer such coverage.

- Thomas Caveny, the broker responsible for the Goulds account, testified that the 1980 policy was subject to an aggregate limit of $500,000.

- Daniel Daly, a Utica underwriter, and Marcia Schilling, the Utica employee responsible for rating the Goulds policies from 1978-82, support that the Primary Policies were subject to aggregate limits.

Utica will also present the live testimony of Marcia Schilling, the Utica employee who was responsible for rating the Goulds policies from 1978 to 1982, and who has testified that "we knew as a company, we never issued a policy, that I'm aware of or anybody else, products coverage without an aggregate limit." Dkt. 64-20 at 80:1-7.

Utica will further demonstrate its good faith by showing that its settlement on the basis that its Primary Policies were subject to aggregate limits was squarely in line with the advice that it received from its attorneys throughout the coverage litigation. On aggregate limits, Utica's counsel advised that Utica had successfully "marshal[ed] the evidence necessary to affirmatively establish policy terms, limits and aggregate limits." P-117 at 47. Commenting on the strength of the evidence, counsel explained that "Utica is fully prepared to prove, on a policy-by-policy basis, the existence of aggregate limits in all its policies." P-118 at H-0043197. On the eve of the mediation with Goulds, Utica's attorneys were "struck again by the persuasive force of" the evidence Utica had gathered. *Id.* at H-0043196. Counsel also wrote that "[a]mple secondary evidence, including certificates of insurance, testimony to be provided by underwriters and other persons with knowledge, and Utica's underwriting practice all serve to unmistakably show that all policies have aggregate limits." P-342. This evidence, which goes not to the truth of the matters asserted but rather to Utica's good faith by showing that Utica acted in accordance with

15

the legal judgment of its attorneys, is all admissible and strongly supports a conclusion that Utica acted in good faith.

That Utica's Primary Policies were subject to aggregate limits is also consistent with the further rulings in the Goulds coverage action. As discussed previously, the California court determined after a contested trial *both* that (1) that the 1977-1982 Utica Primary Policies to Goulds were subject to aggregate limits; and (2) that the 1977-1982 Utica Umbrella Policies contain a duty to defend, with defense costs not eroding the limits of those policies. These rulings are admissible for their legal effect, and courts regularly deem judgments from comparable cases as admissible evidence when assessing the reasonableness or good faith of a settlement. *See, e.g., Vigilant Ins. Co. v. Travelers Prop. Cas. Co.*, 243 F. Supp. 3d 405, 431 (S.D.N.Y. 2017); *Allianz Glob. Corp. & Specialty, N.A. v. Sacks*, No. 08 CIV. 563 LTS, 2010 WL 3733915, at *7 (S.D.N.Y. Sept. 23, 2010); *Casey ex rel. Casey v. Ryder Truck Rental, Inc.*, No. 00 CV 2856 (CLP), 2005 WL 1150228, at *17 (E.D.N.Y. May 16, 2005).

Finally, after the final settlement agreement was signed in 2007, the judges who had mediated Utica's dispute with Goulds signed a Stipulation and Order finding that the settlement was "fair, just, and reasonable; was resolved within the terms of the primary and umbrella insurance policies issued by Utica Mutual to Goulds; and was otherwise entered at arm's length and in good faith by the Parties." P-302 ¶ 8. Such judicial findings made by judges who were intimately familiar with the settlement negotiations can be admitted as evidence not of the truth of the matter asserted, but rather for their legal effect and/or on the question of reasonableness. *See, e.g.*, *Uniroyal, Inc. v. Home Ins. Co.*, 707 F. Supp. 1368, 1379 (E.D.N.Y. 1988) (citing the trial court's approval of a class-action settlement as evidence of its reasonableness for purposes of the indemnification inquiry); *Vigilant Ins. Co.*, 243 F. Supp. 3d at 433 (holding that the

16

comments of the trial judge regarding the settlement and the opinion of a retired judge that the settlement was reasonable are evidence that, with other facts, defeated a motion for summary judgment as to the unreasonableness of a settlement).

