**IN THE UNITED STATES DISTRICT COURT FOR**
**THE NORTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x

UTICA MUTUAL INSURANCE COMPANY, :
                                     :

                 Plaintiff,     :    No. 6:13-CV-01178 (GLS/TWD)

      v.                        :

                                     :

CLEARWATER INSURANCE COMPANY,   :

                                     :

             Defendant.    :

-----------------------------------------------------------x

**UTICA'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR JUDGMENT AS A MATTER OF LAW**

SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

WEBBER & THIES PC
202 Lincoln Square
Urbana, IL 61803
(217) 365-5327

HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1500

COOPER ERVING & SAVAGE LLP
39 North Pearl Street
Albany, NY 12207
(518) 449-3900

*Counsel for Plaintiff Utica Mutual Insurance Company*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ...................................................................................1

II.   LEGAL STANDARD ............................................................................2

III.  ARGUMENT.........................................................................................3

    A.   The Court Should Grant Judgment To Utica On Its Breach Of Contract Claim ...........3

        1.   All Extrinsic Evidence Shows Aggregate Limits. ................................3

            i.    The Overwhelming Extrinsic Evidence Proves Aggregate Limits. .............3

            ii.   Clearwater Presents No Extrinsic Evidence Regarding Aggregate Limits. ..............8

        2.   Clearwater Is Obligated To Pay Defense Costs As A Matter Of Law Because Of The Umbrella Policies. ..........9

            i.    The Overwhelming Evidence Shows The Umbrella Policies Required Utica To Defend. ..........9

            ii.   Utica's Umbrella Policies Required Utica To Defend In Light Of The Court's Prior Ambiguity Finding...........11

        3.   Clearwater Is Obligated To Pay Defense Costs As A Matter Of Law Because Of The Reinsurance Contracts...........12

        4.   The Evidence Established Utica Settled In Good Faith As A Matter Of Law. .........13

        5.   Clearwater Was Not Billed Orphan Share. .........14

        6.   Utica Did Not Breach The Duty Of Utmost Good Faith By Failing To Disclose The Aggregate Limit Dispute..........14

            i.    Clearwater's Argument Is Waived And Prohibited. ..........15

            ii.   Clearwater Did Not Introduce The Necessary Evidence To Imply The Duties It Seeks To Imply. ..........17

            iii.  Clearwater's Argument Is Legally Wrong...........17

            iv.  Utica's Disclosure At July 2013 Claims Review........18

            iv.  Utica's Disclosures Prior To The July 2013 Claims Review ..........20

i

v.    At The Time Utica Billed Clearwater, The Aggregate Limit Issue Was Not Disputed ................................................................21

vi.   Clearwater Did Not Make Use Of Verification Means. ..........................22

vii.  Utica Substantially Performed. ..................................................22

viii. Any Breach Was Not Material. ..................................................23

ix.   Clearwater Failed To Show Prejudice. ......................................23

7.    Clearwater Is Liable For Declaratory Judgment Expenses As A Matter Of Law ................................................................25

i.    Clearwater's Argument Is Waived And Prohibited. ................................25

ii.   Clearwater Is Liable For Declaratory Judgment Expenses .....................25

8.    Clearwater's Argument That Utica Must Allocate Based On Risk Is Legally Wrong. ................................................................27

B.    The Court Should Grant Judgment To Utica On Clearwater's Breach Of Contract Claim ................................................................28

II.   CONCLUSION ................................................................29

## I.       INTRODUCTION

In this dispute between Plaintiff Utica Mutual Insurance Company ("Utica") and

Clearwater Insurance Company ("Clearwater"), a reasonable jury would not have a legally

sufficient evidentiary basis to find for Clearwater on the issues below. *See Compagnie*

*Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232

F.3d 153, 159 & 161 (2d Cir. 2000) (directing entry of judgment as a matter of law under Rule

50 because "overwhelming weight of the extrinsic evidence" supported one interpretation of

ambiguous contract).  Utica thus moves pursuant to Rule 50(a) of the Federal Rules of Civil

Procedure on eight grounds, each of which may be considered a separate motion.

1. **Aggregate Limits.** Whether the extrinsic evidence establishes Utica's and Goulds
   Pumps, Inc.'s ("Goulds") intent that the 1978-81 primary policies were subject to
   aggregate limits.

2. **Defense Costs (Umbrella Policies).** Whether Clearwater is liable for defense costs
   because the 1978-81 umbrella policies actually covered them, including whether the
   extrinsic evidence establishes about Utica's and Goulds' intent that the umbrella policies
   required Utica to defend the asbestos claims.

3. **Defense Costs (Reinsurance Contracts).** Whether Clearwater is liable for defense costs
   because the defense costs meet the definition of expense in the reinsurance contracts,
   regardless of whether umbrella policies actually covered them.

4. **Good Faith Settlement.** Whether Utica's settlement with Goulds was made in good
   faith.

5. **Orphan Shares.** Whether Clearwater is liable for orphan share amounts.

6. **Utmost Good Faith.** Whether Utica's breach of contract claim fails because Utica breached the duty of utmost good faith by failing to disclose the dispute with Goulds about the aggregate limits in Utica's primary policies.

7. **DJ Expenses.** Whether Clearwater is liable for its share of Utica's declaratory judgment expenses.

8. **Allocation Based on Risk.** Whether Utica was required to allocate or pay more money under the primary policies because that was the "risk" that Utica faced in the dispute with Goulds.

## II.   LEGAL STANDARD

Under Fed. R. Civ. P. 50(a), if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on" an issue, the court may "resolve the issue against the party" and may "grant judgment against" a party "on a claim or defense." *See also Cobb v. Pozzi*, 363 F.3d 89, 101 (2d Cir. 2004) (quoting *Nadel v. Isaksson*, 321 F.3d 266, 271–72 (2d Cir. 2003)). "The standard for post-verdict judgment as a matter of law is the same as for summary judgment under Fed. R. Civ. P. 56." *Id.* But denial of a motion for summary judgment does not preclude a court from granting a motion for judgment as a matter of law. *See Williams v. County of Westchester*, 171 F.3d 98, 102 (2d Cir. 1999). Thus, judgment as a matter of law under Rule 50(a) is appropriate where, "viewed in the light most favorable to the nonmoving party, the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Cobb*, 363 F.3d at 101 (alterations in original). Finally, judgment as a matter of law is appropriate on "issues" even if resolving that issue would not decide "a claim or defense." *Ho Myung Moolsan, Co. Ltd. v. Manitou Mineral Water, Inc.*, No. 07 Civ.

07483(RJH), 2010 WL 4892646 (S.D.N.Y. Dec. 2, 2010) (granting Rule 50(a) motion for judgment as a matter of law on single category of damages).

