# IN THE UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

UTICA MUTUAL INSURANCE COMPANY,   :
                                              :

                     Plaintiff,   :      No. 6:13-CV-01178 (GLS/TWD)

    v.   :

CLEARWATER INSURANCE COMPANY,   :
                                              :

                   Defendant.   :

------------------------------------------------------------x

## UTICA'S OPPOSITION TO CLEARWATER'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW AND RULE 59 MOTION FOR A NEW TRIAL OR TO ALTER OR AMEND THE JUDGMENT

SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1500

WEBBER & THIES PC
202 Lincoln Square
Urbana, IL 61803
(217) 365-5327

COOPER ERVING & SAVAGE LLP
39 North Pearl Street
Albany, NY 12207
(518) 449-3900

*Counsel for Plaintiff Utica Mutual Insurance Company*

## **TABLE OF CONTENTS**

Introduction ........................................................................................................ 1

Legal Standards ................................................................................................. 2

    I.     Rule 50(b) Motion for Judgment as a Matter of Law ............................ 2

    II.    Rule 59(a) Motion for a New Trial. ...................................................... 3

Argument .......................................................................................................... 4

    I.     The Jury Properly Awarded Defense Costs Under the
          1978-81 Umbrella Policies. ................................................................. 4

          A.    *Munich II* Supports This Court's Conclusion That the 1978-81
                Umbrella Policies Are Ambiguous on Defense Costs. .............................. 5

          B.    Even if the 1978-81 Umbrellas Do Not Cover Defense Costs under
                *Munich II*, the Court Should Not Overturn the Jury's Award of
                Defense Costs to Utica. ............................................................. 10

    II.    The TPF&C Memoranda Do Not Require Consent Before the Reinsurers
          Must Pay, and the Second Circuit Did Not Hold Otherwise. ............................ 11

    III.    The Jury Properly Found Clearwater Liable for
           All Aspects of the Bills from Utica ........................................................ 14

          A.    The Evidence Supported a Finding that Clearwater Owed the
                Orphan Share Amounts. ............................................................ 14

          B.    The Evidence Supported a Finding that Utica Proved Its Liability
                for the Amounts Paid Under the Umbrella Policies ................................... 17

    IV.    New York's Common Law of Contractual Indemnity Supports the Verdict
           and the Jury Instructions. ...................................................................... 20

          A.    The Common Law of Contractual Indemnity Applies to these
                Reinsurance Contracts. ............................................................. 20

          B.    The Jury Charge and Verdict Form Properly Applied the Common
                Law of Contractual Indemnity. .................................................... 22

    V.    The Second Circuit Did Not Silently Rule That the Primary Policies
          Unambiguously Lacked Aggregate Limits. ........................................... 25

    VI.    The Jury Instructions on Utmost Good Faith Were Proper. ................................. 27

A.      Clearwater Cannot Show Prejudice From Any Instructional Error on Utmost Good Faith.................................................................. 27

B.      Clearwater's Two General Arguments Are Meritless. ........................... 29

C.      Clearwater's Arguments About Five Specific Instructions Are Meritless........................................................................................ 31

    1.      The Court Correctly Instructed the Jury About the Presumption Against Bad Faith. .................................. 31

    2.      The Court Correctly Instructed the Jury That Clearwater Had to Prove the Existence of an Implied Disclosure Duty. ............... 31

    3.      The Court Correctly Instructed the Jury About Any Disclosure Duty. .................................................................. 32

    4.      The Court Correctly Instructed the Jury About the Consequence of Available Means of Verification. ...................... 34

    5.      The Court Correctly Instructed the Jury About Substantial Performance. .................................................................. 35

D.      Clearwater's Jury Instruction Arguments Face Two Other Problems. .................................................................................. 36

VII.    The Verdict Form Was Proper. ............................................................ 36

VIII.   Clearwater's Prejudgment Interest Challenge Fails.................................. 37

A.      Clearwater's Prejudgment Interest Challenge is Waived. ...................... 38

    1.      Any Challenge Under Rule 59 to the Jury Instructions or Verdict Form is Waived............................................................ 38

    2.      Any Rule 50(b) Motion on Prejudgment Interest Is Waived........ 41

B.      The Jury's Finding that Utica Suffered Damages on December 2, 2012 Is Supported by the Evidence and New York Law......................... 42

C.      In the Alternative, the Court Should Amend, Rather than Vacate, the Prejudgment Interest Award. ............................................... 44

Conclusion ...................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                  **Page(s)**

*Aetna Cas. & Sur. Co. v. Home Ins. Co.*,
   882 F. Supp. 1328 (S.D.N.Y. 1995) ..................................................................42

*Allendale Mut. Ins. Co. v. Excess Ins. Co.*,
   992 F. Supp. 278 (S.D.N.Y. 1998) ...................................................................34

*Associated Indus. Ins. Co. v. Excalibur Reinsurance Corp.*,
   No. 13 Civ. 8239, 2014 WL 6792021 (S.D.N.Y. Nov. 26, 2014) ...........................34

*Baraket v. Holder*,
   632 F.3d 56 (2d Cir. 2011) ...............................................................................26

*Bingham v. Zolt*,
   66 F.3d 553 (2d Cir. 1995) ...............................................................................23

*British Int'l Ins. Co. v. Seguros La Republica, S.A.*,
   342 F.3d 78 (2d Cir. 2003) .........................................................................30, 32

*Bucalo v. Shelter Island Union Free Sch. Dist.*,
   691 F.3d 119 (2d Cir. 2012) ...............................................................................3

*Cash v. Cnty. of Erie*,
   654 F.3d 324 (2d Cir. 2011) .............................................................................40

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*,
   773 F.3d 110 (2d Cir. 2014) .............................................................................14

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch,*
   *Pierce, Fenner & Smith Inc.*,
   232 F.3d 153 (2d Cir. 2000) .............................................................................13

*Conner v. Reeves*,
   103 N.Y. 527 (1886) ................................................................................ *passim*

*Conway v. Icahn & Co.*,
   16 F.3d 504 (2d Cir. 1994) ...............................................................................45

*Cross v. N.Y.C. Transit Auth.*,
   417 F.3d 241 (2d Cir. 2005) ...............................................................................3

*Emamian v. Rockefeller Univ.*,
   971 F.3d 380 (2d Cir. 2020) .............................................................................40

*Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*,
   890 F.3d 74 (2d Cir. 2018) .................................................................................5

*Granite State Ins. Co. v. Clearwater Ins. Co.*,
   No. 09 Civ. 10607, 2014 WL 1285507 (S.D.N.Y. Mar. 31, 2014) ...................................33, 34

*Havlish v. 650 Fifth Ave. Co.*,
   934 F.3d 174 (2d Cir. 2019)..............................................................................................27

*HS Equities, Inc. v. Hartford Acc. & Indem. Co.*,
   609 F.2d 669 (2d Cir. 1979)..........................................................................................21, 22

*HS Equities, Inc. v. Hartford Acc. & Indem. Co.*,
   661 F.2d 264 (2d Cir. 1981)..........................................................................................21, 22

*Hugo Boss Fashions, Inc. v. Federal Ins. Co.*,
   252 F.3d 608 (2d Cir. 2001)..............................................................................................31

*In re Union Indemn. Ins. Co.*,
   89 N.Y.2d 94 (1996) .......................................................................................................32

*ING Glob. v. United Parcel Serv. Oasis Supply Corp.*,
   757 F.3d 92 (2d Cir. 2014)........................................................................................ *passim*

*Jarvis v. Ford Motor Co.*,
   283 F.3d 33 (2d Cir. 2002)...........................................................................................37, 38

*Liberty Mut. Ins. Co. v. Star Indus., Inc.*,
   No. 96 C 644, 1997 WL 1068692 (E.D.N.Y. Oct. 10, 1997) ................................................29

*Lore v. City of Syracuse*,
   670 F.3d 127 (2d Cir. 2012).................................................................................................4

*Lupoli v. Venus Labs., Inc.*,
   287 A.D.2d 488 (N.Y. App. Div. 2001) ...............................................................................43

*Mallis v. Bankers Tr. Co.*,
   717 F.2d 683 (2d Cir. 1983).................................................................................................45

*Meloff v. N.Y. Life Ins. Co.*,
   240 F.3d 138 (2d Cir. 2001)..................................................................................................2

*Michalski v. Home Depot, Inc.*,
   225 F.3d 113 (2d Cir. 2000)................................................................................................34

*New York Univ. v. Factory Mut. Ins. Co.*,
   No. 20-1093-CV, 2021 WL 3136078 (2d Cir. July 26, 2021)..................................................5

*North River Ins. Co. v. CIGNA Reinsurance Co.*,
   52 F.3d 1194 (3d Cir. 1995)................................................................................................33

*Novak v. BASF Corp.*,
  869 F. Supp. 113 (N.D.N.Y. 1994) ................................................................22

*Oy Saimaa Lines Logistics, Ltd. v. Mozaica-N.Y., Inc.*,
  193 F.R.D. 87 (E.D.N.Y. 2000) ....................................................................44

*Peachy v. Rosenzweig*,
  215 A.D.2d 301 (N.Y. App. Div. 1995) .........................................................44

*Raedle v. Credit Agricole Indosuez*,
  670 F.3d 411 (2d Cir. 2012) ...........................................................................3

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) .........................................................................................3

*Reliance Ins. Co. v. Certain Member Cos.*,
  886 F. Supp. 1147 (S.D.N.Y. 1995), *aff'd*, 99 F.3d 402 (2d Cir. 1995) ...............32

*Restivo v. Hessemann*,
  846 F.3d 547 (2d Cir. 2017) ...........................................................................4

*Ruocco v. Hemmerdinger Corp.*,
  711 F. App'x 659 (2d Cir. 2017) ..................................................................39

*Scottsdale Ins. Co. v. McGrath*,
  No. 19-cv-7477, 2021 WL 3077578 (S.D.N.Y. July 19, 2021) ......................31

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.*,
  490 F.3d 130 (2d Cir. 2007) ...........................................................................4

*Spano v. N. V. Koninklijke Rotterdamsche Lloyd*,
  472 F.2d 33 (2d Cir. 1973) ...........................................................................29

*Spector v. Mermelstein*,
  485 F.2d 474 (2d Cir. 1973) .........................................................................45

*Spodek v. Park Prop. Dev. Assocs.*,
  759 N.E.2d 760 (N.Y. 2001) .........................................................................45

*TIG Ins. Co. v. Newmont Min. Corp.*,
  413 F. Supp. 2d 273 (S.D.N.Y. 2005) ..........................................................30

*Turley v. ISG Lackawanna, Inc.*,
  774 F.3d 140 (2d Cir. 2014) ...........................................................................4

*Unigard Sec. Ins. Co. v. N. River Ins. Co.*,
  4 F.3d 1049 (2d Cir. 1993) .............................................................21, 32, 33

*U.S. Fid. & Guar. Co. v. Am. Re-Insurance Co.*,
  20 N.Y.3d 407 (2013) ................................................................34

*United States v. Johnson*,
  265 F. App'x 8 (2d Cir. 2008) ...................................................39

*United States v. Quattrone*,
  441 F.3d 153 (2d Cir. 2006)........................................................24

*UST Priv. Equity Inv'rs Fund, Inc. v. Salomon Smith Barney*,
  733 N.Y.S.2d 385 (N.Y. App. Div. 2001) ...................................35

*Utica Mut. Ins. Co. v. Century Indem. Co.*,
  13-CV-995, 2018 WL 4625404 (N.D.N.Y. Sept. 26, 2018)..............31, 33

*Utica Mut. Ins. Co. v. Century Indem. Co.*,
  419 F. Supp. 3d 449 (N.D.N.Y. 2019)..............................38, 39, 41, 44

*Utica Mut. Ins. Co. v. Clearwater Ins. Co.*,
  906 F.3d 12 (2d Cir. 2018)................................................. *passim*

*Utica Mut. Ins. Co. v. Clearwater Ins. Co.*,
  No. 13-cv-1178, 2016 WL 254770 (N.D.N.Y. Jan. 20, 2016), *vacated on other
  grounds by* 906 F.3d 12 (2d Cir. 2018).......................................30

*Utica Mut. Ins. Co. v. Clearwater Ins. Co.*,
  No. 16-2535, Dkt. 119 (2d Cir.).............................................23, 25

*Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*,
  ---F.4th---, No. 19-1241, 2021 WL 3197017 (2d Cir. July 29, 2021) ............ *passim*

*Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*,
  381 F. Supp. 3d 185 (N.D.N.Y. 2019)...........................................4, 6

*Vermont Comm'r of Banking & Ins. v Welbilt Corp.*,
  133 A.D.2d 396 (2d Dep't 1987) ................................................30

*Wechsler v. Hunt Health Sys., Ltd.*,
  330 F. Supp. 2d 383 (S.D.N.Y. 2004) .........................................43

**Other Authorities**

Fed. R. Civ. P. 50(a)(1)...............................................................41

Fed. R. Civ. P. 51(c)(1)............................................................37, 38

Fed. R. Civ. P. 51(d)(1)(B) .......................................................40

Fed. R. Civ. P. 51(d)(2)..............................................................4

N.Y. C.P.L.R. § 5001(b) ...........................................................................................41

N.Y. C.P.L.R. § 5001(c) ...........................................................................................44

11 Wright & Miller, Federal Practice & Procedure § 2886 (3d ed.) ...........................................29

**Introduction**

Jury verdicts should rarely be disturbed. This is not one of those rare cases. After a two-week trial with testimony from over a dozen witnesses and hundreds of exhibits, the jury had ample evidence to conclude that Clearwater was liable to Utica under the parties' reinsurance contracts. Each of Clearwater's contrary arguments is mistaken.