2.    The Evidence Will Show that Utica's Position that an Occurrence Is "Not Covered By" an Exhausted Policy Was Correct and in Good Faith

As an initial matter, this issue should not even go to the jury because, based on the Court's ambiguity finding (Dkt. 158), Utica had a duty to defend as a matter of law. If an insurance policy is ambiguous about the duty to defend, the policy necessarily covers defense costs because any "ambiguity as to the insurer's duty to defend is resolved in favor of the insured." *IBM v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 144 (2d Cir. 2004). That is consistent with the unique standard that governs the duty to defend, which is that an insurance company must defend if there is a "potential" for coverage. *Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*, 779 N.E.2d 167, 170 (N.Y. 2002) (A mere "potential" for coverage means an insurer has a duty to defend.). Thus, based on this Court's prior finding that the Umbrella Policies were ambiguous, Utica has a duty to defend. Utica will move on this issue at the appropriate time.

Even if this issue goes to the jury, the evidence will show that Utica's decision to defend Goulds against asbestos claims was correct and its settlement on that basis was in good faith. Utica's Umbrella Policies expressly state that they cover expenses in addition to the stated limit "[w]ith respect to any occurrence not covered by [underlying policies]." P-8 at GPA 00857. A straightforward reading of this language is that once the Primary Policies exhaust, occurrences are no longer "covered by" the Primary Policies, and so the Umbrella Policies' coverage of

expense takes effect. Numerous courts from various jurisdictions, including California and New York, have endorsed or support this reading.[10]

Clearwater's witnesses agree. Laura McCaffrey was the Clearwater adjuster responsible for handling the Goulds claim. She was asked "[i]f a primary is exhausted it no longer covers a claim, is that correct?" She responded, "I would say yes." McCaffrey Dep. at 88:25-89:4. Albert Ruhlmann was an underwriter at Clearwater's predecessor from 1978-80 when the Clearwater Certificates and the TPFC Memoranda were underwritten. Mr. Ruhlmann was asked, "if a primary policy is not paying out any additional limits, any loss presented to it is not covered by that primary?" Mr. Ruhlmann confirmed: "That's correct. . . ." Ruhlmann Dep. at 28:8-19.

Utica's witnesses, including Kristen Martin and Bernard Turi, will testify that they share the same understanding.

Utica will also show that its counsel repeatedly advised it that the 1977-81 Umbrella Policies covered defense costs in addition to limits. For example, counsel wrote on April 9, 2004, that "the [umbrella] policies for years 1/1/77-1/1/78 and thereafter have a supplemental duty to defend," because "[w]e have coverage parts which establish this duty for these policies." P-110 at E-0635059. Similarly, a September 1, 2005 memorandum noted that the post-1975 umbrella policies had a supplemental duty to defend, and on November 30, 2005, a draft mediation statement from coverage counsel included a note to Utica indicating that "[c]ertain Utica

---

[10] *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1219 (2d Cir. 1995); *Am. Com. Lines LLC v. Water Quality Ins. Syndicate*, 679 F. App'x 11, 15 (2d Cir. 2017); *In re Viking Pump, Inc.*, 148 A.3d 633, 662 & n.127 (Del. 2016); *Am. Motorists Ins. Co. v. Trane Co.*, 544 F. Supp. 669, 692 (W.D. Wis. 1982), *aff'd*, 718 F.2d 842 (7th Cir. 1983); *Schulman Inv. Co. v. Olin Corp.*, 514 F. Supp. 572, 576 (S.D.N.Y. 1981); *U.S. Fire Ins. Co. v. Aspen Bldg. Corp.*, 367 S.E.2d 478, 479 (Va. 1988); *see also Hartford Accident & Indem. Co. v. Superior Court*, 23 Cal. App. 4th 1774, 1779-80 (1994) (under California law, "an excess carrier has a duty to defend after the primary coverage is exhausted unless the excess policy provides to the contrary").

umbrella policies (1977 through 1983) contain a supplemental duty to defend." P-342.

Contemporaneous evidence of insurance industry practices agrees. An insurance hornbook from 1980, for example, discusses this exact question in the context of language substantially equivalent to that included in the Umbrella Policies, and concludes that "[i]t seems clear to us that the insurer has a contractual obligation to defend the insureds after underlying coverage is exhausted." "Umbrella Notes No. 4" in THE UMBRELLA BOOK (James A. Robertson, ed. July 1980).