Where "extrinsic evidence is so-one sided" or where "the overwhelming weight of the extrinsic evidence supports" one party's interpretation, the Court may enter judgment as a matter of law under Rule 50. *Compagnie Financiere*, 232 F.3d at 159 (directing entry of judgment in party's favor because "overwhelming weight of the extrinsic evidence" supported that party's interpretation).

## III.   ARGUMENT

### A.   The Court Should Grant Judgment To Utica On Its Breach Of Contract Claim

#### 1.   All Extrinsic Evidence Shows Aggregate Limits.

##### i.   The Overwhelming Extrinsic Evidence Proves Aggregate Limits.

Utica's 1978-81 primary policies issued to Goulds are ambiguous as to whether they are subject to aggregate limits. Dkt. 106 at 16; June 9, 2021 Tr. at 43:2–5 ("The contract is ambiguous."). Extrinsic evidence thus must be used to determine the intent of the contracting parties. *See Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275–76 (2d Cir. 2000). Granting judgment as a matter of law under Rule 50 is appropriate where there is "overwhelming" extrinsic evidence supporting one party's interpretation. *Compagnie Financiere*, 232 F.3d at 159. That standard is plainly met here.

All of the evidence shows that Goulds and Utica intended to make the 1978-81 primary policies subject to aggregate limits.  This evidence includes the testimony of contemporaneous Utica and Goulds witnesses, summaries of Goulds' insurance by its insurance broker, dozens of certificates of insurance prepared by Utica or Goulds' insurance broker, the "mark-ups" prepared in Utica's underwriting department, a certification by Goulds' secretary, discussions with

Goulds' risk manager and an interview with its insurance broker, and advice from Utica's coverage counsel.

First, testimony from both sides of the transaction confirms a common intent to include an aggregate limit. Barry Bradshaw, the Goulds employee in charge of buying the insurance, Day 4 Bradshaw. Tr. at 5:15-17; P-49; P-119, testified that his understanding was that the 1978-81 primary policies "contained aggregate limits," *id.* at 7:21-8:1; 10:6-10, and that he was told by the broker that the insurance he purchased included an aggregate limit. *Id.* at 9:1-12; 10:6-10; 23:7-13. Similarly, Marcia Schilling, a former Utica employee that worked in the National Accounts department responsible for the Goulds policies, Day 2 Tr. at 194:22-200:12, testified that she marked up the previous years' policy to show an aggregate limit because "that was what the aggregate limit was." *Id.* at 199:8-14. She also explained that she could not do her job to calculate the premium if there was no aggregate limit, *id.* at 199:16-25, making the intent to include an aggregate limit the only plausible conclusion. No testimony from any contemporaneous employee of either Goulds or Utica suggests an intent not to include an aggregate limit.[1]

Second, letters from Goulds' broker to Goulds confirm this testimony. On December 4, 1978, Goulds' broker wrote a letter to Goulds stating that the 1979-80 primary policy was subject to a "$500,000 aggregate":

---

[1] Testimony from later Utica employees concurs. For example, Bernie Turi, one of the Utica employees responsible for handling the Goulds claims, testified that "the policies issued by Utica to Goulds all intended and had aggregate limits." Day 3 Tr. at 238:9-20.

Limits:              Combined Single Limit Bodily Injury and Property
                     Damage.

                          $500,000 Each Occurrence
                          $500,000 Aggregate

P-49 at 12. Bradshaw testified that he relied on this letter, including the description of the limits,

to purchase the 1979-80 insurance policies for Goulds. Day 4 Bradshaw Tr. at 11:10-13:19. On

December 19, 1979, Gould's broker wrote another letter to Goulds stating that the 1980-81

primary policy was subject to a "$500,000 aggregate."

Limits:          Combined Single Limit Bodily Injury and Property
                 Damage - $500,000 Each Occurrence
                 $500,000 Aggregate

P-119 at 14. Bradshaw testified that this letter was accurate and "consistent with [his]

understanding of the insurance program." Day 4 Bradshaw Tr. at 14:22–15:10.

Third, the markups of the 1978-79 policy, the 1979-80 policy, and the 1980-81 policy for

the subsequent year all reflect that intent to subject the coverage to a $500,000 aggregate limit.

P-22 at 23; P-23 at 25; P-24 at 27. The 1979-80 policy markup for the 1980-81 policy year is

typical:



P-23 at 26. Ms. Schilling testified that this marked-up policy contained her handwriting. Day 2 Tr. at 194:22-200:12; *see also* P-24 at 27 (1980-81 marked up for 1981-82); Day 2 Tr. at 209:2-14 (Schilling testifying that P-24 contains her handwriting).

Fourth, dozens certificates of insurance confirm the policies were subject to aggregates. In 1978, Utica issued a certificate of insurance to Goulds that stated that there was a "$500,000 Aggregate-Products" limit for bodily injury for the 1978-79 primary policy:



P-120. Kristen Martin explained that Utica sent this document to Goulds just eleven days after the 1978 primary policy went into effect. Day 1 Tr. at 136:17–22, 137:20–138:5 ("It shows that there was $500,000 for each occurrence and 500,000 in the aggregate."). She also testified that she "didn't see any documents" "where Goulds, in response to receiving a certificate of insurance like this, claimed that these policies shouldn't have any aggregate limits." *Id.* at 138:6–11. Certificates of insurance for the 1980-81 policy also reflect the intent that the policy be subject to an aggregate limit:



P-121 at 1; *see also* P-121 at 2-13 (twelve additional certificates of insurance for 1980); P-397.

Certificates of insurance for 1981-82 are the same:



P-122 (twenty-three certificates of insurance for the 1981 primary policy).

A collection of over 1,000 pages of Goulds' historical insurance information included a certification from Goulds' secretary that Goulds' 1967 primary insurance policy from Utica's contained an aggregate products limit, a certificate of insurance for the 1960 reflecting an aggregate limits for Utica's primary policies, and insurance summaries from Goulds' insurance broker detailing aggregate limits for Utica's 1966 and 1971 primary policies, and an insurance bonder for the 1986 Utica primary containing an aggregate limit.  P-296 (9/13/2001 letter from ITT/Goulds to Utica w/enc.) at 310-11, 45, 186, 353, 769.  Utica General Counsel Bernie Turi testified that Utica and its coverage counsel review all 1000-plus pages of P-296 and found no evidence that Goulds had purchased unaggregated bodily injury coverage for products under its primary policies.  See Day 3 Tr. at 224:2-15.