Clearwater first argues that the Second Circuit's recent decision in *Munich II*[1] that a 1973 Utica umbrella policy did not cover defense expenses requires the same conclusion for the 1978-81 umbrella policies at issue here. This Court previously found that that the 1973 policy "contained materially different language than Utica's 1978-81 policies." Dkt. 158 at 8. *Munich II* demonstrates why that material difference compels a different result. In that case, the Second Circuit rejected Utica's position that, under the 1973 umbrella policy, an occurrence is "not covered by" an exhausted primary policy. It did so in large part due to the absence of policy language on exhaustion, observing that "neither the umbrella nor the primary policy suggests that an occurrence is no longer a 'covered' risk after exhaustion." 2021 WL 3197017, at *4. The 1978-81 umbrella policies, by contrast, state exactly that. In language missing from the 1973 policy, they provide that "an underlying policy otherwise applicable is ***inapplicable by reason of exhaustion of an aggregate limit of liability***." Ex. W[2] at 4 (emphasis added). At trial, Utica showed that the 1978-81 primary policies had exhausted their aggregate limits. Under *Munich II*'s teaching that "inapplicable" means "not covered by," then, upon their exhaustion the 1978-81 primary policies were "inapplicable" and hence occurrences were "not covered by"

---

[1] *Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, ---F.4th---, No. 19-1241, 2021 WL 3197017 (2d Cir. July 29, 2021) ("*Munich II*").
[2] Lettered exhibits refer to exhibits to Clearwater's motion. Dkt. 258. Exhibits to this brief are designated with numbers.

them. *Munich II* thus supports Utica's position.

Clearwater's other arguments fare no better. The TPF&C Memoranda do not require that Utica obtain the consent of a now defunct entity before it is entitled to payment. Consent was a prerequisite to applying the follow-the-settlements doctrine, but that doctrine is not at issue here, and the contracts include a separate indemnification clause that includes no such requirement. Furthermore, Utica presented substantial evidence that its umbrella policies covered, and that Clearwater was liable for, each portion of the billings; Clearwater's contrary argument was waived. Clearwater also contends that the common law of contractual indemnification applies only to an action between a policyholder and its insurer, but the New York Court of Appeals directly holds otherwise. *Conner v. Reeves*, 103 N.Y. 527, 529 (1886). Nor did the Second Circuit rule in this case that the 1978-81 primary policies lack aggregate limits, as Clearwater asserts, which would have left nothing for this Court to do after the Second Circuit's remand for further proceedings. And this Court's jury instructions correctly described the doctrine of utmost good faith, which in any event Utica did not breach by disclosing the facts as the jury found them to be, namely that Utica's 1978-81 primary policies were subject to aggregate limits and the corresponding umbrella policies covered defense costs. Finally, on prejudgment interest, Clearwater, not Utica, is the party that requested the jury decide the issue and it proposed the instructions and verdict form questions that the Court largely adopted. Thus, Clearwater's complaints about the results are both waived and contrary to New York Law.

Clearwater's motion should be denied in its entirety.

## Legal Standards

### I.    Rule 50(b) Motion for Judgment as a Matter of Law

Judgment as a matter of law "should be granted cautiously and sparingly." *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001). "A movant's burden in securing Rule 50 relief is

particularly heavy after the jury has deliberated in the case and actually returned its verdict." *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005). The court "may set aside a jury's verdict pursuant to Rule 50 only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 127–28 (2d Cir. 2012) (citation and quotation marks omitted). The Court's review must "give deference to all credibility determinations and reasonable inferences of the jury, and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence." *Id.* at 128 (citation and quotation marks omitted). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

## II.    Rule 59(a) Motion for a New Trial.

A motion for a new trial should be denied unless the trial court is convinced that the "verdict is seriously erroneous or a miscarriage of justice." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417-18 (2d Cir. 2012) (alterations and quotation marks omitted). Although the court may weigh the evidence and the witnesses' credibility, "trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility, and may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." *Id.* at 418 (citation and quotation marks omitted). As a result, "jury verdicts should be disturbed with great infrequency." *Id.*

A new trial based on alleged instructional error is appropriate only if the jury instruction

"misleads the jury as to the correct legal standard or does not adequately inform the jury on the law" and is not "harmless." *Restivo v. Hessemann*, 846 F.3d 547, 569 (2d Cir. 2017). A new trial is not warranted if the instructions "read as a whole, presented the issues to the jury in a fair and evenhanded manner." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 153 (2d Cir. 2014) (citation and quotation marks omitted). Similarly, "[d]ecisions as to the format and language to be used in a special verdict form are committed to the trial court's discretion, and there is no abuse of discretion if the verdict form, when read in conjunction with the instructions to the jury, clearly presents the material factual issues raised by the pleadings and evidence." *Lore v. City of Syracuse*, 670 F.3d 127, 159–60 (2d Cir. 2012) (citations omitted). A court will entertain a waived or unpreserved challenge to the jury charge or verdict form only if the challenger shows "a plain error" that "affects substantial rights." Fed. R. Civ. P. 51(d)(2). The error must thus be "fundamental," meaning it is "so serious and flagrant that it goes to the very integrity of the trial." *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 142 (2d Cir. 2007) (citations and quotation marks omitted).

## Argument

## I.     The Jury Properly Awarded Defense Costs Under the 1978-81 Umbrella Policies.

Clearwater invokes the Second Circuit's recent *Munich II* decision to argue that the 1978-81 umbrella policies that Utica issued to Goulds unambiguously "do[ ] not obligate Utica to pay defense expense in addition to limits" and the issue should not have been presented to the jury. Dkt. 258-1 at 4-5, 10. But *Munich II* affirmed Judge Sannes's decision in *Munich I*, which—as this Court has already held—addressed a different policy with "materially different" language than those at issue here. Dkt. 158 at 8; *see Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 381 F. Supp. 3d 185 (N.D.N.Y. 2019) ("*Munich I*"). *Munich II* does not undermine the jury verdict; it confirms that the differences in contract language require a different result here.

A. *Munich II* **Supports This Court's Conclusion That the 1978-81 Umbrella Policies Are Ambiguous on Defense Costs.**

This Court has held three times that the 1978-81 umbrella policies are ambiguous as to whether they require Utica to reimburse expenses that Goulds incurred in its defense of asbestos claims. Dkt. 106 at 23 (holding that defense costs are "at least arguably" covered); Dkt. 158 at 10-11 (holding that the contract "is susceptible to more than one reasonable meaning" and is thus "ambiguous"); Tr.[3] at 1460:21-1461:8 (denying Clearwater's Rule 50(a) motion). Clearwater now says these rulings clash with *Munich II*, which held that, under a modified version of Utica's 1973 umbrella policy, an occurrence was still covered by a primary policy even after the primary policy exhausted. 2021 WL 3197017, at *4-5. Clearwater's argument turns on four words in an endorsement to the 1973 umbrella policy: "occurrence not covered by." Ex. 3 at 1. Because these same four words also appear in the 1978-81 umbrella policies, Clearwater says *Munich II*'s interpretation of the 1973 umbrella policy controls here too—even though Utica's umbrella forms were substantially revised between 1974 and 1978, and even though Clearwater previously "concede[d] that the language is 'somewhat different[.]'" Dkt. 158 at 8. Clearwater is wrong.

Clearwater's crabbed focus on these four words violates the basic principle that a contract must be read in light of its "precise terminology" and "specific context." *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 890 F.3d 74, 77 (2d Cir. 2018) (citations and quotation marks omitted). Few interpretive principles are more basic than that a contract is read "as a whole," "placing words and phrases in their proper contexts." *E.g.*, *New York Univ. v. Factory Mut. Ins. Co.*, No. 20-1093-CV, 2021 WL 3136078, at *2 & n.10 (2d Cir. July 26, 2021). And reading the phrase "occurrence not covered by" in the context of the 1978-81 umbrellas—especially their express references to exhaustion—confirms this Court's prior rulings.

---

[3] "Tr." refers to the trial transcripts in this matter, which are consecutively paginated.

The crux of *Munich II*'s reasoning was this: "Not covered by" means the same thing as "inapplicable," which is used elsewhere in the 1973 umbrella to "mean[] there is no underlying primary insurance for the occurrence"—not that the primary policy has exhausted. 2021 WL 3197017, at *4. Moreover, "neither the [1973] umbrella nor the primary policy" includes any language "suggest[ing] that an occurrence is no longer a 'covered' risk after exhaustion[.]" *Id.*; *see also Munich I*, 381 F. Supp. 3d at 212. Accordingly, "'not covered' refers to risks that are uninsured" at the primary level, not to risks that have exhausted an underlying policy. *Id.*

But that reasoning does not hold here. The 1978-81 umbrellas contain a definition of "retained limit" that was absent from the 1973 umbrella, and that defines an "inapplicable" policy to include an underlying policy that is "inapplicable by reason of exhaustion." Ex. W at 4. Because "inapplicable" and "not covered by" capture the "same concept," *Munich I*, 381 F. Supp. 3d at 212; *Munich II*, 2021 WL 3197017, at *4 (equating those two terms), it necessarily follows that, in the 1978-81 umbrellas, a risk is "not covered" if the underlying policy is exhausted. The Second Circuit's reasoning thus confirms this Court's interpretation: the primary policies are inapplicable to an occurrence—and thus an occurrence is not covered by the primary policies—when those policies are exhausted. And so the 1978-81 umbrellas must drop down and provide both liability and defense coverage. Clearwater's contrary view improperly "erases parts of" the contract by ignoring this different language. *See Munich II*, 2021 WL 3197017, at *5.

Other language in the 1978-81 umbrella policies as well as their structure—which also differ from the 1973 umbrella—confirm this conclusion. For example, *Munich II* relied on other uses of "covered" in the 1973 umbrella that are absent from the 1978-81 umbrellas. 2021 WL 3197017, at *4. In particular, the Second Circuit pointed to the definition of "Ultimate Net Loss" in the 1973 umbrella as "that which the insurer must pay 'as a consequence of any occurrence

covered.'" *Id.* The Second Circuit reasoned that in this phrase, an occurrence can be "covered" even if the policy is exhausted, and that "there is no reason to give the term a different meaning in the endorsement." *Id.* But the 1978-81 umbrella does not include this definition of Ultimate Net Loss, so this reasoning does not apply here.

The structures of these contracts also differ. *Munich II* emphasized that the 1973 umbrella policy provides two kinds of coverage: "drop down" coverage that "affords primary coverage in the first instance for categories of risks not covered by the underlying primary policy"; and "excess coverage" that is "triggered by exhaustion of the primary limits." *Id.* at *3. These two types of coverage correspond to the two subparts of the definition of "retained limit" in the 1973 umbrella. Ex. 2 at 6 (Insuring Agreement III(a) and (b)). The Second Circuit reasoned that the "not covered by" language was an explicit reference to the "drop down" coverage in III(b), so it must not apply when the 1973 umbrella is responding as excess coverage under III(a)—that is, when an underlying primary policy is exhausted. *Munich II*, 2021 WL 3197017, at *4.

But the 1978-81 umbrellas are different. They include a definition of "retained limit" that breaks out three distinct categories of coverage, not two. The additional category of coverage, defined in subsection (j)(2), applies when "the underlying policy otherwise applicable is inapplicable by reason of exhaustion," which is a critical difference as explained above:

**Definition of the Retained Limit Above Which the Umbrella Applies**

| 1973 Umbrella (Ex. 1 at 6) (emphasis added) | 1978-81 Umbrellas (Ex. W at 4) (emphasis added) |
|---|---|
| III. Underlying Limit—Retained Limit [Utica] shall be liable only for the ultimate net loss resulting from any one occurrence in excess of either | (j) Retained limit means as to each occurrence **with respect to which insurance is afforded under this policy**: |
| (a) the amounts of the applicable limits of liability of the underlying | (1) if an underlying policy is also applicable or would be applicable but for breach of policy conditions; the relevant "each person," "each accident," "each occurrence" or similar limit of |

| | |
|---|---|
| insurance as stated in the Schedule of Underlying Insurance Policies less the amount, if any, by which any aggregate limit of such insurance has been reduced by payment of loss . . . or<br><br>(b) if the insurance afforded by such underlying insurance is **inapplicable to the occurrence**, the amount stated in the declarations as the retained limit. | liability stated therein (less any reduction thereof by reason of an overriding aggregate limit of liability) plus all amounts payable under other insurance, if any;<br><br>(2) if any underlying policy otherwise applicable **is inapplicable by reason of exhaustion of an aggregate limit of liability**; all amounts payable under other insurance, if any; or<br><br>(3) if neither paragraphs (1) or (2) above apply and<br><br>    (a) the insured has other insurance: all amounts payable under such other insurance . . ., or<br><br>    (b) the insured has no other insurance: the amount stated in the declarations as the insured's retention.[4] |

The Second Circuit concluded that the "occurrence not covered by" language in the 1973 umbrella "unambiguously refers to the . . . drop down coverage" in III(b) because III(b) explicitly references primary policies that are "inapplicable." *Munich II*, 2021 WL 3197017, at *4. As explained above, (j)(2) also references primary policies that are "inapplicable"— specifically policies that are "inapplicable by reason of exhaustion." Under the Second Circuit's reasoning, therefore, the "occurrence not covered by" language must also be triggered when the umbrella provides coverage under (j)(2)—that is, when the primary policy is "inapplicable" because the aggregate limit of the underlying primary policy is exhausted.