Finally, Utica's expert Edward McKinnon, a longtime insurance executive with over 45 years in the industry, will testify that Utica's interpretation of this point of its own Umbrella Policies is consistent with insurance industry custom and practice.

And Utica's settlement was consistent with all of that, reflecting its good-faith nature. Before the settlement, Utica's liability under the 1978-1980 umbrella policies was for defense costs in addition to limits. Thus, Utica was obligated to pay up to $25 million in loss and a potentially unlimited amount of defense costs in addition to that $25 million for loss. Per the settlement, the potentially unlimited nature of defense costs was capped and the limit of each of those policies was increased from $25 million to $48,333,332. Thus, the settlement on that point was in good faith because it was consistent with Utica's liability under those umbrella policies for defense costs in addition to the $25 million limits, and actually reflected Utica's attempt to cap its and therefore its reinsurers' liability for defense costs.

3.      Utica's Settlement of the "Orphan Shares" Issue Was in Good Faith

As part of their settlement, Utica and Goulds compromised the issue of responsibility for amounts paid by Utica in excess of what it would owe under a pro rata allocation approach (the so-called "orphan shares"). The parties agreed that Utica would retain liability for so-called orphan share payments made prior to January 1, 2006, but not those made thereafter. This was a

19

reasonable compromise of a hotly disputed issue. Orphan shares only existed if New York law, and its pro rata allocation, applied.[11] If California's "All-Sums" rule applied, on the other hand, there would be no orphan shares because Goulds could pick any triggered year to which to apply the loss, and Utica would remain liable for those amounts.

Utica's coverage counsel advised in a June 6, 2003 memorandum that the California court would apply California choice of law rules, under which Utica would bear the burden of demonstrating that the New York rule should apply. The memo cited the California Supreme Court's *Hurtado* decision, which explained that "[n]ormally, even in cases involving foreign elements, the court should be expected, as a matter of course, to apply the rule of decision found in the law of the forum." *Hurtado v. Superior Court*, 11 Cal.3d 574, 581 (1974). As a foreign litigant in the California court, Utica could have overcome that presumption only by convincing the court that the interest of New York in applying its allocation law outweighed California's interest in applying its law. *Sommer v. Gabor*, 40 Cal.App.4th 1455, 1467-68 (1995); *Hurtado*, 11 Cal.3d at 579-80. But as a California corporation, Goulds would counter that California had a strong interest in applying California allocation law to California insureds. After an extensive analysis (consuming over 20 pages), Utica's counsel concluded that "the choice-of-law issue presents a close question" and that "it is difficult to predict with certainty the outcome of choice-of-law questions in the abstract."

To overcome the presumption that Utica's settlement proves its liability, Clearwater must show that Utica's assessment of the choice-of-law issue was "legal error." *H.S. Equities I*, 609 F.2d at 675. This it cannot do. California choice of law is notoriously unpredictable. *Chen v. Los*

---

[11] In May 2016, New York abandoned pro rata allocation and adopted the All-Sums allocation approach in *In the Matter of Viking Pump*, 27 N.Y.3d 244 (2016). But that decision came after Utica's final payment was allocated and billed, and so does not affect this case.

*Angeles Truck Ctrs., LLC*, 444 P.3d 727, 730 (Cal. 2019) ("Perhaps no legal subject has caused more consternation and confusion among the bench and bar than choice of law."); *JMP Sec. LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029, 1034 (N.D. Cal. 2012) ("choice-of-law issues . . . can be difficult, even arcane"). Utica's counsel correctly pegged the issue as unpredictable, and Utica's settlement of the issue presumptively proves its liability.