Mr. Turi also testified that he spoke with Goulds' former risk manager, Gary Elkin, who told him that "he could not see why the policies would not have aggregates, they always did." Day 3 Tr. at 234:2-5, citing P-409 (10/7/04 email from B. Turi) (Elkin).  Mr. Turi also spoke with Goulds' former insurance broker, Tom Cavney of Marsh & McClennan.  According to Mr. Turi, Mr. Cavney said "it was his opinion that the Goulds policies issued by Utica always contained aggregate limits."  Day 3 Tr. at 225:25-226:2.  Mr. Cavney made a similar comment to

Utica's counsel in a separate interview.  P-408 (7/1/04 Memo from Berkes Crane ("I ask [Tom Cavney] generally about his recollections as to whether Utica ever issued products coverage without aggregates.  He said he had a clear recollection that it never did so.")   Utica's outside counsel in the Goulds dispute also advised that Utica's primary policies contained aggregate limits.  The Berkes Crane law firm advised Mr. Turi that "by dint of their obviously meticulous preparation, completeness and construction," that "Utica is fully prepared to prove, on a policy-by-policy basis, the existence of an aggregate limits in all of its policies."  Day 3 Tr. at 225:6-11, citing D-71 at 2.

In sum, the overwhelming extrinsic evidence shows that Utica and Goulds intended for the 1978-81 primary policies to be subject to aggregate limits.

### ii.    Clearwater Presents No Extrinsic Evidence Regarding Aggregate Limits.

Clearwater has introduced no extrinsic evidence to the contrary. There is no letter from Marsh to Goulds stating that the policies no longer have an aggregate limit. No binder. No marked-up policy. No certificate of insurance. No request by Goulds for coverage without an aggregate limit. No agreement by Utica to such a request. No testimony that Utica or Goulds intended for the policies to not have an aggregate limit.

The absence of that evidence is best shown by Clearwater's continued reliance on the policies themselves. See, e.g., Day 2 Tr. at 24:8-28:12 (cross examination of Ms. Martin about the limits pages in the 1978-81 primary policies that the Court already found ambiguous). Relying on the policies is insufficient because the Court already found the policies are ambiguous. By definition, the policies are intrinsic evidence, not extrinsic evidence. *RPS Props., LLC v. Performance Props., Inc.*, 862 N.Y.S.2d 811 (Table), 2005 WL 3108238, at *1 (N.Y. Civ. Ct. 2005) (extrinsic evidence is "evidence not contained in the instrument itself"). Extrinsic

evidence is evidence "outside the policy." *Stern v. Cigna Group Ins.*, 2006 WL 2466202, at *2 (S.D.N.Y. Aug. 25, 2006). Clearwater has introduced no such evidence about Utica's or Goulds' intent for the 1978-81 primary policies.

In sum, the evidence overwhelmingly shows that Utica and Goulds intended for the 1978-81 primary policies to be subject to aggregate limits. Thus, Utica was actually liable under the umbrella policies.[2]

### 2.    Clearwater Is Obligated To Pay Defense Costs As A Matter Of Law Because Of The Umbrella Policies.

For Clearwater's obligation to pay defense costs, the Court should grant judgment as a matter of law to Utica for two independent reasons.

### i.    The Overwhelming Evidence Shows The Umbrella Policies Required Utica To Defend.

The umbrella policies state: "with respect to any occurrence not covered by the policy listed in the schedule of underlying insurance . . . the company shall A. defend any suit against the insured . . . ." E.g., P-8 at 5 § 2. As shown below, the extrinsic evidence is "one sided" and "overwhelming" that under this language Utica and Goulds intended for the umbrella policies to cover defense costs after the primary policies were exhausted.

- Turi, a Utica employee responsible for the Goulds claims, testified that the "underlying policy wouldn't cover an occurrence" "if the underlying policy was exhausted," and that the umbrellas would thus cover defense. Day 3 Tr. at 184:8-186:14. And Turi testified that "that's how our company treated these umbrellas." *Id.* at 186:15-20.

- Martin, another Utica employee who had responsibility for handling claims for Goulds, testified that the "Utica umbrella policies issued to Goulds generally require Utica to defend certain claims." Day 1 Tr. at 144:12–14. She explained that the 1978–81 polices are "defense outside limits" and payments to Goulds' attorneys do not "erode" the policy limit. *Id.* at 144:15–146:18.

---

[2] The umbrella policies cover asbestos claims. See, e.g., Day 3 Tr. at 166:8-13. Clearwater has never claimed otherwise.

Goulds also believed that the umbrella policies covered defense costs after exhaustion of the primary policies. See, e.g., P-179 at 20 (Goulds' Mediation Statement: "The Supplemental Duty To Defend Owed By Utica Mutual The 1977 To 1985 Umbrella Policies."); D-135 at 3 (Goulds' January 2006 Letter: Utica "issued seven umbrella policies that provide for an unlimited supplemental defense.").

Clearwater's own employees agreed.

- Ruhlmann, an underwriter at Clearwater involved in underwriting one or more of the reinsurance contracts, stated that "if a primary policy is not paying out any additional limits, any loss presented to it is not covered by that primary policy." Day 2 Tr. 224:9–25. Because the umbrella policy requires Utica to defend any occurrence not covered by the primary policy, Ruhlmann's testimony supports Utica's position.

- McCaffrey, Clearwater's claims handler, agreed that when "a primary is exhausted, it no longer covers a claim." Day 3 Tr. at 71:11–14. Just Like Ruhlmann's, this testimony supports Utica.

Significantly, Ms. McCaffrey testified that she recommended that Clearwater pay the portion of Utica's billings related to expenses under the umbrella policies and she had the umbrella policy terms and conditions at that time. Day 3 Tr. at 70:13-19; P-79 at 16 (Ms. McCaffrey's memorandum recommending payment in which she quotes the relevant umbrella policy language). That confirms her agreement that expenses were covered. On the other hand, Clearwater has presented no extrinsic evidence that Utica and Goulds intended for the umbrella policies to not cover defense costs after exhaustion of the primary policies.

Because the "overwhelming weight of the extrinsic evidence supports" Utica's position, and the Court should grant judgment as a matter of law to Utica on this issue. *See Compagnie Financiere*, 232 F.3d at 161.

ii.   **Utica's Umbrella Policies Required Utica To Defend In Light Of The Court's Prior Ambiguity Finding.**

The Court found the umbrella policy language ambiguous as to whether Utica had a duty to defend (*i.e.*, a duty to pay defense costs) after exhaustion of the underlying policies. Dkt. 158 at 10–12. If the umbrella policies are ambiguous on that issue (as this Court found), Utica necessarily had a duty to defend.

When an insurance policy "'may be reasonably interpreted in two conflicting manners, its terms are ambiguous,' and 'any ambiguity must be construed in favor of the insured and against the insurer.'" *Lend Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co.*, 71 N.E.3d 556, 560 (N.Y. 2017). This basic rule of construction in insurance disputes applies equally to defense obligations. *See Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 144 (2d Cir. 2004) ("Any ambiguity as to the insurer's duty to defend is resolved in favor of the insured.").