What is more, Utica's interpretation is required to avoid an absurd result. The Second Circuit held that if Utica's reading of the earlier contracts were correct, "there would be no need to specify that [the 1973 umbrella] applies when an occurrence is 'not covered by' the primary policy" ("Part I" of the defense cost provision). *Munich II*, 2021 WL 3197017, at *5. "It would

---

[4] A more expansive version of this table, comparing the full relevant language of the 1978-81 umbrellas to the 1973 umbrella, is included as an appendix to this brief.

have been enough that [the 1973 umbrella] applies to occurrences "covered by the terms and conditions of this [umbrella] policy" ("Part II" of the defense cost provision). *Id.* According to the Second Circuit, Utica's construction improperly made Part I superfluous. *Id.*

Again, the same is not true here. Unlike the 1973 umbrella, the 1978-81 umbrella policies cover defense costs for an occurrence "covered by the terms and conditions of this policy **(including damages wholly or partly within the amount of the retained limit).**" Ex. W at 3 (emphasis added). The bolded language means that the 1978-81 umbrellas cover defense costs even when the damages are wholly or partly within the *retained limit*—defined in certain circumstances to mean the limits of the underlying primary policy. *Id.* at 4 (section V(j)(1) defining retained limit to be the "limit of liability" in the "underlying policy"). Without Part I of the defense cost provision, the parenthetical would require *both* the primary policy and the umbrella policy to cover defense costs for occurrences that stayed "wholly or partly" within the primary policy limits—that is, to provide simultaneous coverage.

Part I of the defense cost provision—the "not covered by" part—avoids that result. It specifies that the umbrella policy does not cover defense costs for a loss that is still covered by the primary policy, thereby avoiding redundant coverage. Far from rendering the "not covered by" clause superfluous, then, Utica's interpretation gives it meaning. The 1973 umbrella, however, is different: It provides defense cost coverage for occurrences "covered by terms and conditions of this policy **except for the amount of retained limit specified in item 3 of the declarations.**" Ex. 2 at 1 (emphasis added). That reference to a "retained limit" is to the retained limit for drop-down coverage—i.e., the $25,000 specified in the declarations. It cannot be read to apply to a retained limit that is equivalent to the limits in an underlying primary policy.

In short, Clearwater's argument from *Munich II* relies entirely on the overlap of a single,

four-word phrase, taken out of context and ignoring differing pertinent contractual language. Basic interpretive principles prohibit Clearwater's approach. And when the contracts here are read as a whole, in context, *Munich II*'s reasoning supports this Court's prior holdings. Thus, while Utica does not agree with *Munich II* (and has filed a petition for rehearing en banc), that does not matter—*Munich II* provides no grounds to disturb the jury's award of defense costs.[5]

**B.      Even if the 1978-81 Umbrellas Do Not Cover Defense Costs under *Munich II*, the Court Should Not Overturn the Jury's Award of Defense Costs to Utica.**

Clearwater contends that under *Munich II*, Utica's award should be reduced by roughly $4.1 million in defense costs, leaving an award of indemnity only, totaling around $6.7 million. Dkt. 258-1 at 10. That is not correct. Clearwater ignores that the jury's findings on the common law of contractual indemnification (Questions 3-4 of the verdict form, Dkt. 251) provide a second way for Utica to recover defense costs. *Munich II* did not address the common law of contractual indemnification, and Clearwater does not even argue that *Munich II* requires overturning the jury's verdict on the common law of contractual indemnification.[6]

When instructed on the common law of contractual indemnification, the jury found that Utica is entitled to recover because 1) it entered the 2007 settlement with Goulds in good faith; and 2) Clearwater failed to show that Utica's 2007 settlement reflected bad faith, fraud, or factual or legal error. Dkt. 251 at 2 (Questions 3-4). Even assuming that *Munich II* changed the

---

[5] For the same reasons, Clearwater is wrong to rely on the short, unpublished Oneida County decision involving American Re. *See* Ex. B. That decision's "primary focus" was "the issue of collateral estoppel." *Id*. at 2. And though the court asserted that the "1973 Utica-Goulds umbrella is identical with the 1977-1984 Burnham umbrella policies in every material respect," it did not address any of the distinctions explained above, instead relying solely (like Clearwater) on the phrase "occurrence not covered by." *See id.* at 2–3. The decision thus has no persuasive force here. And Utica has already explained why earlier cases applying New York law, *see* Dkt. 258-1 at 7-8, do not support Clearwater's position, *see* Dkt. 79 at 14–18.

[6] Clearwater raises separate legal challenges to Utica's recovery under the common law of contractual indemnification, which are addressed in section IV, *infra*.

law in 2021, as Clearwater argues, that would have no conceivable bearing on whether Utica

acted in good faith in 2007, or whether the 2007 settlement reflected a legal error *at the time*.

Utica cannot possibly be required to predict how a Court will rule in 2021 when acting in 2007,

and Clearwater does not contend otherwise. Accordingly, the jury's verdict based on the

common law of contractual indemnification is unaffected by *Munich II*. Regardless of whether

Clearwater is correct about *Munich II*, therefore, the award of defense costs should stand.

## II.     The TPF&C Memoranda Do Not Require Consent Before the Reinsurers Must Pay, and the Second Circuit Did Not Hold Otherwise.

Clearwater argues that its liability under the TPF&C Memoranda requires evidence that

TPF&C or Clearwater authorized Utica's settlement with Goulds. Dkt. 258-1 at 10-11. This

argument contradicts the plain language of the TPF&C Memoranda and Clearwater's own

arguments elsewhere in its brief. It is also at odds with the Second Circuit's prior holding in this

case and the parties' course of dealing.

Two clauses of the TPF&C Memoranda bear on this issue:

- The "Agency Clause": All claims settlements when authorized by [TPF&C] shall be binding on the Reinsurers which shall be bound to pay their proportion of such settlements. . . .; and

- The "Payments Clause": Payments of their proportion of loss and expense paid by the Reassured [Utica] will be made by the Reinsurers to the Reassured promptly following receipt of proof of loss.

*See* Exs. D-E (P-3, P-4) at 2. In arguing that consent is required for payment, Clearwater focuses

solely on the Agency Clause, ignoring the Payment Clause. But as already explained, a court

must read a contract as a whole and give effect to all its parts. And doing so makes clear that it is

the Payments Clause, not the Agency Clause, which controls here.

The Agency Clause grants TPF&C authority as agent to bind the members of its

reinsurance pool to follow those claim settlements to which TPF&C consents. This is a sensible

provision for a pool involving multiple reinsurers. *See* Ex. E at 5 (P-4) (identifying 11 members of the 1979 "TPF&C Casualty Pool"). But the Agency Clause cannot stand alone. It makes no mention of the character of obligations covered (loss, expense, other), whether such obligations must be actually paid or simply incurred by the reinsured, whether reinsurer liability is joint and several or proportionate, what evidence of indebtedness by Utica is to be provided (proof of loss or other), and when payment is due. All those questions and more are answered by the Payments Clause of the TPF&C Memoranda.

Thus, for claim settlements TPF&C approves, the two clauses operate in conjunction: the Payments Clause explains how and when the payment obligation is triggered, and the Agency Clause conclusively binds reinsurers to such settlements under the follow-the-settlements doctrine. For all other situations—claim settlements not approved by TPF&C, or claims resolved by judgment and not settlement—the Agency Clause's follow-the-settlements obligation does not apply. But the Payment Clause still does. In this way, any claim submission under the TPF&C Memoranda necessarily triggers at least the Payment Clause.

Clearwater's consent argument simply ignores the Payments Clause. That is improper. And Clearwater elsewhere acknowledges that the Payments Clause is *not* irrelevant to its payment obligations under the TPF&C Memoranda: "To be sure, the reinsurance contracts require merely that Clearwater pay 'promptly' following its 'receipt' of invoices." *See* Dkt. 258-1 at 39; *see also id.* at 1 n.1 (defining "reinsurance agreements" to include the "TPF&C Memoranda.") These "require[d]" terms for payment—"promptly" and "receipt"—appear in the TPF&C Memoranda just once: in the Payments Clause. So, as Clearwater itself recognizes, the Payments Clause applies to any request for payment under the TPF&C Memoranda. Indeed, the Court acknowledged in the jury instructions that the similar Payments Clause in the Clearwater

facultative certificates was the operative clause. *See* Tr. at 1672:23-1673:4.

The Payments Clause does not support Clearwater's consent argument. The Payments Clause's only prerequisites are that: (1) Utica has made a payment of loss and expense under the reinsured policies; and (2) Utica provide a proof of loss. There is no requirement of consent from TPF&C. The evidence is clear that the Payments Clause's prerequisites were met here. *E.g.*, Ex. L (P-310); Ex. N (P-329A). Clearwater does not argue otherwise. Utica is thus entitled to payment under the TPF&C Memoranda.

This conclusion is confirmed by the Second Circuit's decision in the parties' cross-appeals. The Second Circuit analyzed whether the TPF&C Memoranda's Agency Clause operated as a follow-the-settlements clause. *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 21 (2d Cir. 2018). In a section entitled "[t]he TPF&C Memoranda Do Not Impose a Follow-the-Settlements Obligation," the court held that the Agency Clause had follow-the-settlements language but it was not triggered because the condition precedent was not met, namely consent by TPF&C or its proxy. *Id.* at 22-23.

Clearwater contends this holding bars *any* recovery under the TPF&C Memoranda, entitling it to a directed judgment. Dkt. 258-1 at 11. If that were true, the Second Circuit would have directed judgment for Clearwater on this issue already, since no issues would remain for this Court to determine. *Cf. Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 161 (2d Cir. 2000). It did not. Instead, the Second Circuit held that "Clearwater is not obligated under either the memoranda or the certificates *to follow* Utica's settlement with Goulds, *but rather must indemnify Utica* according to Utica's *proven liability* on the umbrella policies." *Utica*, 906 F.3d at 25 (emphasis added). And then—making crystal clear that its condition-precedent holding did not bar liability under

the TPF&C Memoranda—the court remanded the case for this Court "to determine

*indemnification that Clearwater owes to Utica under (1) the TPF&C memoranda.*" *Id.* at 25-26

(emphasis added). Thus, both the court's reasoning and its ultimate disposition confirm that it

decided *only* whether the TPF&C Memoranda contained an operative follow-the-settlements

clause. Even though the consent condition was unmet, the Second Circuit directed this Court to

determine whether indemnification is required, consistent with the Payments Clause.

Clearwater's argument thus conflicts with the Second Circuit's decision.

Finally, Clearwater's course of performance belies its consent argument. In 2012,

Clearwater paid nearly $1 million in Utica billings for Goulds settlement amounts, including

amounts billed under the TPF&C Memoranda. Dkt. 182 at 5; Ex. 4 at 5-6 (P-68). As Clearwater

agrees, there is no evidence that TPF&C consented to Utica's settlement with Goulds. *See* Dkt.

258-1 at 11; Tr. at 440:25-441:20. Clearwater thus made payment under the TPF&C Memoranda

without TPF&C consent, despite having copies of those contracts and being fully aware of their

language. Ex. 5 at 2 (P-69) (email from Laura McCaffrey announcing the payment and stating

"we received the [TPF&C Memoranda]"). This "conduct in rendering or in receiving

performance under" the TPF&C Memoranda confirms Utica's interpretation. *See Chesapeake*

*Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 121 (2d Cir. 2014) ("the parties'

acts" are evidence of their "practical interpretation of a contract" (citation omitted)). For all these

reasons, liability under the TPF&C Memoranda does not require evidence that TPF&C or

Clearwater authorized Utica's settlement with Goulds.

## III.   The Jury Properly Found Clearwater Liable for All Aspects of the Bills from Utica.

### A.   The Evidence Supported a Finding that Clearwater Owed the Orphan Share Amounts.

Clearwater argues that "the evidence overwhelmingly showed that the umbrella policies

did not obligate Utica to pay [] the orphan share amounts." Dkt. 258-1 at 14. This is wrong for procedural and substantive reasons.