### C.   Clearwater's Other Arguments Fail

####   1.   The Second Circuit's Ruling Precludes Clearwater from Disputing that its Clearwater Contracts Pay Expense in Addition to Limits

Clearwater previously argued that the *Bellefonte*[12] case capped its liability under its Clearwater Contracts at "limits" of $5 million and $2.5 million, respectively. The Second Circuit rejected that argument, distinguished *Bellefonte,* and ruled that:

> The umbrella policies plainly require Utica to reimburse Goulds for "expenses . . . *in addition* to the applicable limits of liability of th[e] policy." In light of the follow-the-form clause, Clearwater's obligations on the Clearwater certificates must track Utica's obligations on the underlying policies. Because the underlying policies are expense-supplemental, the Clearwater certificates likewise are expense-supplemental. Thus when Clearwater is liable to pay expenses on its issued policies, it must pay those expenses in addition to the up to $5 million and $2.5 million of reinsurance liability accepted under the 1978 and 1979 reinsurance certificates, respectively.

*Utica v. Clearwater,* 906 F.3d at 19-20 (citation omitted). This holding is law of the case, and Clearwater is precluded from challenging it. Thus, so long as Utica establishes that it has a proven liability to Goulds under its Umbrella Policies (which it will do, see *supra* 10 to 21), then that liability encompasses expense in addition to limits and Clearwater cannot retry that question.

####   2.   The TPFC Memoranda Are Expense-Supplemental and Not Capped

The 1979-81 Umbrella Policies reinsured by TPFC Memoranda are expense-supplemental. The TPFC Memoranda make no attempt to vary from that approach. To the extent

---

[12] *Bellefonte Reinsurance Co. v. Aetna Cas. & Sur. Co.*, 903 F.2d 910 (2d Cir. 1990).

there is any ambiguity about the issue, the principle of concurrency requires that "the balance is tipped in favor of making [the reinsurer] share liability on a basis that conforms its liability to that of the cedent." *Com. Union Ins. Co. v. Swiss Reinsurance Am. Corp.*, 413 F.3d 121, 128 (1st Cir. 2005). Moreover, Clearwater has never raised this argument and waived any such argument. In identifying its defenses in response to a contention interrogatory it was ordered to answer, Clearwater identified the issue of a liability "cap" only as "set forth in Clearwater's 2014 motion for partial summary judgment." Ex. A at Interrog. No. 4. That motion addresses solely the 1978-79 Clearwater Certificates, and not the 1979-1981 TPFC Memoranda. *See* Dkt. 35-1. Clearwater at no point has updated its interrogatory response to suggest that it would contend that its liability for expense under the TPFC Memoranda is capped, and it has thus waived any such argument.[13]

> 3.    Clearwater is Barred From Challenging Payment of Declaratory Judgment Costs

Clearwater has waived any challenge to Utica's payment of declaratory judgment expenses. Clearwater contends that the amounts Utica billed to it for declaratory judgment expenses are not recoverable, because they were not incurred to resolve Utica's coverage dispute with Goulds, and are thus not "loss expenses" covered by the 1978-79 Clearwater Certificates. This Court's summary judgment ruling rejected that argument, holding that Clearwater had

---

[13] Answers to contention interrogatories are "treated by courts in this Circuit as 'judicial admissions' that generally estop the answering party from later seeking to assert positions omitted from, or otherwise at variance with, those responses." *Wechsler v. Hunt Health Sys., Ltd.*, No. 94 CIV. 8294 PKL, 1999 WL 672902, at *2 (S.D.N.Y. Aug. 27, 1999); *see also Unigene Labs., Inc. v. Apotex, Inc.*, No. 06 CV 5571 (RPP), 2010 WL 2730471, at *6 (S.D.N.Y. July 7, 2010) ("Defendants are bound by their contentions interrogatory answers . . . ."); *Guadagno v. Wallack Ader Levithan Assocs.*, 950 F. Supp. 1258, 1261 (S.D.N.Y. 1997) (stating that interrogatory responses are generally treated as judicial admissions, and that "[a] judicial admission is conclusive, unless a court allows it to be withdrawn") (quoting *Keller v. United States*, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995), *aff'd* 125 F.3d 844 (2d Cir. 1997)).

failed to present any evidence to create a material question of fact as to whether any declaratory judgment expenses were unrelated to the coverage dispute and whether Clearwater was liable for them. Dkt. 106 at 20-22. On appeal, Clearwater did not argue that part of the Court's decision should be reversed. Clearwater Opening and Response Brief, *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, No. 16-2535 (2d Cir. Jan. 25, 2017), Dkt. 110. And the Second Circuit did not reverse that part of the Court's decision. *Utica v. Clearwater*, 906 F.3d at 25-26.