This principle has been applied by numerous courts that have concluded that an insurer is obligated to provide a defense when there is an ambiguity in the policy. *See*, *e.g.*, *Charles F. Evans Co. v. Zurich Ins. Co.*, 731 N.E.2d 1109, 1110 (N.Y. 2000) (upholding insurer's duty to defend where "[t]he policy . . . is at least ambiguous as to whether the claims in question are covered, and must be construed against the insurer"); *accord Nassau Plaza Assocs., L.P. v. Greater N.Y. Mut. Ins. Co.*, 904 N.Y.S.2d 478, 479 (N.Y. App. Div. 2010) (holding insurer obligated to defend given dispute over interpretation of notice provision, noting "[t]o the extent that the defendant urges adoption of an alternative interpretation of the notice endorsement . . . , we note that the alternative interpretation establishes, at best, the existence of an ambiguity in the endorsement, which must be construed in favor of the [insured] and against the [insurer]."); *Mack-Cali Realty Corp. v. Peerless Ins. Co.*, 115 F. Supp. 3d 449, 456 (S.D.N.Y. 2015) (where party "has established that the phrase 'intended use' is ambiguous," consideration of extrinsic

11

evidence to determine defense obligations was "unnecessary" because insurer had a duty to defend given the ambiguity). Accordingly, the ambiguous not "covered by" provision in the Utica umbrella policies must be construed in favor of coverage (as Utica did) without regard to extrinsic evidence.

### 3. Clearwater Is Obligated To Pay Defense Costs As A Matter Of Law Because Of The Reinsurance Contracts.

Separately, the defense costs also fall within the relevant definitions in the reinsurance contracts. They state that Clearwater "shall promptly reimburse [Utica] for its share of the loss and loss expense." P-1 ¶ 3(c); P-2 ¶ 3(c). They state that the "term 'loss expense' shall mean all expenses incurred in the investigation, adjustment, settlement or litigation of claims, awards or judgments, including the salaries and expenses of [Utica's] staff adjusters but excluding the office expenses of [Utica] and the salaries and expenses of all other employees of [Utica]." *Id.* ¶ 3(f).

The evidence showed that the defense costs that Utica seeks from Clearwater constitute "expenses incurred in the investigation, adjustment, settlement or litigation of claims, awards or judgments." Utica witnesses testified that Utica paid attorneys to represent Goulds in the asbestos claims. Day 1 Tr. at 92 (Kristen Martin testifying that Utica paid attorneys to represent Goulds in the asbestos claims); Day 1 Tr. at 144-146 (Kristen Martin testifying that Utica defense costs under the 1978-81 umbrella policies, which included money paid to lawyers or experts or investigators); P-424 at 4 (identifying amount of expense that Utica paid under each policy).

Therefore, the Court should grant judgment as a matter of law to Utica, finding that the expenses that Utica seeks to recover from Clearwater fall within the definition of "loss expense" in the reinsurance contract and that Clearwater is therefore obligated to pay them.

####     4.     The Evidence Established Utica Settled In Good Faith As A Matter Of Law.

The evidence above about aggregate limits and defense costs supports that Utica's settlement was in good faith. On both issues, the settlement is consistent with the evidence and Utica's position because the settlement recognizes that the 1978-81 primary policies were subject to aggregate limits and that the 1978-81 umbrella policies covered defense costs after the exhaustion of the primary policies. P-111. Indeed, Clearwater acknowledges that Utica's settlement was in good faith: "Clearwater has never argued—and does not now argue—that Utica's decision to settle with Goulds was made in bad faith." Dkt. 203 at 2 (Clearwater motion in limine brief). Clearwater's witness, Bill Bouvier, affirmed at trial that "Clearwater's not arguing that Utica's decision to settle with Goulds was made in bad faith" and that "Clearwater is not arguing that Utica paid too much to settle." Day 6 Tr. at 221:13-23.

In addition, Utica witnesses testified about the good-faith nature of the settlement. Bernie Turi testified that "it was quite reasonable" and not "made in bad faith." Day 3 Tr. at 272:7-273:10. Mr. Turi testified why the settlement was a "good deal." Day 3 Tr. at 261: 5-262:4. Mr. Turi's view of the aggregate limit issue was not "influenced in any way by the existence of reinsurance." Day 3 Tr. at 271:6-23. Richard Creedon testified why the settlement was "a phenomenal deal." Day 5 Tr. at 58:1-8. He testified that Utica "wouldn't have handled [the settlement] any differently" if it "were not aware of any reinsurance whatsoever." *Id.* at 49:11-21. He testified that Utica "would have taken the best possible terms we could have gotten with [] or without reinsurance." *Id.*

In sum, the evidence establishes that there is no legally sufficient basis for the jury to rule in Clearwater's favor on this issue and the Court should grant judgment as a matter of law to Utica on it.

### 5.    Clearwater Was Not Billed Orphan Share.

Clearwater's argument is that "Utica must prove that Clearwater agreed that it would pay for the orphan shares." Day 1 Tr. at 82:14-15. But Utica is not asking Clearwater to pay for any orphan shares. Utica allocated the orphan shares to the umbrella policies in October 2007 and billed reinsurers for those orphan shares that time. Day 3 Tr. at 130:12-131:7. Utica did not bill Clearwater at that time. *Id.* Clearwater first billed Clearwater in June 2011. *Id.*; P-329-A (stipulated summary of Utica's billings to Clearwater). Thus, no orphan shares are billed to Clearwater and there would be no "legally sufficient evidentiary basis to find" for Clearwater on this issue. Fed. R. Civ. P. 50(a).

Moreover, even if the orphan share payments were removed from the umbrella policies and not billed to any reinsurers, Stefanie Walterick, the Resolute employee responsible for billing Clearwater, testified that Clearwater would still be billed the same amount under the reinsurance contracts. Day 6 Tr. at 13-15. Clearwater did not present any contrary testimony, and judgment in Utica's favor is appropriate on that ground as well.

### 6.    Utica Did Not Breach The Duty Of Utmost Good Faith By Failing To Disclose The Aggregate Limit Dispute.

Clearwater argues that it does not owe Utica $10,901,005.03 because Utica breached the duty of utmost good faith by not disclosing the dispute with Goulds about the aggregate limits in Utica's primary policies.[3]

---

[3] See, e.g., Dkt. 191 at 49 (Clearwater's trial brief alleging that Utica breached the duty of utmost good faith because (1) "Utica failed to advise Clearwater that the critical issue in the California DJ action with Goulds was whether Utica's 1978-81 primary policies contained aggregate limits" and (2) "Utica misrepresented to Clearwater that the limits of Utica's 1978-81 primary policies were exhausted when, in truth, the existence of aggregate limits and whether those limits were exhausted was a hotly contested issue that Utica could lose.").