First, the argument is waived because Clearwater did not raise the issue in its Rule 50(a) motion. *See* Dkt. 247 at 6-8 (Clearwater arguing that the "common law of indemnification cannot be used to establish Clearwater's liability for orphan shares" but not advancing the argument about what the evidence supposedly showed). That means the verdict should not be overturned on this basis unless necessary "to prevent manifest injustice," which exists only if the verdict is "wholly without legal support." *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014). That is not the case here, for two reasons.

First, Clearwater's arguments about orphan shares are academic. The evidence showed that orphan shares had no impact on Clearwater's liability. The orphan shares themselves were not billed to Clearwater. Tr. at 593:1-594:12; Ex. 6 (P-429). And while some orphan shares amounts eroded the limits underlying the policy limits reinsured by Clearwater, that did not affect the billings to Clearwater. For even if those amounts were removed from the payments under the 1978-81 umbrella policy years (as Clearwater urges), the Goulds claims were so large that other amounts "would drop down and fill in the rest of the box." Tr. at 1107:9-10; *see also id.* at 1105:25-1109:12, 1107:9-10, 1149:24-1150:6, 1151:2-25. The evidence on those points was undisputed, as Clearwater introduced no evidence that orphan shares were billed to Clearwater or otherwise affected its liability.

Second, even if the orphan shares had impacted Clearwater's liability, the evidence supported that Utica proved its liability for the orphan share amounts. Under the common law of contractual indemnification, the evidence showed a good-faith settlement, because Utica only paid for these amounts for three years and Goulds paid for more than ten years. Ex. J (P-111)

(under settlement, Utica paid orphan shares for 2003 through 2006 and Goulds paid for 2006 forward); Tr. at 888:25-889:7 (B. Turi testifying that Utica was responsible for "orphan shares made prior to January 1, 2006" and "[t]hereafter, we are only responsible for our share"); Tr. at 1057:17-23 (R. Creedon testifying that allocating orphan share to reinsurers "would have been appropriate" because "[i]t's a loss that under the settlement, that—that the cedent, Utica Mutual, had to pay and it would flow through to reinsurance recovery as per any other claim"). This evidence triggered a presumption of liability, which Clearwater failed to rebut. *See infra* § IV.

In any event, the evidence also supported that Utica, more likely than not, was liable for the orphan shares and would have been liable under all of Utica's umbrella policies, including the 1978-81 policies. Tr. at 128:2-24 (K. Martin testifying that "New York and California had different law on these issues. So it really made where this lawsuit was going to be decided really important. California may, in Goulds' opinion, may provide a more favorable jurisdiction."); Tr. at 188:8-18 ("if California law was ultimately going to apply to this case, Goulds very likely would not have been responsible for the orphan shares under California law"); Tr. at 189:1-19 (if Goulds was right and California law applied, the orphan shares would be allocated to the available coverage, including "the umbrella policies that Clearwater reinsured"); Tr. at 343:25-345:23 (same). The jury was entitled to credit this evidence.

From all of the evidence presented, including 1,694 pages of the trial transcript, Clearwater relies on 10 lines when a Utica witness agreed that the "orphan share . . . didn't arise from or have anything to do with the 1978, '79, '80, '81 policies *in and of themselves*." Tr. at 314:14-24 (emphasis added). That is a red herring. Of course, the orphan shares did not arise from or have anything to do with *just* those policies (i.e., *in and of themselves*). The orphan shares were a function of the different *insurance allocation law* that could have governed, not

just the policies themselves. *See, e.g.*, Tr. at 344:21-345:23 (at first, orphan share payments were not being paid under any particular Utica policy because "it was a litigation issue" and, if Goulds ended up being correct on the issue, Utica would "reallocate them across Goulds' coverage block," including the years with Clearwater). Moreover, the testimony that Clearwater cites was about orphan shares generally, not just the 1978-81 policies. It is undisputed that *all* of the orphan shares did not arise from or have anything to do with just the 1978-81 policies. That is why Utica allocated all of the orphan shares to all of the umbrella policies and did not allocate *all* of the orphan shares to just the 1978-81 policies. Tr. at 189:1-19; Tr. at 344:21-345:23.

In short, Clearwater cannot show a complete absence of evidence that Utica was liable for orphan shares under the 1978-81 umbrella policies. But even if it could, there would be no basis to adjust the verdict because the orphan shares did not impact Clearwater's liability.

### B.   The Evidence Supported a Finding that Utica Proved Its Liability for the Amounts Paid Under the Umbrella Policies.

Clearwater also argues that the evidence showed that the umbrella policies did not obligate Utica to pay (a) "the reset of the umbrella policy limits to 0," (b) "the increase in umbrella policy limits from $25 million to $48.333 million," and (c) defense expense on a supplemental basis given the caps in the settlement. Dkt. 258-1 at 14-15. These claims all fail.

Like the orphan shares challenge, these arguments were not preserved. Clearwater's Rule 50(a) motion does not even mention any reset of limits, increase in limits, or defense within limits based on the settlement. *See* Dkt. 247. Thus, Clearwater has waived these arguments and is precluded from raising them in its Rule 50(b) motion unless it can show manifest injustice. *See ING Glob.*, 757 F.3d at 97. This it cannot do.

Utica had to prove its liability under the umbrella policies. *Utica*, 906 F.3d at 25 (Clearwater must "indemnify Utica according to Utica's proven liability on the umbrella

17

policies"). Thus, Utica has billed reinsurers only for payments made consistent with the terms of the umbrella policies. The settlement did not change that the payments Utica made were all consistent with the terms of the umbrella policies. *See, e.g.*, Tr. at 596:1-597:18; Tr. at 617:7-618:2. The evidence thus supported a finding that Utica proved its liability under the umbrella policies, regardless of Clearwater's theories about the settlement. *See, e.g.*, Tr. at 999:10-15 (Goulds employee testimony that his understanding was that primary policies contained aggregate limits); Tr. at 377:1-381:25 (testimony from Utica employee involved in creating primary policies that intent was to have an aggregate limit); Tr. at 649:18-650:18 (testimony from Utica employee about understanding that umbrella policies covered defense costs); Ex. 7 at 20 (P-179) (reflecting Goulds' position that umbrella policies covered defense costs); Ex. 8 (P-348 to P-394) (documentation from Utica's claim system about Utica's payments under the policies); Tr. at 586:25-591:6 (testimony about that documentation);  Ex. 9 at 4 (P-424) (final total products loss and expense spreadsheet summarizing payments under policies); Tr. at 591:24-592:5 (testimony that claims system information was summarized in total products loss and expense spreadsheet); Tr. at 618:3-14; *see also* Dkt. 248-1 at 3-9 (collecting aggregate limit evidence); *id.* at 9-10 (collecting defense cost evidence).[7]

In addition, Clearwater errs by relying on the *Munich II* decision. Clearwater touts *Munich II*'s holding that a follow-the-settlements clause assumes that the cedent's billing to its reinsurers is at least consistent with, and does not contradict, its "performance of the settlement." Dkt. 258-1 at 19. But unlike in *Munich II*, the Second Circuit here held that Clearwater's

---

[7] Even if Utica had to prove its liability under the umbrella policies for resetting and increasing of limits and expense payments under the settlement, Utica did just that. The evidence cited above showed Utica's liability for all payments (including defense costs) under the umbrella policies, which (under Clearwater's theory) apparently would include any supposedly reset or increased limits.

obligations to Utica were not subject to the follow-the-settlements doctrine and instead turned on "Utica's proven liability on the umbrella policies." *Utica,* 906 F.3d at 25. Because follow-the-settlements does not apply here, the passage Clearwater cites is irrelevant.

Moreover, even if follow-the-settlements applied, the *Munich II* court acknowledged that the 1978-1980 years that Clearwater reinsured and for which the caps in the settlement were $48.333 million were not at issue in *Munich II.* That case involved the 1973 and 1974 years, which had $25 million caps. Thus, the factual predicate for *Munich II* does not exist for the 1978-1980 years. Indeed, in those years, Utica's billing is consistent with its performance of the settlement, because Utica's actual payments are not larger than the settlement caps. *See* Ex. J (P-111) at 18; Ex. 9 at 4 (P-424). Clearwater's argument about the 1981 year likewise misses the mark. Clearwater provides no support for its bald assertion that "Utica's payments to Goulds on and after January 1, 2006 could not exceed $25 million." Dkt. 258-1 at 16. The evidence is to the contrary—it showed that the provisions in the settlement did not supplant the policies and that those provisions were merely for tracking the erosion of the $325 million made available for post-January 1, 2006 payments. *See, e.g.*, Tr. at 617:7-618:2. Utica's actual payments and Utica's reinsurance billings matched. Utica paid $25 million in loss plus $13,411,640.39 in expense. Ex. 9 at 4 (P-424). Utica's reinsurance billings reflect those same amounts. *Id.* at 18-19. Clearwater's assertion that Utica only paid $760,037.20 under the 1981 umbrella policy before January 1, 2006 is wrong. *See* Ex. 10 (P-185); Tr. at 593:1-12; Ex. 11 (P-426).

Finally, Clearwater makes a half-hearted request for a new trial. Dkt. 258-1 at 16. But Clearwater does not even attempt to satisfy the stringent requirements for that relief—that the jury reached a seriously erroneous result or that the verdict was a miscarriage of justice. And as the foregoing evidence demonstrates, Clearwater could not make those showings.

IV.   **New York's Common Law of Contractual Indemnity Supports the Verdict and the Jury Instructions.**

Clearwater says the common law of contractual indemnity "does not fit the facts here" and "is not a substitute for Utica proving its obligation to Goulds." Dkt. 258-1 at 16–17. Clearwater thus objects to the jury instructions and the verdict form's questions on this topic. *Id*. at 34. These arguments go nowhere. The Court correctly instructed the jury that one way for Utica to establish liability—though not the only way—was to show a good-faith settlement with Goulds, which shifted the burden to Clearwater to show bad faith, fraud, or factual or legal error. The jury found Utica had proven its liability on that basis, and also on the independent basis that Utica and Goulds intended for the 1978-81 primary policies to contain aggregate limits and Utica was obliged to defend Goulds under the 1978-81 umbrella policies. *See* Dkt. 251 (Questions 3-4). So even if Clearwater were right that one basis for proven liability was absent (the common-law doctrine), an independent basis for liability would remain (proof of primary aggregate limits and umbrella defense obligations), and so the verdict would stand. But Clearwater is not right.

A.   **The Common Law of Contractual Indemnity Applies to these Reinsurance Contracts.**

To start, Clearwater never grapples with how the common-law doctrine applies here. Clearwater's brief assumes this doctrine can apply only to settlements between Goulds and asbestos plaintiffs, and not to Utica's own settlement with Goulds—apparently because Clearwater believes the doctrine applies only "in an action between [an] insured and its insurer." Dkt. 258-1 at 17. That is incorrect. The common-law doctrine is not limited to insurance contracts—it applies to any "covenant to indemnify." *Conner v. Reeves*, 103 N.Y. 527, 529 (1886). For example, *Conner* did not involve an insured-insurer relationship, or even mention the word "insurance"; it involved an "indemnity bond." *Id.* at 530. The Court of Appeals still held that a consent judgment was "presumptive evidence" of "legal liability" "against the sureties" on

20

the bond. *Id.* at 532. Likewise, although the indemnitor in *H.S. Equities* was an insurance company, the contract at issue was not an insurance policy, but a "a blanket brokers bond[.]" *HS Equities, Inc. v. Hartford Acc. & Indem. Co.*, 661 F.2d 264, 266 (2d Cir. 1981) ("*HS Equities II*"); *HS Equities, Inc. v. Hartford Acc. & Indem. Co.*, 609 F.2d 669, 670 (2d Cir. 1979) ("*HS Equities I*"). The doctrine applied there too. In short, the common law of contractual indemnity applies to all indemnity agreements. And as Clearwater nowhere disputes, "[r]einsurance involves contracts of indemnity." *Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 4 F.3d 1049, 1054 (2d Cir. 1993). The common-law doctrine thus applies to these reinsurance contracts.

As a result, Clearwater's arguments largely miss the point. Clearwater argues at length that Utica offered "no proof at trial" about any of Goulds' settlements with any plaintiffs. Dkt. 258-1 at 18. But that is irrelevant, because the doctrine is triggered here by *Utica's* settlement with Goulds. As the Court instructed the jury: Utica may "prove its liabilities to Goulds" by showing "that it settled with Goulds in good faith," which "is 'presumptive evidence'" that "Utica owed money to Goulds under the insurance policies as provided in the settlement." Tr. at 1675:2-21. And Clearwater does not dispute that Utica proved its own good-faith settlement with Goulds, or that Clearwater failed to rebut the resulting presumption. Clearwater has thus forfeited the only relevant argument here.