As a result, Clearwater has waived the issue (and any other issue it could have raised respecting declaratory judgment costs) and cannot raise it now. *United States v. Quintieri*, 306 F.3d 1217, 1229 (2d Cir. 2002) ("where 'an issue was ripe for review at the time of an initial appeal but was nonetheless foregone,' it is considered waived and the law of the case doctrine bars the district court on remand and an appellate court in a subsequent appeal from reopening such issues"). In addition, any issue Clearwater could raise challenging the payment of declaratory judgment costs is outside of the Second Circuit's remand and thus not open to reconsideration at this stage of the case. *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 175 (2d Cir. 2014) ("Furthermore, where the mandate limits the issues open for consideration on remand, the district court ordinarily may not deviate from the specific dictates or spirit of the mandate by considering additional issues on remand."). Utica will move in limine on this issue to preclude evidence on the declaratory judgment issue, which has been resolved.

4.     Clearwater is Obligated to Pay Declaratory Judgment Costs

Even if Clearwater can raise the issue of declaratory judgment costs, its contentions fail. As this Court noted, "two of Clearwater's own claims handlers testified that they understood Utica's declaratory judgment expenses to be 'loss expense[s]' under the 1978 and 1979 Certificates" that were appropriately ceded to Clearwater. Dkt. 106 at 21-2.

Clearwater can point to no other evidence changing the conclusion of its own claims handlers, which is consistent with the testimony the jury will hear from Utica claims attorney Dan Hammond. Accordingly, Utica will move for judgment from the court at the appropriate time.

## II.   CLEARWATER IS NOT ENTITLED TO REIMBURSEMENT FOR THE $993,159 IT HAS PAID.

Clearwater's counterclaim seeks reimbursement of the $993,159 that it has already paid to Utica. For all of the reasons above, Clearwater is not entitled to reimbursement and this counterclaim should be resolved in Utica's favor as well.

### <u>CONCLUSION</u>

Clearwater has postponed its day of reckoning for nearly a decade. It should be held to answer for its breach of the Reinsurance Contracts, and Utica should be awarded the full amount of its damages, plus prejudgment interest. Utica should also be granted judgment in its favor on Clearwater's counterclaim for a refund of the amounts that it has already paid.

Dated:  May 24, 2021

/s/   Daniel R. Thies

| | |
|---|---|
| Daniel R. Thies (Pro Hac Vice) | Syed S. Ahmad (N.D.N.Y. Bar No. 602911) |
| WEBBER & THIES PC | HUNTON ANDREWS KURTH LLP |
| 202 Lincoln Square | 2200 Pennsylvania Avenue, NW |
| Urbana, IL 61803 | Washington, DC 20037 |
| (217) 365-5327 | (202) 955-1500 |
| Fax: (271) 367-3752 | Fax: (202) 862-3619 |
| danielthies@webberthies.com | sahmad@HuntonAK.com |
| | |
| Thomas D. Cunningham (pro hac vice) | Phillip G. Steck |
| SIDLEY AUSTIN LLP | COOPER ERVING & SAVAGE LLP |
| One South Dearborn Street | 39 North Pearl Street |
| Chicago, IL 60603 | Albany, NY 12207 |
| (312) 853-7000 | (518) 449-3900 |
| Fax: (313) 853-7036 | Fax: (518) 432-3111 |
| tcunningham@sidley.com | psteck@coopererving.com |

*Attorneys for Utica Mutual Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 24, 2021, the foregoing was served on counsel of record by ECF.


By: *<u>/s/ Daniel R. Thies</u>*
  Daniel R. Thies

  Daniel R. Thies (Pro Hac Vice)
  WEBBER & THIES PC
  202 Lincoln Square
  Urbana, IL 61803
  (217) 365-5327

  Counsel for Utica Mutual Insurance Company