**i.      Clearwater's Argument Is Waived And Prohibited.**

This Court previously granted Utica's motion for summary judgment. See Dkt. 106. In

opposing that motion, Clearwater argued "UTICA VIOLATED *UBERRIMAE FIDEI*, THIS

ALONE PRECLUDES UTICA FROM OBTAINING SUMMARY JUDGMENT." Dkt. 80 at 43

(capitals in original). Uberrimae fidei is "the duty of utmost good faith." *Id.* Despite that

argument, the Court granted summary judgment to Utica. On appeal, Clearwater did not argue—

likely for strategic reasons—that summary judgment was inappropriate because of an alleged

violation of the duty of utmost good faith. *See* Clearwater Opening & Response Brief, *Utica Mut.*

*Ins. Co. v. Clearwater Ins. Co.*, No. 16-2535 (2d Cir. Jan. 25, 2017), Dkt. 110 at *passim*. Not

surprisingly, the Second Circuit did not reverse that part of the Court's decision. *See Utica Mut.*

*Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, at *passim* (2d Cir. 2018). This history provides two

reasons the Court should reject Clearwater's assertions of a breach of the duty of utmost good

faith as a matter of law.

First, Clearwater waived its right to raise the duty of utmost good faith as a bar to Utica's

claims. "'[W]here an issue was ripe for review at the time of an initial appeal but was

nonetheless foregone,' it is considered waived and the law of the case doctrine bars the district

court on remand and an appellate court in a subsequent appeal from reopening such issues."

*United States v. Quintieri*, 306 F.3d 1217, 1229 (2d Cir. 2002) (citation omitted). Clearwater had

the opportunity to appeal based on its duty of utmost good faith argument when it appealed this

Court's ruling, but it did not do so. *Kuhl v. United States*, No. 07–CV–3680 (JS), 2008 WL

4527744, at * 5 (E.D.N.Y. Sept. 30, 2008) (When "arguments were available to Appellant at the

Second Circuit, . . . [the District] Court will not grant Appellant an opportunity to make an

argument that she did not have the foresight to make earlier."). Although Clearwater's notice of

appeal states that it appealed the entire decision, it did not actually argue in its appellate brief that

15

the District Court wrongly granted summary judgment because of Clearwater's duty of utmost good faith arguments (2d Cir. Case No. 16-2535, Dkt. 110), and it therefore abandoned this issue. *See Hill v. City of New York*, 820 F. App'x 86, 87 (2d Cir. 2020) ("litigant abandons issue by failing to address it in his appellate brief"); *see also* Fed. R. App. P. 28(a)(5)–(9) (appellant's brief must include issues presented for review, precise relief sought, and argument, including appellant's contentions and reasons for them).

Second, the Second Circuit identified specific issues for this Court to determine on remand, and Clearwater's arguments about the duty of utmost good faith is not among them. When an appellate court "identifie[s] a narrow issue for remand," a party cannot relitigate issues previously decided by the district court that are outside the scope of the remand. *Quintieri*, 306 F.3d at 1226) (holding that district court erred by reconsidering issue outside scope of remand); *Kuhl*, 2008 WL 4527744, at *4 (when appellate court's "mandate was limited in scope," district court does not have "authority" to address issues outside mandate). Here, the Second Circuit found that Clearwater "must indemnify Utica according to Utica's proven liability on the umbrella policies." *Utica Mut. Ins.*, 906 F.3d at 25. And, based on that, it specified which issues should be considered on remand:

> For the reasons stated above, we VACATE the judgment of the district court as to the appeal and REMAND for the district court to determine whether Clearwater's obligations under the reinsurance contracts encompass asbestos-related claims. We also VACATE the judgment of the district court as to the cross-appeal and REMAND for the district court to determine indemnification that Clearwater owes to Utica under (1) the TPFC memoranda and (2) the Clearwater certificates on the basis of Utica's proven liability under its umbrella policies issued to Goulds.

*Utica Mut. Ins.*, 906 F.3d at 25–26. Notably, the issue of the duty of utmost good faith is not included in the Second Circuit's remand.

That the duty of utmost good faith is not included in the mandate makes sense because Clearwater did not appeal that issue. Because that issue is not within the Second Circuit's mandate, and so Clearwater cannot re-raise it.

> ### ii.    Clearwater Did Not Introduce The Necessary Evidence To Imply The Duties It Seeks To Imply.

The reinsurance contracts do not contain the unbounded disclosure obligations Clearwater seeks to put on Utica. Thus, Clearwater is seeking to imply those duties into the contracts. And so Clearwater must have introduced "custom and usage evidence" to "establish that the omitted term is 'fixed and invariable' in the industry in question. *British Intern. Ins. Co. Ltd. v. Seguros La Republica, S.A.*, 342 F.3d 78, 84 (2d Cir. 2003). It must have shown that Utica "was aware of the custom, or that the custom's existence was 'so notorious' that it should have been aware of it." *Id.* That is, it must have shown that the custom was "so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and that they contracted in reference thereto." *Id.* Clearwater introduced no evidence about what duties were fixed and invariable in the 1970s and 1980s. Thus, it failed to show that Utica and Clearwater knew about Clearwater's proposed disclosure duties and contracted in reference to them. Therefore, there is no legally sufficient evidence for the jury to imply such a disclosure obligation into the reinsurance contracts.

> ### iii.    Clearwater's Argument Is Legally Wrong.

In addition, Clearwater's conception of what the duty of utmost good faith requires is legally wrong. See Dkt. 217 at 9-13 (showing that Clearwater's legal arguments have no basis). If the Court adopted it, it would be creating new law. *Id.*[4] The Court should reject Clearwater's

---

[4] Indeed, the amorphous, shifting nature of the supposed duty Clearwater relies on supports that no such duty exists in the law. Clearwater has contended that the duty requires Utica to provide

invitation to imply Clearwater's proposed unbounded disclosure obligation into the parties'

reinsurance contracts. Indeed, as the Second Circuit noted in a prior appeal in this case, the New

York Court of Appeals's "repeated emphasis on plain language makes clear that we should not

imply so significant a term into a contract negotiated between sophisticated parties." *Utica Mut.*

*Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 24 (2d Cir. 2018).

### iv.   Utica's Disclosure At July 2013 Claims Review

Regardless, the undisputed facts at trial show that Utica met Clearwater's invented

standards because it disclosed the dispute with Goulds about the aggregate limits in Utica's

primary policies at Clearwater's July 2013 claims review at the latest. Indeed, Clearwater admits

as much. It concedes that at the July 2013 claims review, the files Utica voluntarily made

available contained "[d]ocument after document about the Goulds' California lawsuit, the lack of

aggregate limits, and Utica's 78, 79,80, and 81 primary policies, the issues in stake in the

California and New York litigations, the fact that the umbrella policies might never have been

triggered, and the details of how Utica was seeking to have the reinsurers pay all of the value to

Goulds to solve Utica's catastrophic problems under the primary policies it issued." Day 1 Tr. at

80-81. The vast majority of Utica's billings to Clearwater came after the audit. *See* P-329.