Clearwater misstates not only the doctrine's scope, but also its effect. It says the common-law rule "only establishes an insured's good-faith settlement as presumptive evidence of *the facts alleged* in the third-party complaint," and "does not provide an avenue for Utica to prove its *liability* to Goulds." Dkt. 258-1 at 19 (first emphasis added). But the doctrine is not limited to presumptively proving facts alleged in a complaint—it can establish liability based on a settlement too. As *Conner* held, an indemnitee's good-faith settlement "presumptively . . .

21

establishe[s] the *liability* of" the indemnitee. 103 N.Y. at 531 (emphasis added). Clearwater's contrary argument relies on a single sentence from each *H.S. Equities* opinion, taken out of context. Dkt. 258-1 at 17 (quoting *HS Equities II*, 661 F.2d at 268; *HS Equities I*, 609 F.2d at 674–75). But the Second Circuit also explained that a good-faith settlement is presumptive "proof *of liability* on the underlying claim"—not merely of the facts alleged therein. *HS Equities I*, 609 F.2d at 675 (emphasis added). Both the Second Circuit and the Court of Appeals hold that the presumption is rebutted if the indemnitor shows a "factual or legal error" establishing that the settlement "was not founded upon any legal liability," *id.* at 675 & n.8 (quoting *Conner*, 103 N.Y. at 532)—which necessarily entails a prior showing *of liability*. Otherwise, a showing that no "legal liability" exists would not rebut anything. But the jury found that Clearwater failed to make this showing, and thus Utica's settlement with Goulds established its liability.[8]

**B.    The Jury Charge and Verdict Form Properly Applied the Common Law of Contractual Indemnity.**

Clearwater is also wrong to challenge "the charges and verdict sheet on the common law of [contractual] indemnification." Dkt. 258-1 at 33. For one thing, any instructional error on this point would not be grounds for a new trial, because the jury also found that Utica proved that the primary policies were intended to contain aggregate limits and the umbrella covered defense costs. *See* Dkt. 251 (Question 1). Although a judgment may be infirm if "there is no way to know whether or not [an] invalid [theory] was the sole basis for the verdict," that problem does not

---

[8] Clearwater also misunderstands the source of this doctrine. It refers repeatedly to the "common law of indemnification," Dkt. 258-1 at 16, having argued during trial that this is "an equitable quasi-contract claim," Dkt. 240 at 2. But the common law that governs a claim for breach of an indemnity contract differs from a claim for common law indemnification, which applies when no contractual indemnity obligation exists. *See Novak v. BASF Corp.*, 869 F. Supp. 113, 119 (N.D.N.Y. 1994). Because this case involves indemnity agreements, "[t]he common law simply inform[ed] the showing required to establish liability under the contracts," as the Court correctly recognized. *See* Dkt. 241 at 10.

arise if—as here—the jury's "special verdict found defendants liable on each" theory. *Bingham v. Zolt*, 66 F.3d 553, 564 (2d Cir. 1995).

In any event, no error occurred here. Clearwater reiterates its canard that the common-law doctrine was "introduced on the eve of and during trial." Dkt. 258-1 at 16-17. To begin with, Clearwater fails to show why that would render the doctrine ineffective or the jury instructions and verdict form legally erroneous. Moreover, it was Clearwater and not Utica that introduced the doctrine first, during the cross-appeal when it argued that the common law controls, telling the Second Circuit that "[a]bsent applicability of the follow-the-settlements doctrine, 'the common law rule' governs." *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, No. 16-2535, Dkt. 119, at 40 (2d Cir.) ("Clearwater Cross-Appeal Br."); *see* Dkt. 241 at 1, 6–7 (Utica brief on common-law doctrine). The Second Circuit agreed, citing the same page of the same article that Clearwater cited to hold that Clearwater "must indemnify Utica according to Utica's proven liability on the umbrella policies." *Utica*, 906 F.3d at 25. And the Second Circuit did not "rule[ ] that the Settlement was entitled to no deference," as Clearwater contends, Dkt. 258-1 at 33–34; it ruled that follow-the-settlements does not apply. That is a different and narrower holding. *See* Dkt. 241 at 5–6, 10–11. Clearwater is thus judicially estopped from disputing that the common-law rule governs here, *see id.* at 6–8, so the only question is how Utica can establish "proven liability"—and as Clearwater recognized on appeal, the common-law rule supplies the answer.

Clearwater's other arguments on this score are equally infirm. Clearwater contends that the common-law doctrine jury charge "allowed a finding of liability outside the terms of the umbrella policies." Dkt. 258-1 at 34. To the contrary, the common-law doctrine provided an avenue for Utica to establish its liability under the terms of the umbrella policies by a means other than a court judgment, namely a good-faith settlement. *See* Dkt. 241 at 3. This approach is

consistent with the language in Clearwater's own reinsurance contracts, which expressly provide that Clearwater must pay "such amounts as are actually paid by [Utica] in settlement of claims or in satisfaction of awards or judgments." *E.g.*, Ex. C at 2 (P-1); Ex. 3 at 2 (P-2).

Likewise, Clearwater objects that the charge "provided the jury a path to finding Clearwater liable without requiring Utica to prove all four essential elements of its contract claims." Dkt. 258-1 at 35. Clearwater thus analogizes this case to a criminal prosecution where the jury instructions omitted an element of the offense, improperly creating a "bare-bones strict liability crime." *United States v. Quattrone*, 441 F.3d 153, 179 (2d Cir. 2006). But no parallel exists between *Quattrone* and the common-law burden-shifting scheme that governs in this civil case. This Court properly instructed the jury that "Utica has the burden of proving every essential element of [its] claim by a preponderance of the evidence," Tr. at 1655:14-18, and that one of those elements is that "Clearwater breached [the parties'] contracts by failing to perform its obligations," *id.* at 1667:16-17. The common-law doctrine did not allow Utica to *avoid* this burden, but rather supplied one of "two separate ways" to satisfy it. *Id.* at 1673:5-9. As the Court correctly told the jury, "a good-faith settlement by a party in Utica's position is 'presumptive evidence' of liability." *Id.* at 1675:15-17. If that presumptive evidence goes unrebutted—as it did here—then liability is established.

In sum, the Court properly applied and instructed the jury on New York's common-law burden-shifting regime, which governs any "covenant to indemnify." *Conner*, 103 N.Y. at 530. The jury applied this regime to find that Utica showed a good-faith settlement and that Clearwater failed to show bad faith, fraud, factual or legal error. Clearwater does not argue that the Court's instructions misstated the common-law doctrine or that the jury's application of the doctrine is unsupported by the evidence. The Court should thus reject Clearwater's arguments.

**V.    The Second Circuit Did Not Silently Rule That the Primary Policies Unambiguously Lacked Aggregate Limits.**

Clearwater renews its argument that—despite remanding this case for trial—the Second Circuit actually decided the whole case in Clearwater's favor by implicitly ruling that Utica's primary policies unambiguously lacked aggregate limits. Dkt. 258-1 at 20. But this Court has already held thrice—at summary judgment, in denying Clearwater's motion in limine making this same argument, and in denying Clearwater's Rule 50(a) motion—that the primary policies are ambiguous. Dkt. 106 at 15–16; Dkt. 220 ("Pretrial Hr'g Tr.") at 43; Tr. at 1085:25–1086:16. These prior rulings are correct and remain law of the case.

To begin with, the Second Circuit did not decide this issue because Clearwater did not raise it on appeal. At summary judgment, Utica argued that the primary policies "themselves are ambiguous." Dkt. 64-2 at 12. This Court agreed. Dkt. 106 at 15–16. And Clearwater did not appeal that holding. Although it argued that the *reinsurance certificates* were unambiguous, it made no such argument about the primary policies. *See* Clearwater Cross-Appeal Br. at 71–72.

Clearwater's contrary argument rests on the Second Circuit's statements, in explaining the background behind the Utica–Goulds settlement, that the "primary policies Utica issued to Goulds from 1978 to 1981 had a glaring omission: they did not include aggregate limits of liability." *Utica*, 906 F.3d at 14; *see id.* at 16–17 (similar); Dkt. 258-1 at 20. But these statements are dicta; they do not purport to decide any disputed issue, let alone an issue necessary to resolving the parties' cross-appeals. Because Clearwater did not appeal this Court's ambiguity holding, the issue was not presented. Unsurprisingly, then, these statements all appear in the opinion's introduction or background section, not in the legal analysis. *See Utica*, 906 F.3d at 14, 16–17. In context, they simply explain the Second Circuit's view of how the Utica–Goulds dispute arose and settled. *See id.* at 16–17.

Undeterred, Clearwater notes that a holding can be implicit. *See* Dkt. 258-1 at 20. But any holding, explicit or implicit, must be "*necessary* for the decision." *Baraket v. Holder*, 632 F.3d 56, 59 (2d Cir. 2011) (emphasis added). And Clearwater nowhere contends that these statements were necessary to decide the cross-appeals. Indeed, at the pretrial conference, Clearwater all but conceded the opposite. In its view, the Second Circuit panel provided "a seminar on these contracts" to "explicate on subject matter that wasn't directly before them" or "wasn't teed up." Pretrial Hr'g Tr. at 37:22, 38:23, 39:11-12. Precisely: the issue "wasn't before the Court," *id*. at 38:20, so these statements are not binding.

In any event, the Second Circuit nowhere suggested that the policies *unambiguously* lacked aggregate limits. The court said nothing about ambiguity or lack thereof; it said only that Utica "failed to include aggregate limits," so the policies lacked "a specific aggregate-liability limit." *Utica*, 906 F.3d at 14, 16. In context, these statements are best read to mean that—as this Court held at summary judgment—the "primary policies lacked an *explicit* aggregate limit," Dkt. 106 at 15 (emphasis added), leading to the dispute with Goulds. Indeed, as part of this background discussion, the Second Circuit noted the California courts' rulings, based on extrinsic evidence, that "Utica's 1977–1982 primary policies had aggregate limits." *Utica*, 906 F.3d at 17 n.4. If the Second Circuit disagreed, it presumably would have said so. It did not.

Clearwater's position also makes no sense. On Clearwater's own account, if the Second Circuit had concluded that the primary policies lacked aggregate limits, "asbestos-related losses [would have] never reached—and therefore never triggered indemnity under—the reinsured umbrella policies." *Utica*, 906 F.3d at 17; *see* Dkt. 258-1 at 22. So, on Clearwater's view, there was no reason for the court to "remand for trial." *Utica*, 906 F.3d at 25. Clearwater's position thus requires this Court to conclude that the Second Circuit implicitly adopted a case-dispositive

holding—and then remanded the case for further proceedings inconsistent with that holding. That is not plausible. This Court's summary-judgment ruling thus remains law of the case. *See Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174, 181–82 (2d Cir. 2019).

## VI.   The Jury Instructions on Utmost Good Faith Were Proper.

Clearwater next seeks a new trial based on scattered arguments about the Court's instructions on the duty of utmost good faith. Dkt. 258-1 at 22-33. None shows that the verdict was seriously erroneous or a miscarriage of justice. Indeed, even if these specific complaints had merit, they would be irrelevant because the jury rejected Clearwater's theory at trial.

### A.   Clearwater Cannot Show Prejudice From Any Instructional Error on Utmost Good Faith.

To start, any instructional error on utmost good faith was necessarily harmless because the jury rejected Clearwater's theory on this issue. Clearwater's trial theory on utmost good faith included two components. Dkt. 242 at 22-23. First, it contended that Utica failed to disclose to Clearwater that the primary policies lacked aggregate limits. *Id.*; *see also* Tr. at 74:17-75:3 ("Did [Utica] inform the reinsurers that Goulds had . . . filed a lawsuit seeking to establish that the primary policies . . . had no aggregate limits and would never exhaust? . . . [T]he reinsurers were kept in the dark"). Second, Clearwater contended that Utica's allocation of the loss to the umbrella policies was unreasonable given that the primary policies lacked aggregate limits and thus never exhausted. Dkt. 242 at 14. These theories required the jury to find that the primary policies in fact lacked aggregate limits.

But the jury held the opposite: The primary policies *did* have aggregate limits. Dkt. 251 (Question 1). There was thus no misrepresentation or non-disclosure—Utica at all times disclosed the facts to be as the jury found them to be. Utica's allocation was necessarily reasonable because it tracked the actual terms of the primary and umbrella policies as the jury

27

found them to be.

Given these jury findings, the specifics of the duty of utmost good faith and how it applies here—whether any misrepresentation must be deliberate or the result of recklessness, whether Clearwater has a duty of verification, and so on—are irrelevant. Whatever the precise contours of Utica's obligations, it satisfied them. For example, Clearwater says Utica violated its duty because it "repeatedly told the reinsurer . . . that all of the primary policies had been fully exhausted." Tr. at 75:19-21. But as the jury found, this was accurate.