Utica's disclosure at the audit gave Clearwater ample notice to evaluate those billings and

eliminated any prejudice to Clearwater from the alleged failure to disclose the information at an

earlier date.

Clearwater's admission that it learned of the aggregate limits issue at least at the audit is

consistent with the evidence at trial:

---

to Clearwater "critical information about Clearwater's risks and obligations," "to fully inform
them of any issues relevant to the risk that they reinsure," to "apprise the [re]insurers of any
matter that would effect its bills." Day 1 Tr. at 60:15-20, 65:14-18, 79:10-14.

- Linda McCaffery, a former Clearwater employee that attended the claims review, testified that her notes from the July 2013 audit documented Utica's disclosure of the dispute with Goulds about aggregate limits. Day 3 Tr. at 79-80.

- She testified that she had no reason to believe that Utica was trying to hide that aggregate limits was an issue at the claims review. Day 3 Tr. at 80.

- Clearwater's notes from the July 2013 claims review are replete with information about the dispute between Utica and Goulds about aggregate limits, including:

    o "First doc – outline titled 'outstanding issues' includes 1) Aggregate Limits – strong evidence." P-71 at 4.

    o "7) litigation risks a. aggregate limits." P-71 at 5.

    o "Goulds sued Utica Mutual and other insurers claiming among other thing[s] . . . certain of Utica Mutual's policies issue[d] to Goulds did not contain an aggregate limit of liability." P-71 at 21.

    o "Gould's Principal Claims . . . 4) primary policies issued from 1/1/78-1/1/82 do not have aggregate limits." P-71 at 24.

    o "June 12, 2003 Memo – Absence of Aggregate Limits in Some Policies." P-75 at 4.

    o "In its 2/9/04 letter Goulds asserted that there are no agg limits for primary policies issued to Goulds by Utica for policy periods commen[c]ing 1/1/78 and ending 1/1/82." P-75 at 7.

    o "Look at those documents alone, one could make the argument that there were no aggregate BI product liability limits. This is precisely what Goulds/ITT is doing." P-75 at 23.

    o "ITT agreed it would be willing to set aside the following well-supported claims, among others, that Utica (i) issued five primary policies that have no aggregate limits." P-75 at 42.

    o "To reach a settlement, ITT agreed to stipulate that all primary policies issued by Utica have aggregate products/completed operations limits and that all such limits have been exhausted." P-75 at 43.

    o "In its moving papers Utica established that the following factual issues may arise at the time of the trial of this matter . . . (ii) whether the Utica policies issued to Goulds contained aggregate limits for products/completed operations coverage." P-75 at 48.

    o "only issue agg . . . was an open issue at time of settlement." P-183 at 13.

19

o "1) $7M orphan share paid back 2) they gave up no agg." P-183 at 14.

o "started sending ltr policies exhausted – Goulds responded no orphan share & agg." P-183 at 14.

In light of this unrebutted evidence showing that Utica disclosed the dispute with Goulds about aggregate limits at the July 2013 claims review (at the latest), "a reasonable jury would not have a legally sufficient evidentiary basis to find for" Clearwater on its claim that Utica breached the duty of utmost good faith because it failed to disclose the dispute with Goulds about the aggregate limits in Utica's primary policies. Thus, the Court should grant judgment as a matter of law to Utica on Clearwater's argument that Utica cannot recover on Utica's breach of contract claims because Utica allegedly breached the duty of utmost good faith.

### iv.   Utica's Disclosures Prior To The July 2013 Claims Review

Because the parties agree that the aggregate limit dispute was disclosed at the July 2013 claims review, consideration of disclosures prior to that time should not be necessary for granting Utica judgment on Utica's breach of contract claim. But, if they are, they too show Utica disclosed the aggregate-limit issue to Clearwater.

In November 2006, Utica sent the primary policies to Clearwater. *See* P-330 at 26, 65, 93, 146, 147, 235, 260. These are the same policies that, according to Clearwater: Have "a box per aggregate limits in each of those four policies and it's not filled in. It's blank. No aggregate limits. Pretty straightforward." Day 1 Tr. at 69:18-21.

In July 2007, Utica sent the settlement agreement to Clearwater. It identifies three issues in dispute between Utica and Goulds, one of which was "the exhaustion of the Goulds Primary Policies as more particularly set forth in Article II, paragraph 1 infra." P-111 at 2. Article II, paragraph 1 is the parties' agreement that the primary policies are subject to aggregate limits. P-111 at 24-25.

At that same time in July 2007, Utica also sent a Stipulation and Order to Clearwater. P-53 at 4-8. That document also identified the issues in dispute between Utica and Goulds. P-53 at 6. The first two issues are the "exhaustion of limits" of Utica's policies and the "available limits" of Utica's policies. *Id.*

Later, in March 2013, Utica sent a document to Clearwater that contained the following passage, summarizing one of the disputes between Utica and Goulds:

> Once Utica was named in the Canon Electric matter it became the subject of an unrelenting chronic refrain by Goulds that many of its early year policies had no aggregate limits thus subjecting itself to unlimited exposure for defense and indemnification. Utica always maintained (rightfully or wrongfully) that its policies did have aggregate limits but that to support this position parol evidence would have to be introduced. Historically, it is important to note that prior to the long form settlement of February 2007, Goulds had always maintained that Utica did not have aggregate limits in many of its policies and as such had virtually unlimited exposure for both defense costs and indemnity with respect to many of the asbestos suits that Goulds was vigorously defending.

P-70 at 7.

In sum, if it were necessary to consider disclosures prior to the July 2013 claims review, they too support granting Utica judgment as a matter of law on Clearwater's argument that Utica breached the duty of utmost good faith by not disclosing the aggregate limit dispute.

### v.    At The Time Utica Billed Clearwater, The Aggregate Limit Issue Was Not Disputed

In addition, at the time Utica began to bill Clearwater in June 2011, there was no dispute between Utica and Goulds about the aggregate limits. Instead, Utica and Goulds had agreed that the primary policies were subject to aggregate limits. P-111. Plus, by that time, Barry Bradshaw (the Goulds employee in charge of purchasing insurance) had testified that he understood the primary policies were subject to aggregate limits, as Utica had said all along. *See generally* Day 4 Bradshaw Tr. Therefore, when Utica began to bill Clearwater in June 2011, there was no

dispute between Utica and Goulds and thus nothing to disclose. Judgment as a matter of law is appropriate on this basis as well.