In addition, the instructions on this issue could not have been prejudicial for several other reasons: Clearwater sought to imply disclosure obligations into the reinsurance contracts and did not submit any evidence to meet the standard necessary to imply obligations into a contract (Dkt. 248-1 at 17); Clearwater's attempt to create an unbounded disclosure obligation is legally unsupported (*id.* at 17-18); Clearwater admits that Utica disclosed the aggregate-limit issue at the July 2013 claims review so Clearwater cannot claim that Utica breached the duty of utmost good faith by failing to disclose that issue (*id.* at 18-20); Utica disclosed the aggregate-limit issue to Clearwater even before the July 2013 claims review (*id.* at 20-21); when Utica billed Clearwater, the aggregate-limit issue was not disputed (*id.* at 21-22); Clearwater did not make use of verification means so it cannot rely on supposed misrepresentations (*id.* at 22); the evidence showed that Utica substantially complied with any obligations it had (*id.* at 22-23); Clearwater failed to show that any breach was material (*id.* at 23); and Clearwater failed to show prejudice resulting from any alleged violation of the duty of utmost good faith (*id.* at 23-24).

Thus, although Clearwater's various arguments are mistaken, as explained next, they are also beside the point—the evidence could not support a breach of utmost good faith under any standard. "Errors in instructions routinely are ignored . . . if the erroneous instruction went to an

issue that is immaterial in light of the jury's verdict, or if it is otherwise apparent that the error could not have changed the result." 11 Wright & Miller, Federal Practice & Procedure § 2886 (3d ed.) (footnotes omitted); *cf. Spano v. N. V. Koninklijke Rotterdamsche Lloyd*, 472 F.2d 33, 35 (2d Cir. 1973) (any instructional error on the negligence standard was harmless, because the jury's special verdict established no basis for liability, so "the jury never needed to reach the question of whether or not the owner failed in a duty to warn").

### B.    Clearwater's Two General Arguments Are Meritless.

In any event, Clearwater's arguments on utmost good faith lack merit. Clearwater first says the Court "failed to define the duty of utmost good faith as that duty applied to this case, only explaining what must be found to prove a breach of the duty." Dkt. 258-1 at 23. So, Clearwater contends, the Court failed to give the jury a "standard by which to evaluate" the evidence. *Id.* This claim is puzzling. What must be found to establish a breach of the duty *is* the standard, and it's unclear how explaining this standard differs (if at all) from "defin[ing]" the duty as it applies here. Regardless, the Court correctly explained Clearwater's position that Utica had a "duty to disclose all material facts." Tr. at 1678:20-25. No more was required.

Clearwater's second argument is that "Clearwater asserted breach of the duty of utmost good faith as a way to dispute an element of Utica's contract claims *as well as* an affirmative defense," and the Court wrongly instructed the jury that Clearwater bore the burden of proof as to both issues. Dkt. 258-1 at 23-24. But Clearwater cites no authority for its position that Utica had to show, as part of its prima facie breach-of-contract case, that it complied with the duty of utmost good faith. None of its cited cases places a burden on the non-breaching party to prove such compliance. *See id.* And courts hold that the party claiming bad faith has the burden on that issue. *See Liberty Mut. Ins. Co. v. Star Indus., Inc.*, No. 96 C 644, 1997 WL 1068692, at *5 (E.D.N.Y. Oct. 10, 1997) ("the burden of proving bad faith on the part of an insurer rests with

the insured"); *Vermont Comm'r of Banking & Ins. v Welbilt Corp.*, 133 A.D.2d 396, 397 (2d

Dep't 1987); *TIG Ins. Co. v. Newmont Min. Corp.*, 413 F. Supp. 2d 273, 286 (S.D.N.Y. 2005);

*see also Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, No. 13-cv-1178, 2016 WL 254770, at *4

(N.D.N.Y. Jan. 20, 2016), *vacated on other grounds by* 906 F.3d 12 (2d Cir. 2018).

     In addition, the Court correctly instructed the jury that this was Clearwater's affirmative

defense because that's what Clearwater told the Court on multiple occasions. Clearwater alleged

the violation of the duty of utmost good faith as an affirmative defense. Dkt. 17 ¶ 65 ("Eleventh

Affirmative Defense," which alleges that Utica's claims were barred "by Utica's breaches of: (i)

the duty of utmost good faith owed by Utica to Clearwater as a matter of industry custom and

practice; and (ii) the implied covenant of good faith and fair dealing owed by Utica to Clearwater

by operation of law"). Clearwater's counsel affirmed that during trial: "we [alleged] an

affirmative defense, utmost good faith, the duty of good faith." Tr. at 1455:25-1456:1.

Clearwater's proposed instructions also confirmed that posture: "In this lawsuit, Clearwater has

raised the following affirmative defenses: That Utica's claims are barred, in whole or in part, by

Utica's breaches of: (i) the duty of utmost good faith; or (ii) the implied duty of good faith and

fair dealing." Dkt. 242 at 26. The Court accepted Clearwater's position. Tr. at 1465:25-1466:8

("So let me say that Clearwater asserts both with its utmost good faith argument and its standard

good faith argument that those are affirmative defenses. Utica has treated them as such in that

request to charge as has Clearwater, so I'm going to charge them as affirmative defenses. Parties

have asked me to do that, I'm going to honor your request to do it."). The Court should reject

Clearwater's criticism that the Court erred in adopting Clearwater's position.

     In any event, because Clearwater was trying to imply a duty into the contract, the burden

was properly Clearwater's. *See British Int'l Ins. Co. v. Seguros La Republica, S.A.*, 342 F.3d 78,

83 (2d Cir. 2003) (burden for implying duty into contract lies with "party benefiting from its existence") (citation and quotation marks omitted). It would make no sense for Utica to have the burden to establish compliance with an obligation that Clearwater had yet to even establish.

### C.   Clearwater's Arguments About Five Specific Instructions Are Meritless.

#### 1.   The Court Correctly Instructed the Jury About the Presumption Against Bad Faith.

Clearwater says the Court erred by instructing the jury about the presumption against the finding of breach of the duty of utmost good faith by an insurer. Dkt. 258-1 at 25-26. But it overlooks the Second Circuit's clear direction that that "there remains a strong presumption in New York against a finding of bad faith liability by an insurer." *Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, 252 F.3d 608, 624 (2d Cir. 2001); *see also Scottsdale Ins. Co. v. McGrath*, No. 19-cv-7477, 2021 WL 3077578, at *6 (S.D.N.Y. July 19, 2021) (citing "strong presumption" against bad faith and finding no bad faith due to supposed failure to disclose information); *Utica Mut. Ins. Co. v. Century Indem. Co.*, 13-CV-995, 2018 WL 4625404, at *12 (N.D.N.Y. Sept. 26, 2018) (citing "strong presumption" against bad faith in reinsurance dispute).

#### 2.   The Court Correctly Instructed the Jury That Clearwater Had to Prove the Existence of an Implied Disclosure Duty.

Clearwater argues that it did not have to prove the existence of the implied disclosure duty that it invoked throughout the case. Dkt. 258-1 at 18-19. But it did.

The reinsurance contracts specify what Utica must disclose: "such pleadings and reports of investigations as are pertinent to the claim and/or as may be requested." *See, e.g.*, Ex. C at 2 (P-1). Even so, Clearwater argued that Utica had a far broader duty to disclose "all known circumstances that materially affected the risk being reinsured." *See, e.g.*, Dkt. 242 at 18-19. Thus, Clearwater tried to imply a duty into the contracts, and had to establish either that the party sought to be bound was aware of the custom, or that the custom's existence was so notorious that

it should have been aware of it. Tr. at 1679:1-5; *accord British Int'l Ins. Co.*, 342 F.3d at 84. Although Clearwater says *British International* is inapposite because the custom at issue was payment of declaratory judgment expenses, it never explains why that makes a difference. There is no reason not to apply the generally applicable standard for implying contractual duties here.

Clearwater contends that it need not make this showing because the duty of utmost good faith is implied by law in all reinsurance contracts. Dkt. 258-1 at 26–27. But that is beside the point. Clearwater's cases address the general duty of utmost good faith as applied to pre-contractual communications, and it fails to cite any cases binding the cedent to a broad *post-contract* duty to disclose. To imply such a duty, therefore, it must meet the usual standard.

### 3.    The Court Correctly Instructed the Jury About Any Disclosure Duty.

Clearwater launches three attacks on the Court's instructions about the contours of any disclosure duty. Dkt. 258-1 at 27-30. It first argues that the Court erred by instructing the jury that "Clearwater must show that Utica either deliberately deceived Clearwater about a material fact, or recklessly disregarded Clearwater's right to the disclosure of material facts." Dkt. 258-1 at 27-28. But that language tracked the standards given by the Second Circuit in *Unigard* for alleged bad faith with respect to disclosure obligations: The "proper minimum standard for bad faith should be gross negligence or recklessness. If a ceding insurer deliberately deceives a reinsurer, that deception is of course bad faith." *Unigard*, 4 F.3d at 1069. *Unigard* rejected the notion that "simple negligence in not disclosing a material fact constitutes bad faith." *Id.*

Clearwater responds with decisions involving standards governing pre-contract disclosures. *See In re Union Indem. Ins. Co.*, 89 N.Y.2d 94, 104-05, 110 (1996) (addressing failure to disclose "during the negotiation of the reinsurance agreements"); *Reliance Ins. Co. v. Certain Member Cos.*, 886 F. Supp. 1147, 1151, 1154 (S.D.N.Y. 1995) (in "negotiations leading up to execution," the reassured "is in the best position to know of any circumstances material to

the risk"), *aff'd*, 99 F.3d 402 (2d Cir. 1995); *Century Indem.*, 2018 WL 4625404, at *9 (quoting *Gerling Glob. Reinsurance Co.-U.S. Branch v. Ace Prop. & Cas. Ins. Co.*, 42 F. App'x 522, 524 (2d Cir. 2002) (addressing nondisclosure going to "the certificates' very formation"). The Court has already seen through Clearwater's mischaracterization of these kind of rulings. *See, e.g.*, Tr. at 1453:19-22 (the Court: "[W]e have looked at those cases and I concur. I don't see a case where the utmost duty of good faith comes in where they [Clearwater] want it to come in.").

Nor does *Munich II* aid Clearwater. According to Clearwater, that court "concluded that Utica *could* be found to have breached the duty of good faith *simply* by billing its reinsurer for amounts that were not due." Dkt. 258-1 at 29. The Second Circuit held no such thing. It merely remanded for further proceedings because it stated that an erroneous jury instruction about Utica's claims may have tainted the jury's conclusion on Century's good faith counterclaim. *Munich II*, 2021 WL 3197017, at *10. The Second Circuit thus had no occasion to rule on the standard for a reinsurer to establish that a cedent acted in bad faith. And it certainly did not purport to reject its prior decisions holding that negligence is not enough to show bad faith, and that "recklessness" or "deliberat[e] . . . deception" are required. *Unigard*, 4 F.3d at 1069.

Clearwater's second complaint is that the Court erred by instructing the jury that Clearwater had to show that any "failure to disclose information to it caused Clearwater prejudice," i.e., "economic harm." Dkt. 258-1 at 27-28. That instruction also reflected the law. *See N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1215 (3d Cir. 1995) (applying New York law and ruling that "to establish a breach of the duty of good faith, CIGNA Re must prove that it suffered economic injury because of North River's allegedly grossly negligent or reckless conduct.").

Clearwater's cases are not to the contrary. *Granite State* involved late notice, an issue not

33

present here. *See* Tr. at 435:8-10; *Granite State Ins. Co. v. Clearwater Ins. Co.*, No. 09 Civ. 10607, 2014 WL 1285507, at \*21 (S.D.N.Y. Mar. 31, 2014). *Allendale Mut. Ins. Co. v. Excess Ins. Co.* involved pre-contract disclosures, which the Court has already found irrelevant. 992 F. Supp. 278, 282 (S.D.N.Y. 1998).

Clearwater's third grievance is that the Court erred by instructing the jury that the "duty of utmost good faith does not require Utica to put Clearwater's interests ahead of its own interest." Dkt. 258-1 at 28-29. Again, this was accurate: "Cedents are not the fiduciaries of reinsurers, and are not required to put the interests of reinsurers ahead of their own." *U.S. Fid. & Guar. Co. v. Am. Re-Insurance Co.*, 20 N.Y.3d 407, 420 (2013) (*USF&G*). *USF&G* ruled that when several options are available, a cedent may "choose the one most favorable to itself." *Id.* at 421. In response, Clearwater cites an unpublished district court case asserting that a cedent must "protect its reinsurers' interests as if they were the cedent's own." *Associated Indus. Ins. Co. v. Excalibur Reinsurance Corp.*, No. 13 Civ. 8239, 2014 WL 6792021, at \*6 (S.D.N.Y. Nov. 26, 2014). But that case cited nothing for this proposition and did not address *USF&G*, the controlling "law from [the] state's highest court." *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir. 2000).