### vi. Clearwater Did Not Make Use Of Verification Means.

A party cannot claim it justifiably relied on representations made by another party if it "failed to make use of the means of verification that were available to it." *UST Private Equity Inv'rs Fund, Inc. v. Salomon Smith Barney*, 733 N.Y.S.2d 385, 386 (N.Y. App. Div. 2001) (explaining that "a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it, such as reviewing the files of the other parties" and dismissing fraud claim because plaintiffs did not request or carefully review documents during due diligence). The reinsurance contracts provided Clearwater with that means of verification: "At the request of Skandia, the Company shall place at its disposal and Skandia shall have the right at all reasonable times in the office of the Company, or elsewhere if mutually agreed, to inspect all books, records and papers of the Company in any way pertaining to the reinsurance provided hereunder, including but not limited to claims in connection therewith." P-1 ¶ 4. Thus, Clearwater cannot claim it justifiably relied on any representations by Utica prior to the July 2013 claims review because it had failed to exercise its means of verification provided for under paragraph 4 of the reinsurance contracts.

### vii. Utica Substantially Performed.

If the evidence set forth above does not establish that Utica met its obligations as a matter of law, it would nevertheless constitute substantial performance. "Substantial performance is performance, the deviations permitted being minor, unimportant, inadvertent, and unintentional." *Bank of New York Mellon Trust Co., N.A. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 311-12 (2d Cir. 2016) (internal citations and quotation marks omitted). A court will examine

22

several factors "such as absolute and relative magnitude of default, its effect on [the] contract's purpose, willfulness, and degree to which injured party was benefited under [the] contract." *Id.* at 312. In *Bank of New York Mellon*, the Second Circuit stated that when "the only performance issue is timeliness" there is "strong[] support" for a finding of substantial performance. *Id.*

### viii.    Any Breach Was Not Material.

Even if Utica breached, Clearwater has failed to show how it is material with respect to Utica's breach of contract claim. *See Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (A breach is only material if it "go[es] to the root of the agreement between the parties [and] defeats the object of the parties in making the contract."); *Sasson v. Mann*, 2019 WL 3532155, at *10 (S.D.N.Y. Aug. 2, 2019) ("The burden of proof on the issue of whether Defendant's performance is excused because of a material breach by Plaintiff is on Defendant."). The disclosure obligations Clearwater has created under the duty of utmost good faith are not even expressed in the contract. They could hardly "go to the root of the agreement" and "defeat[] the object" of Utica and Clearwater in making the contract. Indeed, the purpose of the contract was for Clearwater to provide reinsurance to Utica, not for Utica to disclose certain information to Clearwater. Thus, there is no material breach.

### ix.    Clearwater Failed To Show Prejudice.

Additionally, Clearwater has failed to present legally sufficient evidence that any alleged violation of the duty of good faith is prejudicial to it. In the absence of a showing of prejudice in the form of economic injury, Clearwater cannot succeed in avoiding its obligations under the contracts. *See N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1215 (3d Cir. 1995) ("Furthermore, to establish a breach of the duty of good faith, CIGNA Re must prove that it suffered economic injury because of North River's allegedly grossly negligent or reckless conduct."); *Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.*, 944

F. Supp. 986, 994 (D. Mass. 1996) ("The trend in these modern cases has been to recognize *uberrimae fidei* as the traditional operative standard, but to interpret it so as to require rescission of reinsurance contracts only where the reinsured acted in bad faith or where the reinsurers suffered prejudice from a failure to disclose.").

Clearwater has not presented any evidence sufficient to support a jury finding of such prejudice. To the contrary, the evidence establishes that Clearwater learned the information it alleges Utica withheld during the July 2013 audit at the latest. Even Clearwater admits this. Day 6 Tr. (Bouvier) at 81:13-82:6.  Clearwater has presented no evidence suggesting that it suffered any harm as a result of learning this information only in 2013. To the contrary, the vast majority of Utica's billings post-dated July 2013 (P-329-A), when Clearwater plainly had all of the information it alleges it needed.

In fact, Clearwater failed to show it relied on any alleged misrepresentations or nondisclosures with respect to Utica's breach of contract claim, a necessary predicate for showing prejudice. Clearwater appears to claim that Utica's September 2004, July 2005, October 2006, and July 2007 letters contained misrepresentations or nondisclosures. Yet Clearwater introduced no testimony that anyone at Clearwater even read those letters, much less that someone at Clearwater relied on the information or lack of information in those letters.  Day 6 Tr. (Bouvier) at 190:1-191:16; 197:22-198:15; 199:8-201:8.

A reasonable jury thus could not find that there has been any prejudice to Clearwater as a result of the alleged breach of Utica's duty of utmost good faith.

In sum, for a variety of reasons, the Court should grant Utica judgment as a matter of law on Clearwater's arguments about the duty of utmost good faith.[5]

       **7.**      **Clearwater Is Liable For Declaratory Judgment Expenses As A Matter Of Law**

       **i.**      **Clearwater's Argument Is Waived And Prohibited.**

In its summary judgment ruling, this Court held that Clearwater was required to cover declaratory judgment expenses. Dkt. 106 at 20–22. On appeal, Clearwater did not argue that part of the Court's decision should be reversed. *See* Clearwater Opening & Response Brief, *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, No. 16-2535 (2d Cir. Jan. 25, 2017), Dkt. 110. And the Second Circuit did not reverse that part of the Court's decision. *See Utica v. Clearwater*, 906 F.3d 12. Thus, Clearwater waived and is prohibited from asserting any argument that it is not liable for declaratory judgment expenses (for the same reasons Clearwater waived and is prohibited from asserting Utica breached the duty of utmost good faith).[6]

       **ii.**      **Clearwater Is Liable For Declaratory Judgment Expenses**

The 1978-79 Clearwater Certificates provide that reinsurers shall pay their portion of all "loss expense," which is defined to include "all expenses incurred in the investigation, adjustment, settlement or litigation of claims." P-1 ¶ 3. Declaratory judgment expenses are

---

[5] Clearwater does not argue that Utica failed to perform its obligations under the contract in any other way.

[6] In addition, nothing in the Second Circuit's opinion undermines the Court's prior ruling that Clearwater is liable for the declaratory judgment expenses that Utica billed to Clearwater. That ruling had nothing to do with the issues the Second Circuit addressed: whether the Clearwater Contracts required Clearwater to pay expense in addition to limits or whether the follow-the-fortunes and follow-the-settlements doctrine governed Clearwater's obligations. Dkt. 106 at 22. There is therefore no reason for this Court to deviate from its earlier ruling on declaratory judgment expenses even ignoring Clearwater's failure to appeal and the limited scope of the Second Circuit's mandate.

expenses "incurred in the investigation, adjustment, settlement or litigation of claims," and therefore fall within the definition of "loss expense."