### 4.   The Court Correctly Instructed the Jury About the Consequence of Available Means of Verification.

Clearwater challenges the Court's instruction that "Clearwater may not establish that Utica failed to perform because of any alleged misrepresentation or nondisclosures by Utica if Clearwater failed to make use of the means [of] verification that were available to it." Dkt. 258-1 at 30-31 (emphasis omitted). This instruction adhered to New York law: "a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were

available to it, such as reviewing the files of the other parties." *See UST Priv. Equity Inv'rs Fund, Inc. v. Salomon Smith Barney*, 733 N.Y.S.2d 385, 386 (N.Y. App. Div. 2001) (dismissing fraud claim because plaintiffs did not request or carefully review documents in due diligence).

Clearwater argues that *UST Private* does not apply because it does not involve the duty of utmost good faith. But again, the courts have not extended that duty from the pre-contracting context to the post-contracting situation here. *Cf.* Dkt. 258-1 at 30-31 (citing decisions involving pre-contract failures to disclose). Thus, the post-contracting disclosure duties that apply here are the generally applicable ones described in *UST Private*. Thereunder, a party cannot rely on its own willful blindness to information it had the ability to obtain.

### 5. The Court Correctly Instructed the Jury About Substantial Performance.

Clearwater says the Court's substantial performance charge was improper because substantial performance does not apply to the duty of utmost good faith. Dkt. 258-1 at 31-32. But its authorities do not support that proposition. Even if the utmost good faith prohibits "concealment or deception, *however slight*," *id.* at 32, that would not mean a party cannot substantially perform these obligations despite innocent errors. The same is true for the supposed lack of an "intent" requirement or the purported basic obligation to "volunteer all material facts." *Id.* These requirements are simply separate from whether the basic, Contracts-101 principle of substantial performance applies here. Clearwater cites no authority otherwise.

Clearwater fares no better in its assertion that the charge lacks "factual support in the record [and] does not fairly summarize Clearwater's theory of how Utica violated its duty of utmost good faith or Utica's defense thereto." Dkt. 258-1 at 32. That is wrong. Clearwater's entire disclosure theory was based on the idea that Utica should have disclosed the aggregate-limit issue earlier. Indeed, Utica disclosed the primary policies to Clearwater in 2006 and the

aggregate-limit dispute to Clearwater in July 2013 before this case even started. Dkt. 248-1 at

18-20 (cataloguing undisputed evidence supporting that statement); Tr. at 1580:2-3 (Clearwater's

closing argument reaffirming that "Clearwater learned what it needed to learn at the audit[] in

2013"). Yet Clearwater persisted in arguing that Utica breached its supposed disclosure

obligations. That argument makes sense only if Clearwater believed that Utica should have made

those disclosures before July 2013. Indeed, Clearwater expressly based its arguments on the

timing of the disclosures. *See, e.g.*, Tr. at 1531:17-20 ("What was Utica . . . telling the reinsurers

in this critical time frame [early 2003 to February of 2007]"?); *id.* at 1546:6-9 ("[T]he fight

between Utica and Goulds goes on all through 2006. No other letters, no emails, no other

communications with reinsurers in this critical time frame."); *id.* at 1547:4, 1560:23-1561:6,

1580:7-9. Thus, the substantial performance instruction and accompanying timing aspect were

consistent with the parties' theories and the evidence.

### D.    Clearwater's Jury Instruction Arguments Face Two Other Problems.

Finally, even if Clearwater's jury-instruction arguments were correct, the Court should

not grant Clearwater relief for two other reasons. First, as Utica's Rule 50(a) brief explained,

Clearwater did not challenge on appeal this Court's summary judgment ruling based on the duty

of utmost good faith, and thus forfeited the chance to do so. *See* Dkt. 248-1 at 13–15. Second, the

Second Circuit identified specific issues for this Court to determine on remand, and Clearwater's

arguments about the duty of utmost good faith was not among them. *See id.* at 16.

## VII.   The Verdict Form Was Proper.

In a brief paragraph, Clearwater also suggests that the verdict form improperly failed to

ask about "whether Utica had proven that it was liable to Goulds under the umbrella policies for

each and every component of the amounts sought by Utica." Dkt. 258-1 at 35-36. As examples,

Clearwater faults the verdict form for failing to ask about "orphan shares and reset and additional

umbrella limits." *Id.* at 36. But Clearwater never requested an interrogatory on the verdict form

asking specifically about "orphan share" or "reset" or "additional umbrella limits." *See* Dkt. 245

(Clearwater's proposed verdict form); Dkt. 250 at 5-6 (Clearwater's objections to verdict form).

Any such argument is thus waived. *See* Fed. R. Civ. P. 51(c)(1); *see also Jarvis v. Ford Motor

Co.,* 283 F.3d 33, 57 (2d Cir. 2002) ("[F]ailure to object to a jury instruction or the form of an

interrogatory prior to the jury retiring results in a waiver of that objection." (citation and

quotation marks omitted)).

　　　　Clearwater also argues that the Court should have asked the jury question no. 5 from its

own proposed verdict form, which asks if Utica established "that the amounts it now seeks to

recover from Clearwater under the 1978-81 reinsurance contracts represent only Clearwater's

proportional share of Utica's proven liability under the 1978 to 1981 umbrella policies that Utica

issued to Goulds?" Dkt. 245 (Question 5). This question was unnecessary, as Clearwater never

disputed the proportional share it owed under the Reinsurance Contracts. *See* Dkt. 191 at 8

(Clearwater's trial brief reciting the proportional share it owed under each Reinsurance

Contract). Nor did it ever contend that the amounts Utica billed, which the parties stipulated (Ex.

N), inaccurately calculated Clearwater's proportional share. The Court thus properly declined to

pose Clearwater's question no. 5 to the jury.

　　　　Moreover, the verdict form did ask the jury about Utica's damages, which would have

encapsulated orphan shares, any excessive proportional share, and any other amounts for which

Clearwater believed Utica was not liable. Thus, those issues were accounted for on the verdict

form because the jury could have reduced Utica's damages accordingly if they were not due.

## VIII.　Clearwater's Prejudgment Interest Challenge Fails.

　　　　Clearwater says running prejudgment interest from December 2, 2012, the date the jury

chose, "runs afoul of New York law." Dkt. 258-1 at 36. This argument is waived and mistaken.

### A.    Clearwater's Prejudgment Interest Challenge is Waived.

At trial, Clearwater asked to have the jury decide the date from which prejudgment interest should run. Tr. at 1467-72. The Court agreed, Dkt. 251 at 3, adopting a jury instruction and a verdict-form question that tracked Clearwater's proposed instruction nearly verbatim. Dkt. 242 at 37; Tr. at 1684:11-24; Dkt. 251. Clearwater hoped the jury would find that Utica was damaged, if at all, long after Utica submitted its bills to Clearwater. *See* Tr. at 1471:21-1472:1. That gambit backfired, as the jury found that Utica suffered damages 30 days after its first unpaid bill. Dkt. 251 (Question 7). Having lost with the jury, Clearwater now argues that the jury's finding—based on the legal standard Clearwater itself requested—should be vacated. But whether this argument is analyzed under Rule 59 or Rule 50(b), it is waived.

Utica's litigation with Century illustrates Clearwater's waiver. There, as here, the dates used to calculate interest "were selected by the jury in response to" a question on the verdict form. *Utica Mut. Ins. Co. v. Century Indem. Co.*, 419 F. Supp. 3d 449, 453 (N.D.N.Y. 2019), *rev'd on other grounds by Munich II*. Century responded by arguing, as Clearwater does here, that "the [judgment] awarded Utica too much pre-judgment interest" and must be amended. *Id.* at 452. Judge Hurd declined to "discard [the] jury's factual determination about the correct date," because "Century received plenty of notice that the Court planned to resolve this issue by asking the jury to decide it," yet failed to object. *Id.* at 456. So too here.

### 1.    Any Challenge Under Rule 59 to the Jury Instructions or Verdict Form is Waived.

To preserve a challenge to the jury instructions or verdict form, Clearwater needed to "stat[e] distinctly the matter objected to and the grounds for the objection" before the case's submission to the jury. Fed. R. Civ. P. 51(c)(1). "[F]ailure to object to a jury instruction or the form of an interrogatory prior to the jury retiring results in a waiver of that objection." *Jarvis,*

283 F.3d at 57 (citation and quotation marks omitted). But far from objecting to the jury

instructions on prejudgment interest, Clearwater proposed them. *See* Dkt. 242 at 37; *see also* Tr.

at 1467-72. The Court adopted Clearwater's proposal nearly verbatim:

| Clearwater's Proposed Instruction (Dkt. 242 at 37) | Court's Instruction (Tr. at 1684:12-21) |
|---|---|
| Both parties seek an award of prejudgment interest from the date of their damage to the date of the judgment. If you award damages to either party, you must specify the date on which their damages were suffered so interest can be properly calculated. | Both parties seek an award of prejudgment interest from the date of their damage to the date of the judgment. You don't have to worry about the date of the judgment but do you have to worry about the date of the damage. If you award damages to either party, you must specify the date on which their damages were suffered so that interest can be properly calculated from that date. |
| The law provides that interest is to be awarded from the date or dates that payments became due. If you find in favor of Utica on any of its claims, then you must also decide the date or dates on which payments became due. | The law provides that interest is to be awarded from the date or dates that payments became due. If you find in favor of Utica on its breach of contract claim, then you must also decide the date on which the payment became due. |

Before instructing the jury, the Court informed the parties of the instructions it intended to give,

and Clearwater filed numerous written objections. None mentioned prejudgment interest. *See*

Dkt. 250; *see also* Tr. at 1689:8-10 (Clearwater's counsel agreeing that its written objection

"fairly states [its] objections to the charge").

Clearwater thus requested the very instruction the Court later adopted, and never

indicated any dissatisfaction with it. As a result, Clearwater waived any objection to that

instruction, even for plain error review. *See Ruocco v. Hemmerdinger Corp.*, 711 F. App'x 659,

663 (2d Cir. 2017) (explaining that a party's "endorsement" of a proposed jury instruction to

which it later objects is "a true waiver, negating even plain error review") (citation and quotation

marks omitted); *United States v. Johnson*, 265 F. App'x 8, 10 (2d Cir. 2008) (similar); *see also*

*Century*, 419 F. Supp. 3d at 457.

Clearwater similarly waived any objection to the verdict form. Question No. 7 asked the jury to determine "[o]n what date did Utica suffer damages." Dkt. 251. Again, the Court informed the parties that this question would be included on the verdict form, and again Clearwater's numerous written and oral objections said nothing about this. Dkt. 250 at 5-6.

Clearwater may argue that Question No. 7 should have asked for multiple dates, rather than "a single date." *See* Dkt. 258-1 at 36. But Clearwater cannot complain that the Court posed a question to the jury using language that Clearwater itself proposed. *Compare* Dkt. 242 at 37 (Clearwater proposing: "you must specify *the date* on which their damages were suffered"), *with* Dkt. 251 (Question 7) (Court's verdict form asking: "[o]n what date did Utica suffer damages?"). And while Clearwater's proposed instruction also included references to a "date or dates," this language similarly contemplated that a single date may be appropriate. Dkt. 242 at 37.

Nor did Clearwater's proposed verdict form suggest that the jury be tasked with finding multiple dates on which Utica *suffered damages*. Dkt. 245. Clearwater's form asked for "the precise dates on which Utica provided Clearwater *sufficient proof* that the amounts awarded by you were due." *Id.* at 4 (emphasis added). But that question asks when Utica provided a sufficient proof of loss, not when Utica suffered damages.

In any event, "a party may not rely on her submission of . . . a requested instruction [or verdict question] to preserve an objection." *Emamian v. Rockefeller Univ.*, 971 F.3d 380, 387 (2d Cir. 2020) (quotation marks omitted). A party can object to a failure to give an instruction or pose a verdict question only "if that party properly requested it and—unless the court rejected the request in a definitive ruling on the record—also properly objected." Fed. R. Civ. P. 51(d)(1)(B); *see Cash v. Cnty. of Erie*, 654 F.3d 324, 340 (2d Cir. 2011) (Rule 51 governs an "objection to the form or substance of questions on a special verdict form"). As noted, Clearwater's written

objections said nothing about prejudgment interest, let alone multiple dates. *See* Dkt. 250.

Further, when discussing the jury instructions with the Court, Clearwater's counsel repeatedly referred to the jury finding a single date. *See* Tr. at 1468:20-24 ("[W]e've suggested that there are several reasons why *the date*, time or place when those damages were certain is up in the air." (emphasis added)); *id.* at 1469:4-8 ("[M]aybe [the jury] will decide that the allocation occurred on *a particular date* and time." (emphasis added)). These statements suggested that, far from objecting to a question about a singular date, Clearwater was advocating it. Clearwater thus did not preserve an objection that the Court should have asked the jury about multiple dates.

Clearwater's new emphasis on New York's "reasonable intermediate date" standard comes too late. Not only is this just one option to calculate prejudgment interest, N.Y. C.P.L.R. § 5001(b), but Clearwater's proposed instructions said nothing about it, instead declaring that "interest is to be awarded from the date or dates that payments became due." Dkt. 242 at 37. Clearwater cannot now argue that the jury should have been instructed to choose a reasonable intermediate date instead. *See Century*, 419 F. Supp. 3d at 457. Nor did Clearwater propose such a question for the verdict form or object to its absence. This argument is thus waived.