Courts agree. *See Emprs. Reinsurance Corp. v. Mid-Continent Cas. Co.*, 358 F.3d 757, 763-64 (10th Cir. 2004) (holding that a reinsurance agreement providing for payment of "claim expenses," defined as "all expenses we incur" with respect to "any claim we investigate or settle or 'suit' against an insured we defend" covered declaratory judgment expenses); *Fireman's Fund Ins. Co. v. Gen. Reinsurance Corp.*, No. C-03-4406, 2005 U.S. Dist. LEXIS 43650, at *33 (N.D. Cal. Aug. 5, 2005) (construing similar language to cover declaratory judgment expenses because that conclusion is consistent with a near universal practice in the reinsurance industry); *Emprs. Ins. Co. v. Am. Re-Insurance Co.*, 256 F. Supp. 2d 923, 925 (W.D. Wis. 2003) ("The primary definition of 'allocated loss expenses'—'all expenses incurred in the investigation and settlement of claims or suits'—encompasses expenses incurred in declaratory judgment actions attempting to avoid coverage for a claim.").

In addition, Clearwater's challenge to the allocation of the declaratory judgment expenses is meritless. It contends that Utica should not have allocated declaratory judgment expenses to the umbrella policies because, according to Clearwater, the Utica-Goulds dispute involved the primary policies and not the umbrella policies. That is false. The litigation involved both the primary and umbrella policies. P-112 (Goulds' complaint alleging that Utica breached the primary and umbrella policies). Utica's position in that dispute was that the umbrella policies provided coverage. In addition, the orphan share was an umbrella-policy issue. Day 1 Tr. at 126:3-9; *id.* at 146:5-14, Day 2 Tr. at 11:1-19.

**8.      Clearwater's Argument That Utica Must Allocate Based On Risk Is
Legally Wrong.**

Clearwater argues that Utica had to or should have allocated more money to the primary

policies because the supposed risk that Utica settled with Goulds was that Utica would have to

pay more money under the primary policies. This claim is legally wrong for two reasons.

First, the Second Circuit held that Clearwater "must indemnify Utica according to Utica's

proven liability." *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 25 (2d Cir. 2018).

Clearwater's argument that Utica has to allocate based on risk is incompatible with this proven-

liability standard. The primary policies provide a perfect paradigm. According to the Second

Circuit, Utica must prove it was liable under the umbrella policies, which includes showing that

the primary policies were subject to aggregate limits. According to Clearwater, Utica had to

allocate more to the primary policies simply because of the risk Utica faced in the dispute with

Goulds. Dkt. 191 at 43. Clearwater argues that Utica had to do that *even if the primary policies

were subject to aggregate limits*. Dkt. 195-1 at 10-11 ("Whether Plaintiff intended to include

aggregate limits in the primary policies in question . . . is wholly tangential to the jury's task.").

That is, Clearwater contends that even if Utica was actually liable under the umbrella policies,

Utica cannot recover because it should have allocated more money to the primary policies. That

is inconsistent with the Second Circuit's proven liability standard. Put differently, if the primary

policies were in fact subject to aggregate limits, Utica could not both allocate based on its proven

liability (i.e., to the umbrellas after the primary policies exhausted) and based on its supposed

risk (i.e., to the primaries even after the primary policies exhausted). Thus, Clearwater's

argument that Utica had to allocate based on risk is legally wrong given the Second Circuit's

holding in this case.

Second, even if the follow-the-fortunes or follow-the-settlements doctrine applied, the

Second Circuit and the New York Court of Appeals have rejected the premise of Clearwater's

argument (that insurers most allocate based on the risk they faced in a dispute with their

policyholder). *See N. River Ins. Co.*, 361 F.3d at 138-43 (rejecting reinsurer's argument that

cedent must allocate to particular policies because the cedent's "pre-settlement analysis of

possible litigation outcomes identified risk of loss in higher layers" and explaining that the

reinsurer confused "loss", which the certificates covered, with "risk of loss"); *Gerling*, 419 F.3d

190-95 (rejecting reinsurer's argument that cedent must allocate to primary policies because the

cedent faced exposure largely, if not entirely, under those policies); *USF&G*, 20 N.Y.3d at 426-

28 (upholding as a matter of law USF&G's allocation to one primary policy even though

USF&G faced risk under thirteen different primary policies). Thus, even ignoring the proven

liability standard and assuming that the follow-the-fortunes or follow-the-settlement doctrines

still applied, Clearwater's argument would still be legally wrong.

### B.     The Court Should Grant Judgment To Utica On Clearwater's Breach Of Contract Claim

Clearwater has the burden to establish its breach of contract claim, and for all the reasons

stated above, the Court should also grant judgment as a matter of law to Utica on Clearwater's

breach of contract claim.

In addition, the contract does not obligate Utica to reimburse Clearwater for any

payments that Utica makes. Thus, Utica did not breach the contract by refusing to reimburse

Clearwater for the payments made. The Court should grant judgment to Utica for this reason as

well.

And Clearwater waived its ability to obtain reimbursement. Waiver is "a voluntary and

intentional relinquishment of a known right." *New York v. AMRO Realty Corp.*, 936 F.2d 1420,

1431 (2d Cir. 1991). Actual payment, like Clearwater made here, establishes waiver. *See Nat'l Grange Mut. Ins. Co. v. T.C. Concrete Constr., Inc.*, 843 N.Y.S.2d 877, 878 (App. Div. 2007) (right to assert defense waived where insurer had already indemnified insured). Finding waiver is particularly appropriate because Clearwater bases its reimbursement claim on the issues it supposedly learned of for the first time at the July 2013 claims review and Clearwater made its payment after it had internally decided to perform a claims review.

## II.   CONCLUSION

For the reasons stated above, the Court should grant Utica's Rule 50(a) motion and grant Utica judgment as a matter of law on both its affirmative claim and on Clearwater's counterclaim.

Dated: July 7, 2021

/s/ Syed S. Ahmad
Syed S. Ahmad (N.D.N.Y. Bar No. 602911)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1500
Fax: (202) 862-3619
sahmad@HuntonAK.com

Daniel R. Thies (Pro Hac Vice)
WEBBER & THIES PC
202 Lincoln Square
Urbana, IL 61803
(217) 365-5327
Fax: (271) 367-3752
danielthies@webberthies.coms

Thomas D. Cunningham (Pro Hac Vice)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000
Fax: (313) 853-7036
tcunningham@sidley.com

Phillip G. Steck
COOPER ERVING & SAVAGE LLP
39 North Pearl Street
Albany, NY 12207
(518) 449-3900
Fax: (518) 432-3111
psteck@coopererving.com

*Counsel for Utica Mutual Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 7, 2021, the foregoing was served on counsel of record by ECF.

By: /s/ Syed S. Ahmad
      Syed S. Ahmad
      HUNTON ANDREWS KURTH LLP
      2200 Pennsylvania Avenue, NW
      Washington, DC 20037
      (202) 955-1500
      Fax: (202) 862-3619
      sahmad@HuntonAK.com

      *Counsel for Utica Mutual Insurance Company*