### 2.      Any Rule 50(b) Motion on Prejudgment Interest Is Waived.

Alternatively, Clearwater may be asking the Court to enter judgment as a matter of law under Rule 50(b) on the ground that the jury's finding on the date Utica suffered damages lacked a "legally sufficient evidentiary basis" under New York law. Fed. R. Civ. P. 50(a)(1). As explained below, the jury's decision is consistent both factually and legally with New York law. Regardless, Clearwater failed to raise this issue in its Rule 50(a) motion. *See* Dkt. 247. Consequently, the motion may not properly be granted "except to prevent manifest injustice," which exists only if the verdict is "wholly without legal support." *ING Glob.*, 757 F.3d at 97. As explained next, Clearwater cannot meet this standard.

41

**B.      The Jury's Finding that Utica Suffered Damages on December 2, 2012 Is Supported by the Evidence and New York Law.**

Waiver aside, the evidence supports the jury's finding that Utica suffered damages on December 2, 2012, and New York law supports using that date to calculate prejudgment interest.

First, the jury's determination that Utica suffered damages on December 2, 2012 has ample evidentiary support. Utica's first unpaid billing was sent on November 2, 2012. Ex. N (P-329A – stipulated list of bills). Utica witness Jim McKay testified that in the reinsurance industry, payment is considered timely if made within 30 or 60 days of billing. Tr. at 987:3-18. Thus, evidence supported the jury's finding that Utica suffered damages when Clearwater failed to pay the November 2, 2012 within 30 days. At the very least, that factual determination was not a "manifest injustice" wholly without support. *ING Glob.*, 757 F.3d at 97.[9]

Second, New York law supports calculating prejudgment interest from this date. For example, the Southern District of New York has held that, when applied to reinsurance billings, N.Y. C.P.L.R. § 5001 allows the calculation of interest from the single date when a loss was first billed, even though some amounts were billed later. *Aetna Cas. & Sur. Co. v. Home Ins. Co.*, 882 F. Supp. 1328, 1353-54 (S.D.N.Y. 1995). In *Aetna*, the cedent submitted a demand for payment to its reinsurer on three facultative certificates dating from 1972-74. *Id.* at 1354 & n.19. The cedent did not demand payment under a fourth facultative certificate for the 1976 year until approximately three years later. *Id.* at 1354. The court held that the reinsurer's failure to respond to the initial demand for payment constituted an anticipatory repudiation of the same set of claims for the 1976 policy year. *Id.* The court thus calculated interest for the 1976 year based on

---

[9] Clearwater claims Utica failed to "prove the dates when Clearwater received all of Utica's bills." Dkt. 258-1 at 39. The evidence is otherwise. P-329A (Ex. N) identified the date of each billing. *See also* Tr. at 594:13-23 (testifying that P-329A "reflect[s] the billing dates"); Tr. at 1098:16-21 (testifying that P-329A was "a summary of the bills that have been sent to Clearwater"). Clearwater introduced no evidence to the contrary.

the date of the demand for payment on the 1972-74 policy years. *Id.*

As *Aetna* shows, a reinsurer can be liable for interest on the entire amount of a claim once it has repudiated its obligation to pay that claim. By finding that Clearwater damaged Utica as of December 2, 2012, the jury necessarily also found that Clearwater repudiated its obligation to pay as of that date. As in *Aetna*, that makes December 2, 2012, an appropriate date from which to calculate prejudgment interest.

Independently, where damages arise from multiple bills over time, New York law allows a court to calculate interest from a "reasonable intermediate date" and grants "wide discretion" to select that date. *Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 435 (S.D.N.Y. 2004) (citation and quotation marks omitted). That discretion extends to selecting a point that is not the median date among a series of bills, and is not the date by which half of the damages had been incurred. *Id.* at 435-36 (selecting the date the parties ended a factoring agreement as a reasonable intermediate date amongst a "sampling of dates" when damages were incurred, even though it was not the midpoint). December 2, 2012, is also an appropriate date from that perspective.

Clearwater disagrees, because December 2, 2012 is the date of Clearwater's *first* unpaid bill. Dkt. 258-1 at 37. But that argument ignores Clearwater's delay in making pre-suit payments on bills that had been issued long before December 2012. In particular, Utica first billed Clearwater on numerous dates between June 22, 2011, and June 27, 2012. Clearwater left those earliest billings unpaid for up to 17 months, before making an initial payment on November 9, 2012. Ex. N (P-329A); *see also* Ex. 12 (P-70). Under New York law, the Court could award interest under § 5001 for Clearwater's delay in making these pre-suit payments. *Lupoli v. Venus Labs., Inc.*, 287 A.D.2d 488, 489 (N.Y. App. Div. 2001) (plaintiff was not entitled to interest on a pre-suit payment of $200,000 "for the period after he received those funds," but leaving intact

interest award for the period before the payment was made); *Peachy v. Rosenzweig*, 215 A.D.2d 301, 302 (N.Y. App. Div. 1995) (remanding for calculation of interest under § 5001 on entire award, even though part was offset by a rent abatement); *see also Oy Saimaa Lines Logistics, Ltd. v. Mozaica-N.Y., Inc.*, 193 F.R.D. 87, 91 (E.D.N.Y. 2000) (awarding interest under § 5001 on pre-suit payments that were "overdue for at least a year and a half"). Accordingly, the range of potential dates from which to calculate interest was from June 22, 2011 through May 3, 2016. December 2, 2012 is a "reasonable intermediate date" between those two points.

Finally, Clearwater's argument ignores that N.Y. C.P.L.R. § 5001(c) requires deference to a jury's finding on interest. Reviewing courts are "extremely reluctant . . . to set aside the jury's fact-finding" on this topic. *Century*, 419 F. Supp. 3d at 458. Clearwater cites no case tossing out a jury finding on the date for calculating interest, and Utica has not found one. *See id.* at 456 ("Not a single one of the cases cited by Century . . . discard a jury's factual determination about the correct date in favor of a different one selected by the court."). For all of these reasons, using December 2, 2012, to calculate prejudgment interest is not a "manifest injustice" wholly without legal support under New York law. *ING Glob.*, 757 F.3d at 97.

### C.     In the Alternative, the Court Should Amend, Rather than Vacate, the Prejudgment Interest Award.

Clearwater contends that if the Court finds any error in using December 2, 2012, to calculate interest, it should forego awarding any interest as punishment for Utica's "misconduct." Dkt. 258-1 at 38-39. But Utica did nothing wrong. *Clearwater* fought to put the interest question to the jury, and now seeks to "throw out a . . . specific factual finding[ ] made by the jury because it thinks the results unpleasant." *Century*, 419 F. Supp. 3d at 457. Clearwater's backfired tactics are not a reason to punish Utica.

In any event, Clearwater cites no case supporting the total elimination of any interest

recovery. Nor would such a result be appropriate under New York law, which treats an award of prejudgment interest for a breach of contract as "mandatory." *See Spector v. Mermelstein*, 485 F.2d 474, 482–83 (2d Cir. 1973); *Spodek v. Park Prop. Dev. Assocs.*, 759 N.E.2d 760, 762 (N.Y. 2001) (explaining that "the purpose of awarding interest is to make an aggrieved party whole"). This mandatory right cannot be waived even by "a plaintiff's failure to pursue his request for prejudgment interest during the trial or even to demand such interest in his complaint." *Mallis v. Bankers Tr. Co.*, 717 F.2d 683, 694 (2d Cir. 1983). This settled law leaves no room to deny *any* prejudgment interest, even if the December 2, 2012 date is incorrect.

Thus, if the Court finds that prejudgment interest should not run from December 2, 2012, it should amend the judgment to award interest from another appropriate date.

Utica proposes as an alternative that interest be awarded from September 20, 2013—the date this action was filed. *See Conway v. Icahn & Co.*, 16 F.3d 504, 512 (2d Cir. 1994) (holding that where a court cannot determine a single reasonable intermediate date, the lawsuit's "date of commencement is appropriate"). Or, as another alternative, December 16, 2013, is the median date between thirty days after Utica's first bill on June 22, 2011, and thirty days after the final bill on May 3, 2016, and would also be an appropriate date from which to calculate prejudgment interest. *See* Ex. N.

## Conclusion

For these reasons, the Court should deny Clearwater's motion. Alternatively, if the Court concludes that prejudgment interest cannot run from December 2, 2012, it should amend the judgment to award interest from either September 20 or December 16, 2013.

45

Dated: August 26, 2021

/s/ Thomas D. Cunningham

Syed S. Ahmad (N.D.N.Y. Bar No. 602911)      Daniel R. Thies (Pro Hac Vice)
HUNTON ANDREWS KURTH LLP                      WEBBER & THIES PC
2200 Pennsylvania Avenue, NW                  202 Lincoln Square
Washington, DC 20037                          Urbana, IL 61803
(202) 955-1500                                (217) 365-5327
Fax: (202) 862-3619                           Fax: (271) 367-3752
sahmad@HuntonAK.com                           danielthies@webberthies.com

Thomas D. Cunningham (Pro Hac Vice)           Phillip G. Steck
SIDLEY AUSTIN LLP                             COOPER ERVING & SAVAGE LLP
One South Dearborn Street                     39 North Pearl Street
Chicago, IL 60603                             Albany, NY 12207
(312) 853-7000                                (518) 449-3900
Fax: (313) 853-7036                           Fax: (518) 432-3111
tcunningham@sidley.com                        psteck@coopererving.com

*Counsel for Utica Mutual Insurance Company*

## APPENDIX

## Defense Costs Provisions

|  | 1973 Umbrella (Ex. 2 at 6) & 1974 Endorsement (Ex. 3 at 1) (emphasis added) | 1978-81 Umbrellas (Ex. W at 2, 4) (emphasis added) |
|---|---|---|
| **Insuring Provision** | [Utica agrees] to pay on behalf of the Insured **the ultimate net loss which the insured may sustain** by reason of liability imposed upon the insured . . . . | [Utica agrees] to pay on behalf of the insured **all sums in excess of the retained limit** which the insured shall become legally obligated to pay . . . . |
| **Definition of the Retained Limit Above Which the Umbrella Applies** | III. Underlying Limit—Retained Limit<br><br>[Utica] shall be liable only for the ultimate net loss resulting from any one occurrence in excess of either<br><br>(a) the amounts of the applicable limits of liability of the underlying insurance as stated in the Schedule of Underlying Insurance Policies less the amount, if any, by which any aggregate limit of such insurance has been reduced by payment of loss . . . or<br><br>(b) if the insurance afforded by such underlying insurance is **inapplicable to the occurrence**, the amount stated in the declarations as the retained limit. | (j) Retained limit means as to each occurrence **with respect to which insurance is afforded under this policy**:<br><br>(1) if an underlying policy is also applicable or would be applicable but for breach of policy conditions; the relevant "each person," "each accident," "each occurrence" or similar limit of liability stated therein (less any reduction thereof by reason of an overriding aggregate limit of liability) plus all amounts payable under other insurance, if any;<br><br>(2) if any underlying policy otherwise applicable **is inapplicable by reason of exhaustion of an aggregate limit of liability**; all amounts payable under other insurance, if any; or<br><br>(3) if neither paragraphs (1) or (2) above apply and<br>  (a) the insured has other insurance: all amounts payable under such other insurance . . ., or<br>(b) the insured has no other insurance; the amount stated in the declarations as the insured's retention. |
| **Defense Costs Provision** | With respect to any **occurrence not covered by** the underlying policy(ies) of insurance described in the schedule of underlying insurance . . . , but covered by terms and conditions of this policy **except for the amount of** | With respect to any **occurrence not covered by** the policies listed in the schedule of underlying insurance . . . , but covered by the terms and conditions of this policy **(including damages wholly or partly within the amount of** |

|  | **retained limit specified in item 3 of the declarations** [Utica] shall:<br><br>(a) defend any suit against the insured . . . . [and]<br><br>(d) reimburse the insured for all reasonable expenses . . . ; | **the retained limit)**, [Utica] shall:<br><br>(a) defend any suit against the insured . . . . [and]<br><br>(d) reimburse the insured for all reasonable expenses . . . ; |
|---|---|---|
| **Ultimate Net Loss Definition** | Ultimate Net Loss shall mean the total sum which the insured . . . becomes obligated to pay . . . **as a consequence of any occurrence covered hereunder . . . .** | None |

## **CERTIFICATE OF SERVICE**

I certify that on August 26, 2021, the foregoing was served on counsel of record by ECF.


By: */s/ Thomas D. Cunningham*
    Thomas D. Cunningham

    Thomas D. Cunningham (Pro Hac Vice)
    SIDLEY AUSTIN LLP
    One South Dearborn Street
    Chicago, IL 60603
    (312) 853-7000
    Fax: (313) 853-7036
    tcunningham@sidley.com

    *Counsel for Utica Mutual Insurance Company*